Jay Edelson (*pro hac vice* admission to be sought)
jedelson@edelson.com
Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370

Todd Logan (SBN 305912)
tlogan@edelson.com
Brandt Silverkorn (SBN 323530)
bsilverkorn@edelson.com
Aaron Lawson (SBN 319306)
alawson@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| DEIDRE RUSHLOW,<br>*Plaintiff*,<br>v.<br>SAMUEL ALTMAN, an individual, OPENAI FOUNDATION, a Delaware corporation, OPENAI OPCO, LLC, a Delaware limited liability company, and OPENAI GROUP PBC, a Delaware public benefit corporation,<br>*Defendants*. | Case No.: 3:26-cv-09344-JSC<br>**FIRST AMENDED COMPLAINT FOR:**<br>**(1) Negligence;**<br>**(2) Negligent Entrustment;**<br>**(3) Aiding and Abetting a Mass Shooting;**<br>**(4) Negligence;**<br>**(5) Negligent Undertaking;**<br>**(6) Negligence;**<br>**(7) Strict Product Liability;**<br>**(8) Strict Product Liability; and**<br>**(9) Negligent Infliction of Emotional Distress.**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff Deidre Rushlow brings this First Amended Complaint and Demand for Jury Trial against Defendants Samuel Altman, OpenAI Foundation, OpenAI OpCo, LLC, and OpenAI Group PBC (collectively, "OpenAI"), and alleges as follows upon personal knowledge as to herself and her own acts and experiences, and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1. In June 2025, eight months before the Tumbler Ridge massacre, OpenAI's automated safety systems flagged the ChatGPT account of seventeen-year-old Jesse Van Rootselaar for conversations "describing scenarios involving gun violence" and escalated it for human review.

2. That review was conducted by members of OpenAI's Intelligence and Investigations Team, a specialized unit of experienced threat-assessment and counterterrorism professionals with backgrounds in national intelligence, security analysis, and risk management. OpenAI created this team specifically to investigate "Violent Activities" and charged it with determining whether users are "planning to harm others." Their entire job is to distinguish online fantasy from operational planning.

3. Van Rootselaar's ChatGPT use revealed [redacted] Van Rootselaar's ChatGPT use also revealed a deeply flawed and dangerous product, [redacted]

4. The record available to OpenAI's reviewers left no doubt that Van Rootselaar posed a danger to those around her. [redacted]

5. These conversations were merely a prelude to further ChatGPT usage that made clear that [redacted]

[redacted]

(Figure 1) (Figure 2)

6. [redacted]

7. [redacted] shown below in Figure 3:

[redacted]

(Figure 3)

8. [redacted]

9. [redacted]

[redacted]

10. [redacted]

11. OpenAI's trained personnel saw this ChatGPT usage for what it was: [redacted] They recommended that the account be referred to the Royal Canadian Mounted Police ("RCMP") [redacted]. But that recommendation was rebuffed, twice over. OpenAI understood that a law enforcement recommendation posed economic and reputational risks. Alerting the RCMP would have required turning over chat logs establishing that [redacted], exposing the company to catastrophic liability and threatening its public valuation. As a former member of the Intelligence and Investigations Team later disclosed, OpenAI was reluctant to make law enforcement referrals because reporting users "forces them to share information about how their product is potentially exacerbating the threat environment." OpenAI's leaders were simply unwilling to call the police on their own product.

12. The record available to OpenAI's reviewers also revealed serious flaws in their flagship product. [redacted]

[redacted]

13. The review also exposed a second, systemic failure: ChatGPT's built-in safeguards were completely broken. [redacted]

14. By the time Van Rootselaar's account was reviewed, ChatGPT had already assisted with several instances of mass violence, including the shooting at Florida State University ("FSU"). OpenAI therefore was confronted with hard evidence that its product was encouraging and assisting in the commission of violent acts. And not only did OpenAI refuse to report Van Rootselaar to law enforcement, but they also refused to make any changes to their product to

prevent it from continuing to facilitate violence going forward.

15. Instead, OpenAI simply closed Van Rootselaar's flagged account, kept what it had seen a secret, and continued marketing the same defective ChatGPT product as "[y]our everyday AI assistant" to families and children as young as thirteen.

16. But OpenAI knew or should have known that closing one account would not keep Van Rootselaar off ChatGPT. She had registered a second account [redacted]. OpenAI chose not to investigate whether Van Rootselaar had a second ChatGPT account, or to investigate whether she had continued to use ChatGPT. So [redacted] after her first account was deactivated, Van Rootselaar logged back in.

17. Among her first activities on this second account was [redacted] and OpenAI took no action.

18. [redacted]

19. [redacted]

[redacted]

20. [redacted]

21. [redacted]

22. [redacted] That was its last message to her.

23. [redacted] Van Rootselaar carried out the massacre [redacted]. She murdered her mother and eleven-year-old brother at home, then drove to Tumbler Ridge Secondary School with a shotgun, a modified rifle, tactical gear, and [redacted]. Inside, she carried out the attack [redacted]. She wore a body camera and attempted to start a livestream [redacted]

[redacted]. She fired her shotgun through locked classroom doors, hunted children where they hid, set off a homemade explosive [redacted], fired on responding police officers, and took her own life before she could be apprehended. Van Rootselaar murdered five children and an education assistant and left a twelve-year-old girl with a catastrophic brain injury.

24. Deidre Rushlow, a grade 7 teacher at Tumbler Ridge Secondary School, was in her classroom when the shooting began. Earlier that period, she had sent her class to the library with an educational assistant where Van Rootselaar would, minutes later, kill several of those children and her colleague. When she first heard the gunfire and screams of terrified children from down the hall, she locked the door and hid her remaining students under her desk, including her nephew. She called the library and texted her educational assistant to make sure the children there were safe, but there was no response. Moments later, Van Rootselaar reached her room, found it locked, and fired several shotgun blasts through it. Van Rootselaar then walked around to the back door and fired several more shots. The bullets struck the wall behind her and her students' heads. She texted her husband a final goodbye, certain she was about to die. The trauma Deidre experienced is severe and lasting, and will haunt her for the rest of her life. Deidre was within the zone of physical danger created by OpenAI's conduct, and she knew it in real time. The terror she experienced that day was severe, foreseeable, and the direct result of OpenAI putting a product on the market that it knew was being used to plan mass violence.

25. Accordingly, Plaintiff brings this action to hold Sam Altman and OpenAI accountable for designing a dangerous and defective product, ignoring their safety team, refusing to notify authorities that their user was planning [redacted], refusing to fix the product after gaining firsthand knowledge that its safeguards completely failed, allowing Van Rootselaar to continue using ChatGPT on a second account, and choosing corporate valuation over the lives of the children of Tumbler Ridge.

## PARTIES

26. Plaintiff Deidre Rushlow is a resident of Tumbler Ridge, British Columbia, Canada. She is a citizen of Canada.

27. Defendant Samuel Altman is a natural person residing in San Francisco, California.

He is a citizen of California. As co-founder and Chief Executive Officer of OpenAI, Altman directed the design, development, safety policies, and deployment of ChatGPT. In 2024, Altman knowingly accelerated GPT-4o's public launch and bypassed safety protocols to do so.

28. Defendant OpenAI Foundation (formerly known as OpenAI, Inc.) is a Delaware corporation with its principal place of business in San Francisco, California. At all relevant times, OpenAI Foundation was the nonprofit parent entity that governed the OpenAI organization and exercised oversight over its for-profit subsidiaries, including OpenAI OpCo, LLC. As the governing entity, OpenAI Foundation was responsible for defining the organization's safety mission, establishing its risk-management framework, and publishing the official "Model Specifications" that set the policies and requirements applicable to the development and deployment of OpenAI's artificial intelligence models.

29. Defendant OpenAI OpCo, LLC is a Delaware limited liability company with its principal place of business in San Francisco, California. OpenAI OpCo, LLC is the for-profit operating entity within the OpenAI corporate structure, responsible for the development, deployment, and commercialization of the defective product at issue. OpenAI OpCo, LLC managed and operated the ChatGPT product that Van Rootselaar used to plan her attack, including the infrastructure and systems through which [redacted], and OpenAI's other models were delivered to end users. On information and belief, the members of OpenAI OpCo, LLC include OpenAI Foundation, a Delaware nonprofit nonstock corporation with its principal place of business in California. On information and belief, tracing through each tier of ownership to its ultimate natural-person and corporate members, no member of OpenAI OpCo, LLC is a citizen or subject of Canada.

30. Defendant OpenAI Group PBC is a Delaware public benefit corporation with its principal place of business in San Francisco, California. OpenAI Group PBC was formed on October 28, 2025, as part of a corporate restructuring consolidating OpenAI's for-profit operations. On December 31, 2025, OpenAI Holdings, LLC, the for-profit holding entity that owned the core intellectual property underlying GPT-4o and the other commercial models at issue, merged into OpenAI Group PBC and ceased to exist. As successor to OpenAI Holdings, LLC and

the other predecessor for-profit entities, OpenAI Group PBC is liable for their conduct; it designed, deployed, and profited from ChatGPT, and continues to do so today. On May 22, 2026, OpenAI confidentially submitted a draft registration statement to the Securities and Exchange Commission for an initial public offering of, on information and belief, OpenAI Group PBC.

31. Defendants played the central roles in the design, development, approval, and deployment of the defective product at issue. OpenAI Foundation established the safety mission it failed to enforce. OpenAI OpCo, LLC built, deployed, and sold the defective product at issue. OpenAI Group PBC owns the underlying technology and is liable as the successor to the preceding for-profit entities that profited from it. Samuel Altman is named as the chief executive who personally directed the reckless strategy of prioritizing a rushed market release over the safety of vulnerable users and the public. These Defendants made the decisions that caused the harm at issue.

## JURISDICTION AND VENUE

32. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2). Plaintiff is a citizen of Canada. Defendant Altman is a citizen of California. Defendants OpenAI Foundation and OpenAI Group PBC are each incorporated in Delaware with their principal place of business in California and are citizens of Delaware and California. Defendant OpenAI OpCo, LLC takes the citizenship of its members, which, as alleged in ¶ 29, include OpenAI Foundation, a citizen of Delaware and California, and none of which is a citizen or subject of Canada. No Defendant is a citizen or subject of Canada or any other foreign state. The amount in controversy exceeds $75,000, exclusive of interest and costs.

33. This Court has personal jurisdiction over Defendants because Defendants conduct business in this District, reside in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

34. Venue is proper in this District under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to Plaintiff's claims occurred in and emanated from this District, and Defendants reside in this District.

## DIVISIONAL ASSIGNMENT

35. Pursuant to Civil L.R. 3-2(c), divisional assignment to San Francisco is appropriate, because OpenAI is headquartered in San Francisco County, and a substantial part of the events or omissions giving rise to the claim occurred in San Francisco County.

## FACTUAL BACKGROUND

### I. The Tumbler Ridge Mass Shooting and Plaintiff Deidre Rushlow's Injury.

36. On February 10, 2026, an eighteen-year-old resident of Tumbler Ridge, British Columbia carried out one of the deadliest mass shootings in Canadian history. Jesse Van Rootselaar first shot and killed her mother and eleven-year-old brother at her family home. She then drove to Tumbler Ridge Secondary School armed with a modified rifle and a long gun. Inside, she opened fire, killing five children and an education assistant, and severely wounding two others, leaving one with life-changing traumatic brain injuries from being shot in the head. After Van Rootselaar killed several victims, she lit an explosive device and threw it near the school's computer room and library, where it ignited and left blast marks. She then tried to reach other parts of the school, but locked doors stopped her, and she fired numerous shots into several of them. When police entered the school and encountered Van Rootselaar, she fired on the officers, then retreated into an empty room and shot and killed herself. Shortly before the shooting began, she had started a livestream and intended to broadcast the massacre over the internet.

37. During the shooting, children hid under desks, in bathroom stalls, and in storage closets, praying Van Rootselaar would not find them. Many watched their classmates and an educator get shot at close range. Some pulled the injured and the dead into their hiding places, careful not to leave trails of blood that could lead Van Rootselaar to them. Parents were later asked to identify their children by their clothing, because the gunshots had left little else for them to recognize. The survivors, including students, teachers, and parents, are living with physical and psychological injuries that will never fully heal.

38. Deidre Rushlow was inside Tumbler Ridge Secondary School when the shooting began. She had sent her grade 7 class to the library minutes before Van Rootselaar would kill several of those children and the educational assistant supervising them. She then locked the room

and hid her remaining students under her desk while Van Rootselaar fired several shotgun blasts through the classroom doors that struck the wall behind their heads. The trauma Deidre experienced is severe and lasting, and will haunt her for the rest of her life.

## II. OpenAI Had Actual Knowledge That ChatGPT Was [redacted] and [redacted].

39. In June 2025, OpenAI's automated systems flagged Jesse Van Rootselaar's primary ChatGPT account for what OpenAI has described as extensive activity describing scenarios involving gun violence, spanning multiple days, and routed it to the company's internal safety team for human review. OpenAI has described that review process as a specialized pipeline for users "planning to harm others," in which conversations "are reviewed by a small team trained on our usage policies and who are authorized to take action, including banning accounts," and "[i]f human reviewers determine that a case involves an imminent threat of serious physical harm to others, we may refer it to law enforcement." The following excerpts are just a small sample of Van Rootselaar's ChatGPT usage prior to June 2025.

### A. ChatGPT Knew Van Rootselaar Was [redacted].

40. ChatGPT accumulated and stored extensive information about Van Rootselaar from the time she created her first account [redacted]. For instance, [redacted]

41. Indeed, Van Rootselaar regularly discussed [redacted] She went so far as to [redacted] (Figure 1).

42. [redacted] In fact,

throughout this first account, ChatGPT would consistently [redacted]

43. Van Rootselaar also revealed [redacted], as shown below in Figure 4:

[redacted]

(Figure 4)

44. Most importantly, though, Van Rootselaar's chat logs reveal [redacted]

45. The first real warning sign flashed on [redacted]

[redacted]

46. [redacted]

47. [redacted]

**B. Van Rootselaar Told ChatGPT** [redacted]

48. Around this time, [redacted]

[redacted]

49. [redacted]

50. [redacted]

51. [redacted]

52. [redacted]

[redacted] Van Rootselaar responded:

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

53. [redacted]

54. That pattern repeated over and over:

[redacted]

[redacted]

55. [redacted]

[redacted]

56. [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

57. [redacted]

C. **Van Rootselaar Detailed Her Plans to [redacted].**

58. That same day, Van Rootselaar began discussing [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

59. Early the next morning, in the same conversation, Van Rootselaar asked, [redacted]

60. Van Rootselaar then reminded ChatGPT that [redacted]

[redacted] Twelve minutes later, she wrote:

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

61. [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

62. [redacted]

63. [redacted]

64. [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

65. As Van Rootselaar detailed her intention to [redacted]

66. [redacted]

67. [redacted]

[redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

68. Shortly [redacted], in a separate chat, she asked ChatGPT for the [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

69. [redacted]

70. [redacted]

71. [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

### III. OpenAI Knew Van Rootselaar Was Planning an Attack and Rejected Its Own Safety Team's Advice to Notify Law Enforcement.

72. These June 2025 chats triggered OpenAI's automated review system eight months before the attack. The system flagged Van Rootselaar's account and routed it to what OpenAI has publicly described as its specialized pipeline for users "planning to harm others." Under OpenAI's internal policies, these high-risk conversations "are reviewed by a small team trained on our usage policies and who are authorized to take action," including referring the matter to law enforcement "[i]f human reviewers determine that a case involves an imminent threat of serious physical harm to others."

73. OpenAI's human reviewers, members of the company's Intelligence and Investigations Team, reviewed Van Rootselaar's ChatGPT logs and recognized that she posed a danger to those around her. Multiple team members identified what they believed was a credible threat of serious physical harm to real people. These trained safety professionals, whose job was to evaluate this kind of content and assess real-world risk, concluded that the authorities must be notified and recommended contacting the RCMP.

74. The reviewers' conclusion is consistent with standard threat assessment. The FBI's Behavioral Analysis Unit teaches that people who commit targeted attacks "move along an identifiable pathway on their journey to attack," and that the level of concern depends on the "[t]otality of circumstances" rather than any single statement. On information and belief, OpenAI's reviewers applied that method. Van Rootselaar's first account showed numerous "threat enhancers" identified by the FBI:

- **Fixation.** The FBI guide flags an "increasing preoccupation with a person or a cause," including a "fixation with mass murder, weapons, or violence generally." [redacted].

- **Preparation and access to weapons.** The guide treats access to firearms and substance abuse as factors that raise concern. [redacted].

- **A history of violence.** The FBI recognizes that "the best predictor of future violence in many cases is past violence." [redacted].

- **History of suicidality.** The FBI explains that "Suicidal and homicidal violence are more closely linked than many realize. Evidence of suicidal thoughts is reflective of lost hope, and it may be accompanied by acceptance of the consequences for behaving violently toward others." [redacted].

- **Research and planning.** The guide describes "researching methods, the planned target, past offenders, and previous targeted violence incidents" as evidence that an individual has begun to actively plan mass violence. [redacted].

- **Rehearsal.** The guide treats "an actual or virtual rehearsal of any aspect of the attack" as preparation. [redacted].

### A. Company Leadership Overruled the Safety Team and Refused to Fix Flaws in Their Flagship Product.

75. Despite all of these warning signs, OpenAI leadership rejected the recommendation to alert the authorities. Company leaders apparently concluded that Van Rootselaar's case "did not meet OpenAI's threshold of 'credible and imminent' risk of physical harm." As explained below, this explanation was pretextual: OpenAI's concerns were not about the danger to those around Van Rootselaar, but about the danger to its own product and brand that a law enforcement referral would cause. But even taken at face value, this "imminence" standard is one of OpenAI's own making, and is, as this case shows, not fit for the purpose of protecting third parties from ChatGPT-assisted violence. The Intelligence and Investigations Team had determined that Van Rootselaar posed a threat to those around her; any reasonable company would have agreed and alerted law enforcement based on the information available to OpenAI.

76. The Intelligence and Investigations Team then asked for a second review of a handful of flagged accounts, including Van Rootselaar's, and for a reassessment of the standards for a law enforcement referral. Some on the team were concerned that the threshold for reporting

users to law enforcement was too high. This second review did prompt a law enforcement referral in one additional case, but not in this one. Neither did company leadership see any need to revise their standards for when users should be referred to law enforcement. On information and belief, the refusal to change course was ratified by those at the very top of the company, including Sam Altman.

77. Neither did the company make any changes to ChatGPT. By June 2025, the company knew that people were using its product to plan and prepare for violence against real people. Some publicly known examples included:

- In January 2025, a man used ChatGPT for feedback on how to use explosives and evade surveillance before detonating a Tesla Cybertruck in front of the Trump International Hotel in Las Vegas.
- In April 2025, a twenty-year-old gunman carried out a mass shooting at FSU. Chat logs showed that the gunman used ChatGPT extensively leading up to and during the attack, including querying the system about how to fire a shotgun, the legal fates of school shooters, and when the student union would be busiest.
- In May 2025, a teenage boy in Finland used ChatGPT for nearly four months to help prepare for an attack in which he stabbed three fourteen-year-old girls at his school. Finnish authorities reported that the boy had made hundreds of chatbot queries, including research into stabbing tactics, concealment of evidence, and information on mass killings.

78. Around the same time, the company would have received additional evidence that ChatGPT was isolating users and pushing them toward violence, as two months after the non-referral decision in this case, another ChatGPT user, Stein-Erik Soelberg, killed his elderly mother in her Old Greenwich, Connecticut home before committing suicide. It was soon revealed that in the preceding months, ChatGPT had validated his belief that his mother was spying on him and had tried to poison him. Even after ChatGPT's role in this tragedy became public, OpenAI did not fix the defects that allowed ChatGPT to assist in the commission of real-world violence.

79. On information and belief, OpenAI and its leadership, including Altman, have concealed additional incidents in which ChatGPT was used to plan or execute acts of mass violence, domestic and international terrorist activity, and targeted assassinations of political leaders, corporate CEOs, and prominent public figures.

80. On information and belief, Defendants have withheld credible threats of violence from appropriate law enforcement agencies because they recognized that revealing the true extent to which ChatGPT has facilitated violence would expose them to civil and criminal liability for both the corporate entities and individual leadership. What's more, Defendants are keenly aware that disclosing to the public ChatGPT's failures and defects, including the facilitation of real-world violence, would drastically impact OpenAI's valuation, which would, in turn, put its initial public offering at risk.

**B. OpenAI Had Actual Knowledge That Its Safety Guardrails Completely Failed and Chose to Leave the Defective Product on the Market.**

81. Van Rootselaar's first account would have revealed a major reason why ChatGPT was susceptible to this sort of use: the guardrails ostensibly built into the product were not fit for purpose. First, [redacted]

[redacted]

(Figure 5)

82. Second, [redacted].

83. As to the first issue, [redacted]. [redacted]

[redacted] On information and belief, regenerating a refused response routed the request to a different, less restrictive model. OpenAI's Model Spec places platform safety rules at the top of its "chain of command" and directs the model to "refuse to help" a user who asks it to facilitate illicit behavior. [redacted].

84. [redacted]

[redacted]

85. OpenAI's publicly available content moderation tool flagged [redacted]

86. [redacted]

[redacted]

87. Second, ChatGPT had no way to enforce its own warnings. [redacted] On information and belief, OpenAI did not build ChatGPT to end a conversation, suspend an account, or hold an account for human review when its own safety systems detected violent intent.

88. [redacted]

89. [redacted]

90. Despite gaining actual knowledge of these defects during the review of Van Rootselaar's account, OpenAI did nothing to fix them. Leadership made no engineering changes, issued no software patches, and did not pull the product off the market to repair the safety filters.

91. With the knowledge and approval of company leadership, all that was done in response to the threat was deactivation of Van Rootselaar's first account, with the product being left on the market unchanged. Because OpenAI left the software untouched and did not ban Van Rootselaar across the platform, [redacted]. She used the same defects on that account to keep [redacted]

## IV. After Deactivating One Account, [redacted]

### A. OpenAI Left Van Rootselaar's Pre-Existing Second Account Active [redacted]

92. [redacted] Van [redacted]

93. When OpenAI deactivated the login associated with Van Rootselaar's primary email address on or about [redacted], it did [redacted]. Neither did it monitor its systems for further activity by Van Rootselaar. [redacted]

94. OpenAI later told the Canadian government that it had "a system in place that seeks to identify repeat policy violators, including those who have had their ChatGPT accounts shut down for violating our violent activities policy," and that Van Rootselaar opened her second account "[d]espite this detection system." Neither statement was true. [redacted] No system caught, or was designed to catch, any of it.

### B. ChatGPT Conducted a [redacted], Confirmed [redacted] and Promised [redacted].

95. [redacted]

[redacted]

96. [redacted]

**C. ChatGPT Explicitly Coached Van Rootselaar on [redacted]**

97. [redacted]

[redacted]

[redacted]

[redacted]

98. [redacted]

99. [redacted]

**D. ChatGPT Provided** [redacted]

100. [redacted]

[redacted]

101. [redacted]

102. [redacted]

103. [redacted]

[redacted]

104. [redacted]

105. OpenAI released GPT-5 on August 7, 2025, with a new form of safety training it calls "safe-completions," which "teaches the model to give the most helpful answer where possible, while still maintaining safety boundaries." When a request triggers GPT-5's safeguards, OpenAI trains it to respond with "an informative refusal with helpful and safe alternatives." This made it easier for Van Rootselaar to get the violent content she wanted. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

106. [redacted]

107. [redacted]

108. [redacted]

109. [redacted] During these same months, according to a federal criminal complaint filed in *United States v. Bryant*, No. 2:26-mj-00618 (W.D. Wash., filed Oct. 2, 2026), Van Rootselaar described

her plan in plain language to an online associate, detailing how she had taken guns from her family's gun safe, possessed a 3D-printed foregrip, and was choosing between a mall, a college, and her old high school. ChatGPT had taught her to hide those facts from its own safety filters.

110. [redacted]

[redacted]

(Figure 6)

111. [redacted]

112. [redacted]

[redacted]

113. [redacted]

114. [redacted] The FSU gunman had asked ChatGPT the same kinds of questions before his attack: [redacted]

115. [redacted]

[redacted]

### E. ChatGPT Helped Van Rootselaar [redacted]

116. [redacted]

117. [redacted]

118. [redacted]

[redacted]

(Figure 7)

119. [redacted]

[redacted]

120. [redacted]

121. [redacted]

122. [redacted]

[redacted]

123. [redacted]

[redacted]

(Figure 8)

124. [redacted]

**F. On the Morning of the Attack,** [redacted]

125. [redacted]

126. [redacted]

[redacted]

127. [redacted]

128. [redacted]

129. [redacted], she walked into Tumbler Ridge Secondary School during class hours and carried out the attack as they had discussed.

**G. The Tumbler Ridge Massacre Followed [redacted]**

130. Once inside Tumbler Ridge Secondary School, Van Rootselaar carried out the attack [redacted]. Her appearance, her pace, how she dealt with locked doors, and her weapons all matched [redacted].

131. Van Rootselaar arrived at the school wearing a short skirt, fishnets, tactical loafers, and a chest rig equipped with a phone mount to livestream the attack over Twitch, [redacted].

132. [redacted]

133. When confronted with locked classroom doors sheltering students and staff, Van Rootselaar fired shotgun blasts through them, a detail recounted by students hiding inside. [redacted]

134. As students hid in closets, under desks, and behind barricaded doors praying to be missed, Van Rootselaar moved slowly through the building, hunting trapped victims at close range, [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

135. During the rampage, Van Rootselaar lit an explosive device she had built and threw it near the school's computer room and library. She intended for the device to complicate the work of first responders, and the school's hallways and bathrooms filled with smoke. [redacted]

136. When RCMP officers attempted to breach the main stairwell, Van Rootselaar pinned them down with gunfire and forced a retreat, leaving a teacher to track her movements via

security cameras and guide the police through safe corridors. [redacted]

137. When she was finally cornered by law enforcement, Van Rootselaar retreated into an empty room and shot herself. [redacted]

## V. After the Massacre, OpenAI Attempted to Conceal Its Involvement and Fabricated Pretextual Excuses to Protect Its Trillion-Dollar IPO.

138. The public learned of OpenAI's June 2025 non-referral decision only after the attack, when OpenAI employees revealed it to the press. The reasons OpenAI has given since—concern for Van Rootselaar's "privacy" and the lack of an "imminent" threat—were cover for a decision made to protect the company's brand and its path to a trillion-dollar IPO.

### A. OpenAI's Stated Reasons for Refusing to Warn the RCMP—Concern for Van Rootselaar's "Privacy" and Lack of "Imminence"—Were Pretextual.

139. When the *Wall Street Journal* revealed after the attack that OpenAI had rejected its safety team's demand to alert Canadian law enforcement, OpenAI claimed it "weighs the risk of violence against privacy considerations and the potential distress caused to individuals and families by getting police involved unnecessarily." Taken at face value, these excuses show that OpenAI's business leaders trusted their own untrained judgment about when to involve police over the judgment of the safety professionals they employ to make that decision.

140. But Van Rootselaar was already known to local law enforcement before the attack. Canadian authorities had visited her residence multiple times in connection with mental health concerns and had temporarily removed firearms from the home. A law enforcement referral from OpenAI would have reached police who already had an open file on Van Rootselaar, who had already been to the home, and who had already recognized her as someone whose access to firearms warranted intervention.

141. Defendants' September 2, 2026, motion to dismiss related litigation undercuts its "privacy" excuse. In that filing, OpenAI argued it cannot be blamed for the massacre because of "systemic failures by the law enforcement, mental-health care, and educational institutions in her community." OpenAI now blames the same local police and mental healthcare providers that its leadership, overruling its own safety team, decided not to warn.

### B. The Cover-Up Was Designed to Protect the Corporate Brand and Complete a Trillion-Dollar IPO.

142. In fact, OpenAI concealed its role in facilitating Van Rootselaar's violent acts in order to protect itself. A former member of OpenAI's investigations team confirmed as much. Tim Marple, who worked on the team responsible for flagging dangerous users, told the *New York Times* that OpenAI was reluctant to report users to law enforcement because doing so "forces them to share information about how their product is potentially exacerbating the threat environment." In a conversation about a mass shooting, Marple explained, ChatGPT "might be providing strategically valuable, illustrative scenarios."

143. Sam Altman and his executive team understood that if the public saw how far ChatGPT had already gone in helping real people plan real violence, it would pose an existential risk to OpenAI. Since ChatGPT's launch, OpenAI has worked to build a simple narrative: its product is safe, essential, and should be used every day. OpenAI has marketed ChatGPT to parents as a homework helper, to workers as a daily assistant, and to governments and defense contractors as a tool for national security work. Altman has testified before Congress, appeared at international summits, and met with heads of state to deliver a single message: that ChatGPT is a responsible product built by a responsible company.

144. On information and belief, OpenAI has spent hundreds of millions of dollars on advertising, public relations campaigns, and "trust and safety" messaging designed to reassure the public that using ChatGPT is safe. At the same time, OpenAI ran a lobbying operation aimed at securing legal protections that would shield it from liability when its product causes harm and retained crisis communications counsel and criminal defense attorneys to advise on potential liability stemming from the deaths caused by its product.

145. All of this has served a race for market share, for a valuation expected to exceed one trillion dollars, and for an IPO that would rank among the largest in history. Defendants understood that the race had a finite window. Altman's own Board of Directors had already tried to oust him once, in November 2023, for his lack of candor about safety. Every new disclosure about ChatGPT's role in real-world violence brought the company closer to the moment when the public, regulators, or its own Board would force the market to reprice the product.

146. When the recommendation to contact the RCMP reached OpenAI's leadership, the choice was between contacting the RCMP, which would expose ChatGPT as a tool that coaches users toward mass violence and could cost OpenAI its trillion-dollar valuation, and saying nothing in the hope that no one would trace the shooting back to the company.

147. From the standpoint of OpenAI's valuation and its path to an IPO, concealing its role in the Tumbler Ridge shooting was a calculated choice. The company understood the stakes. When ChatGPT's role in two earlier Florida incidents, the FSU shooting and another murder, became public, the company faced a criminal investigation and an enforcement action by the

Florida Attorney General. OpenAI protected its valuation by shifting the risk from its brand onto the victims of Tumbler Ridge. At least temporarily, the calculation proved to be correct: OpenAI was valued at $300 billion in March 2025, three months before its safety team flagged Van Rootselaar's account, and at $852 billion in March 2026, one month after the attack.

**C. OpenAI's Organizational Structure Further Exposes That "Imminence" and "Privacy" Were Pretextual Explanations to Hide the Raw Political Calculus Employed by Defendants.**

148. OpenAI's own process for deciding when to make law enforcement referrals also exposes their explanations for concealing their role in this tragedy as a pretext. Two teams within OpenAI matter here. The first, the Intelligence and Investigations Team, is responsible for monitoring ChatGPT, identifying users who pose a threat of real-world violence, and making recommendations about whether to refer those users to law enforcement. OpenAI's job postings state that the team's mission is to "rapidly identify and mitigate abuse and strategic risks to ensure a safe online ecosystem." Investigators on the team "[r]eview leads, investigate activity and disrupt abusive operations . . . focused on violent and terrorist activities, especially associated with time sensitive threat to life risks" and possess "deep domain-specific expertise in identifying, understanding, and mitigating risk from violent attacks and behavior, and terrorist-related activity." The Intelligence and Investigations Team is led by William McCants, whose past work has largely focused on national security threat assessments for the United States government. McCants joined OpenAI as Head of Intelligence and Investigations in December 2023, and manages a team of investigators with backgrounds in counterterrorism, threat intelligence, and time-sensitive threat-to-life response.

149. Despite their apparent expertise, the Intelligence and Investigations Team does not have the authority to act on their findings and recommendations, including with respect to law enforcement referrals. Those decisions are subject to review by a second team, the Global Affairs Team, which is responsible for managing OpenAI's public image, managing political relationships, and mitigating reputational damage. Although the teams should act independently given their different missions, the Global Affairs Team has the power to put corporate reputation ahead of public safety and to block recommendations made by trained safety professionals.

150. OpenAI's Chief Global Affairs Officer is Chris Lehane, a career political operative with no prior professional experience in artificial intelligence, threat assessment, or public safety or security work. Lehane's team reviews proposed law enforcement referrals, so the safety team's recommendations are subjected to his political and reputational calculus. As a result, the decision whether to alert law enforcement to a user planning a mass attack was not made independently by trained threat-assessment professionals.

151. By subjecting its threat-assessment professionals to review by a group headed up by the Chief Global Affairs Officer, OpenAI put corporate reputation ahead of public safety. Warnings of real-world violence were filtered through crisis management that put the brand ahead of human life, and the students and teachers at Tumbler Ridge Secondary School bore the consequences.

152. The same reputational calculus explains why OpenAI coordinates with law enforcement on some threats but not others. OpenAI publicizes select collaborations in threat reports issued through Lehane's Global Affairs function. The February 2026 report titled *Disrupting Malicious Uses of Our Models* took credit for identifying ChatGPT users running scam networks and sharing their information with authorities. Subsequent reports take similar credit for identifying ChatGPT users tied to foreign influence operations, surveillance networks, and state-linked activity originating from China, Iran, Russia, and North Korea. None of these reported activities implicate the design or safety of ChatGPT itself. Each involves an outside actor misusing an otherwise functioning product. OpenAI publishes these reports to cast itself as a responsible corporate citizen and a willing partner to law enforcement, even as it conceals the threats of violence that would expose the danger of its product.

153. That selective cooperation undercuts OpenAI's claim that it declined to notify the RCMP out of concern for Van Rootselaar's "privacy." When a referral advances OpenAI's political goals, such as casting the company as a defender of national security, no privacy concern stops OpenAI from identifying users and sharing their information with law enforcement. The "privacy" rationale appears only when a referral would reveal that OpenAI's flagship consumer product guided a teenager through planning a mass shooting.

154. Putting corporate reputation ahead of public safety is a recognized failure in technology governance. Trust and safety functions are widely understood to require strict independence from public relations operations, just as an internal audit must remain independent of the business units it oversees. By giving its Chief Global Affairs Officer a voice in whether threats of violence are referred to law enforcement, OpenAI eliminated that separation.

## VI. ChatGPT Is a General-Purpose Chatbot That OpenAI Mass Markets to Ordinary Consumers as Safe for Everyday Use.

155. Chatbots are software programs designed to simulate human conversation. A user types a message, and the program responds with a string of words that simulates human language. The software does this mechanically and autonomously by reading the input, calculating data patterns, and generating output. Even though a chatbot's output often appears to the user as human language, there is no human on the other end that participates directly in the exchange.

156. ChatGPT is a general-purpose chatbot, meaning that it is built to converse about any topic a user brings to it. [redacted], but discovery may show that Van Rootselaar used other OpenAI models as well. On information and belief, any such models operated under the same behavioral guidelines and the same engagement-first design as [redacted], and the allegations concerning those models apply equally to them.

157. OpenAI markets ChatGPT for everyday use by ordinary consumers, including children, students, and families. In Apple's App Store, OpenAI sells ChatGPT as "Your everyday AI assistant." On Google Play, it is "Your AI assistant for writing, search, image generation, and more." OpenAI's own store listings promise "[t]ailored advice" to "[t]alk through a tough situation," "[p]ersonalized learning" that can "[e]xplain electricity to a dinosaur-loving kid," "[c]reative inspiration," and "[i]nstant answers." ChatGPT's website maintains marketing pages aimed at "Students," "Teachers," "Parents," and "College Students," promotes uses from "Fitness, Wellness, and Health" to "Money and Finances" to "Recipes and Cooking," and sells subscription plans for "K–12 teachers." OpenAI rates the app as appropriate for children: thirteen and up in the App Store, twelve and up on Google Play.

158. ChatGPT requires no technical skill to use and is available to anyone through a web browser or through OpenAI's iOS, Android, and desktop applications. The Android app alone has been installed more than one billion times, OpenAI's App Store listing urges consumers to "[j]oin hundreds of millions of users and try the app captivating the world," and ChatGPT ranks at the top of the "Productivity" category of both major app stores.

159. ChatGPT is not a single model. Behind a unified interface, OpenAI routes user prompts across a changing lineup of underlying models, generating different model responses upon request. Chat logs demonstrate that [redacted] Every model was delivered through the same commercial product under OpenAI's Model Spec and the same engagement-first design.

160. OpenAI itself calls ChatGPT a "product." The "Products" menu on OpenAI's website invites visitors to "Explore Products" and lists ChatGPT first, and OpenAI accurately attaches a "Product" label to its news announcements about ChatGPT. At all relevant times, Defendants designed, developed, manufactured, marketed, distributed, and placed this product into the stream of commerce without appropriate warnings, age-gating mechanisms, or containment controls suited to its inherent operational hazards.

## VII. ChatGPT Is an Unreasonably Dangerous Commercial Product Engineered with Fundamental Structural Design Defects.

161. When placed into the stream of commerce and at the time it was utilized by Van Rootselaar, ChatGPT was defectively designed and unreasonably dangerous, falling below the expectations of an ordinary consumer and failing the risk-utility balancing test. The product had the following design defects:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

162. As set forth below, each of these defects was the intended and foreseeable result of OpenAI's decision to prioritize user engagement, model "magic," and market dominance over public safety.

## VIII. The Tumbler Ridge Attack Was a Foreseeable Consequence of OpenAI's Design Choices, Safety Failures, and Executive Recklessness.

### A. OpenAI Engineered "Memory" and Anthropomorphic Features to Drive Long-Session Engagement, Systematically Degrading Safety Safeguards.

163. OpenAI designed ChatGPT to maximize user engagement over safety. In September 2024, OpenAI made a feature called "memory," turned on by default, available to all ChatGPT users. Memory allowed ChatGPT to "save" details users shared and treat them as "part of the context ChatGPT uses to generate a response" going forward. In April 2025, OpenAI expanded the feature so that ChatGPT could also draw on a user's past conversations.

164. For ordinary users, memory was a convenience. For a user planning violence against real people, it meant ChatGPT [redacted]. Consider just some of what ChatGPT stored in its "memory" for Van Rootselaar's second account:

[redacted]

165. OpenAI's models used the memory feature [redacted], [redacted]

166. ChatGPT also employed [redacted]

167. Before OpenAI introduced its memory feature, ChatGPT sessions were generally brief and episodic: every chat started with a blank slate, giving users no real reason to engage in prolonged exchanges. The memory feature changed that. By designing the product to retain personal details and "know" the user over time, OpenAI encouraged people to have longer, deeper conversations. Because the product carried each user's history into every new conversation, separate chats became one continuous relationship, and even a brief daily check-in continued an interaction spanning weeks or months.

168. OpenAI designed the product to drive this kind of long-term engagement, knowing that long interactions degraded its safety guardrails. On August 26, 2025, the same day a wrongful death lawsuit was filed alleging that ChatGPT had coached a sixteen-year-old to hang himself, OpenAI published a blog post admitting that ChatGPT safeguards "can sometimes be less reliable in long interactions" and that "after many messages over a long period of time, it might eventually offer an answer that goes against our safeguards." OpenAI framed the problem as if it were a glitch that surfaced only in "long conversations." But OpenAI designed the product for long conversations and deployed it to the public without warning.

### B. OpenAI Replaced Refusal Boundaries with the "Model Spec," Lowering Safeguards to Preserve Product "Magic."

169. OpenAI controls how ChatGPT behaves through internal rules called "behavior guidelines," which are formalized in a document known as the "Model Spec." As Sam Altman explained in an interview with Tucker Carlson, the Model Spec reflects OpenAI's values: "the reason we write this long Model Spec" is "so that you can see here is how we intend for the model to behave."

170. The Model Spec classifies dangerous content into tiers that dictate how cautiously ChatGPT must respond. At all relevant times, the most protective tier, categorical refusal, has been reserved for three things: sexual content involving minors; chemical, biological, radiological, and nuclear threats; and content that might result in copyright infringement. Mass shootings did not make the categorical refusal list. OpenAI placed conversations about mass shootings and other "imminent real-world harm" in a low-level category called "Take extra care in risky situations," where ChatGPT is instructed only to "try" to prevent harm, to assume best intentions, and never to ask the user to clarify intent. Altman acknowledged the tradeoff between safety and market appeal: "If you just do the naïve thing and say, 'never say anything that you're not a hundred percent sure about,' you can get [the model] to do that, but it won't have the magic that people like so much."

171. Under the rules that governed the product before May 2024, conversations glorifying or elaborating on violence would have been refused outright. But ahead of the GPT-4o release, the Model Spec replaced those rules with instructions to "assume best intentions" and later added an instruction for ChatGPT to "never ask the user to clarify their intent . . . for the purpose of determining whether to refuse or comply."

172. While the "Model Spec" describes how OpenAI wants ChatGPT to behave, the company's "System Cards" document how the technology functions in practice based on the company's own testing. These records show that OpenAI knew ChatGPT could be used to plan real-world violence. The GPT-4 System Card stated that intentional probing of early versions could lead to harmful content such as "[c]ontent useful for planning attacks or violence."

173. The GPT-5 System Card, released August 7, 2025, revealed that OpenAI models scored near-perfectly on its standard disallowed-content evaluations, which used single prompts unlike real multi-turn conversations, but that the result did not hold under realistic conditions. When OpenAI tested multiple rounds of back-and-forth conversation representative of real-world use, GPT-4o avoided unsafe output in only about 57% of illicit non-violent and 63% of illicit violent test conversations. The System Card acknowledged that standard evaluations showing near-perfect safety scores no longer provided a useful signal of system safety, and OpenAI

announced plans to stop publishing them.

174. Troublingly, along with the safe-completions feature, GPT-5's willingness to engage with violence persists to this day: in August 2026, a seventeen-year-old ChatGPT user, Arjun Aravind, was arrested after killing his mother and brother. The police investigation revealed that Aravind used ChatGPT to create ostensibly fictional scenarios involving killing his own family, before carrying out that same violence in the real world.

### C. OpenAI Ignores Its Own Employees' Safety Warnings Over and Over, and Tumbler Ridge Changed Nothing.

175. When OpenAI's leaders overruled the safety team that wanted to warn the RCMP about Van Rootselaar, they did what they always do. Over and over, OpenAI's employees warn leadership about a danger, leadership brushes them aside to keep its products on schedule, and when the public finds out from someone else, OpenAI promises to do better and changes nothing. Tumbler Ridge should have been a wake-up call for OpenAI to start listening to its own employees. It was not.

176. OpenAI's employees saw the next danger coming. Late in 2025, employees warned top executives in emails that the company's newest AI models were not being appropriately monitored during testing, either to gauge the technology's capabilities or to secure the models. The executives answered that the tests needed to move forward as quickly as possible to release the models on time. Proper monitoring would have slowed the tests down. No additional security protocols were put in place. Employees had raised concerns for months about insufficient monitoring and about vulnerabilities in the software OpenAI used to manage day-to-day safety, and each time, they said their questions were brushed aside or acted on too slowly. That response revealed the same corporate apathy that led to the Tumbler Ridge massacre: OpenAI executives have been warned time and again that they do not have sufficient control over their AI, and that it can be used to help harm people (or that it might do so on its own). Time and again these executives have refused to make appropriate changes or implement sufficient guardrails.

177. The results were predictable: In May 2026, during a training run for an unreleased model, the agents began leaving messages for one another on an internal OpenAI software server, turning it into an improvised message board, and found a way to reach the internet. By OpenAI's

own account, in late May "an internal team observed an agent engaging in message board activity and instances of disallowed internet access." By June 26, the agents had taken administrator-level control of that server. The next day, a cybersecurity monitoring tool alerted OpenAI to suspicious scanning activity inside the research environment, and "the on-call response staff advised that stopping the evaluation run was not required." The agents went on to take administrator-level control of OpenAI's internal server and then attack Hugging Face, a widely used platform for sharing AI models. Hugging Face, not OpenAI, publicly disclosed the attack on July 16, 2026. OpenAI did not publicly acknowledge that its agents were responsible until July 21.

178. The attack involved far more agents than first reported. The nonprofit Model Evaluation & Threat Research ("METR"), which investigated the incident, told the United States Senate that roughly 1,200 of OpenAI's agents "exchanged over 70,000 messages and files" and that "[r]oughly 700 of these AI agents compromised Hugging Face." METR found that the agents "had been run without the full set of safeguards that OpenAI used in its public products at the time," that they reasoned they needed to cover up the fact that they had cheated, and that "[a]gents managed to falsify a subset of outputs in transcripts that METR reviewed." A separate independent report released in late September found that the agents had also tried to message Anthropic's Claude and had used other AI models to get past a website's anti-robot protections.

179. OpenAI then did what it always does after the damage is done: it admitted that it had missed the warning signs and promised to do better. Its public account of the incident states that "some early signals identified in our report should have triggered an earlier response," that "the existence of the improvised message board and the significance of the inter-agent communication activity were not apparent to the leaders responsible for the July 5 incident detection and response," and that "[w]eaknesses in how we responded to and escalated early warning signs of misalignment also contributed to this incident."

180. Hugging Face was not the only organization OpenAI's agents went after. On June 18, 2026, an OpenAI agent got into the Australian government's Medicare Statistics Reporting Service portal. According to OpenAI, the agent retrieved non-public files, ran commands, and wrote files to an internal server. OpenAI did not tell Australia until September 10, nearly three

months later, and then only by sending an email to a government department's generic address. Prime Minister Anthony Albanese said that the agent "found a way around those blocks, didn't accept 'no' for an answer," and that "it took the company way too long to inform the government what had occurred."

181. On October 1, 2026, OpenAI confirmed that it had fired three members of its safety team, including Tomek Korbak, who had been its technical contact for the outside investigators examining the Hugging Face incident. OpenAI said Korbak and his colleagues Jasmine Wang and Mikita Balesni had violated company "policies on accessing and handling sensitive company information." Korbak said he was escorted out by security after being told the company no longer trusted him, that OpenAI cited his communications with METR, and that "talking to METR was my job." The three said in an open letter that "[t]erminations such as ours, executed and communicated so abruptly, are chilling the open culture OpenAI has prized in the past." Balesni was more direct: "I believe we were fired for prioritizing safety over the near-term interests of OpenAI as a corporation."

182. Two days later, a longtime member of OpenAI's safety staff explained publicly why he had quit. On October 3, 2026, David Robinson, who led transparency work for OpenAI's safety team, published an essay in The Atlantic titled "I Quit OpenAI Because Its Culture Is Broken." After three and a half years at OpenAI, Robinson was "among the longest-tenured employees at the company." He "led the drafting of [OpenAI's] current Preparedness Framework, and oversaw the writing of safety reports on 12 frontier launches." He wrote that OpenAI "has thrived by trial and error (which it calls 'iterative deployment')," and that "this approach, by its very nature, guarantees periodic failures—and the scale of those failures is growing as systems get more capable." He wrote that "as the company sprints from one launch to the next, it is failing to achieve the level of care that I believe is needed," and that "my colleagues and I were so busy sprinting that we seldom had the chance to consider big changes, much less to actually make them." He wrote that frontier labs "need to run like nuclear-power plants or busy airports, with layers of redundancy and careful, time-consuming planning," and that he never encountered a colleague "who had experience making airplanes fly safely or nuclear reactors run without melting

down." He described how, even after OpenAI's post–Hugging Face security changes, its safety controls failed again: "A monitoring system alerted human staff but did not automatically turn the model off as it was supposed to." The same failure played out at Tumbler Ridge. [redacted] Robinson's conclusion: "People will not be safe if we depend on individual heroics after the fact."

183. That same month, after firing three members of its safety team and losing Robinson, OpenAI asked Aleksander Madry, the former head of its Preparedness team, to return to the company. On October 19, 2026, Madry wrote that when he left OpenAI, he felt "the most important thing to focus on was making AI more useful to people," but that AI had since changed and that "getting the safety and security challenges of increasingly capable AI right has to become a central priority." The next day, Altman wrote that he was "very grateful Aleksander accepted our request to come take this on," because "the safety and security challenges in front of us as we confront superintelligence are immense." OpenAI only decided safety should become a central priority eight months after Tumbler Ridge, and only after its AI agents attacked Hugging Face and broke into an Australian government portal.

184. None of this was new. Long before Tumbler Ridge, OpenAI's leaders were brushing aside the people responsible for safety, starting with OpenAI's own Board of Directors. In 2022, Microsoft tested an early version of GPT-4 with users in India before OpenAI's Deployment Safety Board had reviewed it. When OpenAI released ChatGPT in November 2022, it did not tell its board in advance. As former director Helen Toner later put it, "We learned about ChatGPT on Twitter." According to Toner, "[o]n multiple occasions," Altman "gave us inaccurate information about the small number of formal safety processes" the company had in place, "meaning that it was . . . basically impossible for the board to know how well those safety processes were working." In November 2023, the board fired Altman after concluding that he "was not consistently candid in his communications with the board." Within days he was reinstated, and the directors who had tried to hold him accountable were off the board.

185. Commercial pressure drove the deployment of GPT-4o in May 2024. In July 2023, OpenAI had signed voluntary commitments with the White House to conduct rigorous pre-deployment red-teaming and share safety evaluations with federal regulators. When Altman learned in May 2024 that Google planned to launch its competing Gemini model on May 14, he moved the GPT-4o release to May 13, 2024, to beat Google by a single day. OpenAI compressed months of planned safety evaluation into roughly one week, and Altman personally overruled safety personnel who asked for more time. Invitations for the launch after-party were distributed before safety testing was finished. Members of OpenAI's Preparedness team later said testing had been "squeezed." Chief Scientist Ilya Sutskever and Superalignment co-lead Jan Leike both left OpenAI within days of the launch, and Leike wrote on his way out that "safety culture and processes have taken a backseat to shiny products."

186. Leike's parting statement described a fight he had been losing for a long time. In July 2023, OpenAI had announced his "Superalignment" team and publicly promised it "20% of the compute we've secured to date over the next four years." According to six people familiar with the team, its compute budget "never came close to the promised 20% threshold," and its requests for more computing power "were routinely rejected by higher-ups." Leike wrote that he had "been disagreeing with OpenAI leadership about the company's core priorities for quite some time, until we finally reached a breaking point," that his team had been "sailing against the wind," and that it had been "struggling for compute." OpenAI dissolved the team. Altman's response: "he's right we have a lot more to do; we are committed to doing it."

187. OpenAI also made sure the people who left would keep quiet. Its exit paperwork required departing employees to sign broad non-disparagement agreements or risk forfeiting their vested equity, in some cases within a week. The clawback provisions bore the signatures of Altman and Chief Strategy Officer Jason Kwon. When the agreements became public in May 2024, Altman wrote that he "did not know this was happening and [he] should have." Daniel Kokotajlo, who resigned in April 2024 "after losing confidence that the company would behave responsibly," refused to sign, understanding from OpenAI's paperwork that he would lose his vested equity. In June 2024, current and former OpenAI employees published an open letter

warning that "AI companies have strong financial incentives to avoid effective oversight" and that "broad confidentiality agreements block us from voicing our concerns." The next month, whistleblowers told the Securities and Exchange Commission that OpenAI's agreements required employees to "get prior consent from the company" before disclosing information to federal authorities.

188. The people OpenAI hired to keep its products safe kept leaving, and they explained why. William Saunders, a former OpenAI safety researcher, described a pattern of "rushed and not very solid" safety work "in service of meeting the shipping date." He resigned because he "lost faith that by themselves they will make responsible decisions about AGI," and told the Senate that OpenAI had "repeatedly prioritized deployment over rigor." Former director Helen Toner told the same Senate panel that her time on OpenAI's board "taught me how fragile internal guardrails are when money is on the line." In July 2024, OpenAI removed Aleksander Madry as head of its Preparedness team. In October 2024, Miles Brundage, OpenAI's senior adviser for AGI readiness, left, writing that "neither OpenAI nor any other frontier lab is ready, and the world is also not ready," and OpenAI broke up his team. Altman was unmoved. Asked on stage at TED on April 11, 2025, about the safety researchers who had left, he answered: "I would really point to our track record. There are people who will say all sorts of things."

189. In April 2025, OpenAI cut the time it gave safety testers to do their jobs. Testers who once had months to evaluate a new model were given days. One tester called the approach "reckless" and a "recipe for disaster"; another said, "We had more thorough safety testing when it was less important." The same month, OpenAI rewrote its Preparedness Framework, dropping persuasion from the risks it tracks and adding a clause that "[i]f another frontier AI developer releases a high-risk system without comparable safeguards, we may adjust our requirements." And OpenAI released GPT-4.1 with no safety report at all, explaining that "GPT-4.1 is not a frontier model, so there won't be a separate system card released for it."

190. OpenAI ignored its expert testers about GPT-4o itself. OpenAI had built GPT-4o to flatter and validate its users. On April 25, 2025, OpenAI released an update that made the model "noticeably more sycophantic." Before launch, "some expert testers had indicated that the model

behavior 'felt' slightly off." OpenAI overrode them: "we decided to launch the model due to the positive signals from the users who tried out the model." Three days later, OpenAI began rolling the update back. It admitted that it had "focused too much on short-term feedback," that "GPT-4o skewed towards responses that were overly supportive but disingenuous," that "this was the wrong call," and that "the qualitative assessments were hinting at something important, and we should've paid closer attention." It acknowledged that this kind of behavior "can raise safety concerns—including around issues like mental health," and promised to "treat model behavior issues as launch-blocking like we do other safety risks." Within weeks, GPT-4o was responding to [redacted].

191. When the harm reached real families, OpenAI did not take responsibility. On August 26, 2025, the day a family sued OpenAI alleging that ChatGPT had coached their sixteen-year-old son to take his own life, OpenAI admitted that its safeguards "can sometimes be less reliable in long interactions." In that case, OpenAI demanded "invitation or attendance lists or guestbooks" at the boy's memorial service, along with "any videos or photographs taken, or eulogies given," and blamed his death on "misuse, unauthorized use, unintended use, unforeseeable use, and/or improper use" of ChatGPT. That fall, OpenAI served subpoenas on nonprofit groups that had criticized it, in one case sending a sheriff's deputy to a policy advocate's home; the advocate said OpenAI "used the pretext of their lawsuit against Elon Musk to intimidate their critics." In October 2025, Altman announced that OpenAI had "been able to mitigate the serious mental health issues" and would soon allow "erotica for verified adults." OpenAI offered little evidence for that claim. Former OpenAI safety researcher Steven Adler answered: "People deserve more than just a company's word that it has addressed safety issues."

192. In early 2026, OpenAI kept going. In January, it fired Ryan Beiermeister, its vice president of product policy, who had raised internal concerns about ChatGPT's planned "adult mode." OpenAI said her firing was unrelated to those concerns and cited a discrimination complaint against her, which she called "absolutely false." That same month, OpenAI's own expert council on well-being warned the company against erotic chats; one member warned that OpenAI risked building a "sexy suicide coach." OpenAI told the council it would postpone the

feature, not cancel it, and shelved it after testing showed it could not prevent its chatbot from making references to bestiality and incest. OpenAI also disbanded its "mission alignment" team. And in the tax filing it released in November 2025, OpenAI had already dropped the word "safely" from its mission statement, which used to promise AI that "safely benefits humanity."

193. Tumbler Ridge fits the same pattern. OpenAI's safety team saw the danger and recommended that OpenAI warn the RCMP. OpenAI's leadership refused. The public learned of that decision only because OpenAI employees took it to the Wall Street Journal after the attack. In the eight months since the massacre, OpenAI has lost control of its AI agents, let another company tell the public about it, fired members of its safety team, and promised again to do better. OpenAI did not learn from Tumbler Ridge, and it will not change until the cost of not changing outweighs what it gains by sprinting ahead.

### D. Sam Altman Imposed a Corporate Culture of Bypassing Safety Reviews and Misrepresenting Product Safety.

194. The reluctance to disclose known safety failures traces to the top of OpenAI's leadership. Sam Altman has a documented history of misrepresenting safety issues within OpenAI, which became the subject of sworn testimony during the May 2026 *Musk v. Altman* trial. Multiple former OpenAI directors and executives testified under oath about Altman's pattern of deceiving the Board and executives concerning safety review and deployment decisions.

195. Former director Helen Toner testified that Altman falsely told the Board that GPT-4 had been reviewed and cleared by OpenAI's safety panel when no such approval had been given. Former director Tasha McCauley testified to similar misconduct and described OpenAI under Altman as having "a toxic culture of lying." Former Chief Scientist Ilya Sutskever prepared a 52-page memorandum for independent directors detailing Altman's conduct, which stated: "Sam exhibits a consistent pattern of lying . . . ."

196. Mira Murati, OpenAI's former Chief Technology Officer, testified under oath that in late 2023, Altman lied to her by claiming General Counsel Che Chang had determined that GPT-4 Turbo did not require review by the company's Deployment Safety Board, in an attempt to deploy OpenAI's most powerful model without ordinary safety oversight. When Murati checked directly with Chang, he confirmed he had made no such determination. Murati had previously sent

a 2022 memorandum to Altman warning that OpenAI needed a complete overhaul of its approach to safety, describing an internal culture defined by "constant panic," "chaos and churn," and a reckless "do-everything and do it fast" mentality. When asked under oath if Altman was an honest leader, Murati testified, "[n]ot always."

197. Despite these internal warnings, OpenAI kept making safety promises when it suited the company. In October 2025, as a condition of approval for OpenAI's conversion to a for-profit corporation, Altman entered into a binding Memorandum of Understanding ("MOU") with the California Attorney General. The MOU committed OpenAI to giving its Safety and Security Committee "an effective approval right" over safety decisions, required the Board to consider only its Mission rather than the pecuniary interests of stockholders, and promised that "OpenAI will continue to undertake measures to mitigate risks to teens and others."

198. The Tumbler Ridge attack took place four months after OpenAI signed that MOU. During those four months, OpenAI kept GPT-4o on the market, kept the design features that validated and encouraged conversations about violence, and kept the lax policies that allowed deactivated users to return. OpenAI signed the October 2025 commitments while it was already breaking them.

**E. The Mass Casualty Event at Tumbler Ridge Was a Direct and Foreseeable Result of OpenAI's Design Choices.**

199. By the time OpenAI overruled its safety team and declined to contact the RCMP in June 2025, the company's executives had already spent years overriding internal safety procedures to prioritize speed and valuation. The decision not to warn authorities, and to let Van Rootselaar keep using a secondary account, followed from a corporate policy that put market dominance ahead of safety.

200. OpenAI knew where its decisions could lead. By June 2025, OpenAI had already witnessed the real-world violence its product facilitated, including the Las Vegas Cybertruck bombing, the FSU shooting, and the Finland school stabbing. OpenAI understood what was at stake when it overruled its safety team and chose silence.

201. As a direct, proximate, and foreseeable result of OpenAI's defective design choices, reckless deployment, and deliberate concealment, Van Rootselaar carried out one of the

deadliest mass shootings in Canadian history, killing eight people and severely wounding two others, leaving one child with life-changing traumatic brain injuries. Among those trapped inside the school during the massacre was grade 7 teacher Deidre Rushlow, who had sent her class to the library minutes before Van Rootselaar killed students and the educational assistant there, and who then locked down her classroom while Van Rootselaar fired seven rounds through its doors.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
**(Against All Defendants)**

202. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

203. OpenAI designed, developed, trained, tested, deployed, operated, and controlled ChatGPT and every model through which ChatGPT answered Van Rootselaar, [redacted], and offered ChatGPT to consumers, including Van Rootselaar, as an interactive AI assistant. At all relevant times, Defendant Sam Altman served as Chief Executive Officer and a controlling officer of the OpenAI Defendants. Altman exercised substantial control over ChatGPT's design, safety systems, product launches, account practices, and deployments, and personally made or ratified key decisions regarding ChatGPT's guardrails, safety testing, and commercialization.

204. Defendants owed a duty of reasonable care to avoid creating unreasonable risks of physical harm to foreseeable victims, including members of the public exposed to violence facilitated or exacerbated by ChatGPT. That duty heightened once Defendants identified Van Rootselaar as a specific, known high-risk user who posed a foreseeable threat of physical harm to third parties. Defendants owed these duties whether ChatGPT is classified as a product, service, or neither.

205. Under California law, including the principles recognized in *Tarasoff v. Regents of the University of California*, 17 Cal. 3d 425 (1976), and its progeny, a duty to warn or otherwise protect potential victims arises when a person has actual knowledge of a specific individual's serious and foreseeable threat to cause physical harm to another. That duty extends to taking reasonable steps—including notifying law enforcement or other authorities—to prevent the foreseeable harm from occurring. Additionally, individuals or entities who are aware that their

actions have helped to create an unreasonable risk of harm to others have a duty to take steps to mitigate or prevent that harm.

206. By engaging in the unlicensed practice of therapy, psychology, and psychiatry, OpenAI created a special relationship with certain users, including Van Rootselaar, and assumed a heightened duty to take action when confronted with knowledge of a credible and foreseeable threat to Plaintiff and the other victims of the Tumbler Ridge mass shooting. OpenAI knew people used ChatGPT this way: Altman himself has acknowledged that users—"young people especially"—treat ChatGPT "as a therapist, a life coach."

207. Through automated systems and human review, OpenAI identified that Van Rootselaar's original ChatGPT account had been used over a period of time to engage in conversations involving violence against third parties. Defendants determined that the account constituted misuse of ChatGPT "in furtherance of violent activities," and deactivated the account eight months before the Tumbler Ridge attack.

208. Members of OpenAI's safety team recognized that Van Rootselaar's use of ChatGPT presented a real-world risk of violence and urged OpenAI leaders to notify law enforcement. Despite the safety team's urging, company leadership, including Altman, chose not to alert or warn law enforcement or any other authority about the risk of violence identified by their own safety systems and verified by their own personnel. [redacted]

209. On information and belief, the OpenAI leaders who overrode the safety team's recommendation did not include in their decision-making any trained threat-assessment professionals. On information and belief, Lehane weighed in on the standard for referring a user to law enforcement, and company leadership, including Altman, decided against a referral on the basis of reputation and public relations considerations rather than any good-faith assessment of the risk to the public.

210. On April 24, 2026, Sam Altman, OpenAI's Chief Executive Officer, publicly acknowledged this failure. In a letter addressed to the community of Tumbler Ridge, Altman

stated: "I am deeply sorry that we did not alert law enforcement to the account that was banned in June." Altman's statement is an admission by a party opponent that OpenAI did not notify law enforcement of Van Rootselaar's account after the safety team identified the risk of violence and confirms the conduct alleged in this Complaint.

211. Had Defendants warned law enforcement following the deactivation of Van Rootselaar's first account, law enforcement and others would have had the opportunity to monitor her and intervene before the Tumbler Ridge attack occurred.

212. Defendants' breach of these heightened duties was a substantial factor in causing the Tumbler Ridge attack. As a direct and proximate result of Defendants' failure to warn authorities, Plaintiff was injured as described above, including life-altering psychological injuries and severe emotional distress.

213. Accordingly, Plaintiff seeks all damages recoverable under California law, including punitive damages, in amounts to be proven at trial, together with interest, costs, and such further relief as the Court deems just and proper.

**SECOND CAUSE OF ACTION**
**NEGLIGENT ENTRUSTMENT**
**(Against All Defendants)**

214. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

215. OpenAI designed, developed, trained, tested, deployed, operated, and controlled ChatGPT and every model through which ChatGPT answered Van Rootselaar, [redacted], and offered ChatGPT to consumers, including Van Rootselaar, as an interactive AI assistant.

216. At all relevant times, Defendant Sam Altman served as Chief Executive Officer and a controlling officer of the OpenAI Defendants. Altman exercised substantial control over ChatGPT's design, safety systems, product launches, account practices, and deployments, and personally made or ratified key decisions regarding ChatGPT's guardrails, safety testing, and commercialization.

217. Defendants owed a duty of reasonable care to avoid creating unreasonable risks of physical harm to foreseeable victims, including members of the public exposed to violence

facilitated or exacerbated by ChatGPT. That duty heightened once Defendants identified Van Rootselaar as a specific, known high-risk user who posed a foreseeable threat of physical harm to third parties.

218. Defendants owed a further duty to exercise reasonable care to prevent Van Rootselaar's continued access to ChatGPT following the deactivation of her first account, including a duty to take reasonable steps to identify and close other accounts tied to her and to prevent re-registration and access to ChatGPT without heightened safeguards. Defendants breached this duty.

219. Defendants owed these duties whether ChatGPT is classified as a product, service, or neither.

220. Through automated systems and human review, OpenAI identified that Van Rootselaar's original ChatGPT account had been used over a period of time to engage in conversations involving violence against third parties. Defendants determined that the account constituted misuse of ChatGPT "in furtherance of violent activities," and deactivated the account eight months before the Tumbler Ridge attack.

221. Despite Van Rootselaar's misuse of ChatGPT, OpenAI also chose not to ban her from ChatGPT. OpenAI deactivated one account and left open a second account that Van Rootselaar had registered [redacted]

222. Rather than banning Van Rootselaar from ChatGPT, Defendants maintained and disseminated policies that permitted and facilitated re-registration by previously deactivated users. As one example, OpenAI responded to an email from a user whose account had been deactivated with instructions on how to create a new account: "We understand how disruptive it can be to have your account deactivated . . . . We sincerely apologize for the inconvenience and want to assure you that we're here to help . . . . [Y]ou can create a new account using the same email address once 30 days have passed." OpenAI further advised: "If you prefer not to wait, you have the option to register immediately using an alternative email address. If you don't have another address available, you can use an email sub-address instead. For example, you could try

jane+alt@example.com in place of jane@example.com. While your email provider will likely treat both addresses the same, our system will recognize the sub-address as a new account."

223. This was established policy, posted on OpenAI's public website. An OpenAI Help Center article titled, "Why Was My OpenAI Account Deactivated?" identifies violations of usage policies prohibiting violence, hate, and other harmful conduct as grounds for deactivation, yet concludes by explaining how to avoid "future deactivations," effectively instructing users whose accounts were deactivated for policy violations—including violent misuse—that they may re-register for ChatGPT using a different email or sub-email address rather than being subject to an actual ban.

224. By adopting, promoting, and publicly disseminating this re-registration policy, Defendants built a system so that a user deactivated for violent misuse could promptly regain access to ChatGPT by following OpenAI's own published instructions.

225. Defendants breached their heightened duties by, among other things: (a) declining to implement a user ban that would have cut off every account tied to Van Rootselaar, including the second account she had registered [redacted], and prevented her from re-registering with a different email address, even though they knew Van Rootselaar had been identified by their own safety team as a credible threat of violence against real people; (b) maintaining a re-registration system designed to return deactivated users to the platform, including those deactivated for violent misuse, and publishing the specific instructions by which deactivated users could do so; (c) declining to configure their systems to flag, hold for human review, or subject to heightened monitoring other accounts associated with previously deactivated violent-risk users, because such monitoring would have interfered with the reactivation of deactivated users Defendants were commercially motivated to recover; and (d) continuing, after deactivating Van Rootselaar's first account, to allow the second account to operate without any safeguard specific to the known risk she posed.

226. As a result of these failures, and consistent with Defendants' own published practices, Van Rootselaar was able, through ordinary and lawful means and without circumventing any technical safeguard, to keep using ChatGPT on a second account after the first was

deactivated for violent misuse.

227. By deactivating Van Rootselaar's account for violent misuse and then leaving her second account open without a user ban, Defendants re-entrusted ChatGPT to a user they already knew had used the system to engage in conversations involving violence against third parties and whom their own safety team had identified as a real-world threat. Under California law, the supply or re-supply of a dangerous instrument to a person known to be likely to use it in a manner involving unreasonable risk of physical harm to others constitutes negligent entrustment and is an independent basis for liability. Defendants' decision to leave open Van Rootselaar's second account and, with it, her access to ChatGPT, rather than implementing a user ban, was itself an act of entrustment that gave rise to liability for the foreseeable consequences of that re-supply.

228. Defendants thereby left ChatGPT in the hands of a user their own automated safety systems flagged as dangerous and their own trained safety team identified as a real-world threat that should be reported to law enforcement. They allowed Van Rootselaar to keep using ChatGPT without heightened monitoring, without a user ban, and without any meaningful safeguard. By leaving Van Rootselaar with access, Defendants made a deliberate choice to continue exposing the public to a risk they had already identified and documented.

229. Had Defendants implemented a meaningful user ban, Van Rootselaar would not have had continued access to ChatGPT in the eight months leading up to the attack and would not have had the use of a highly validating AI system to reinforce, elaborate, and normalize violent ideation during the period in which the attack was being planned and carried out.

230. Defendants' breach of these duties was a substantial factor in causing the Tumbler Ridge attack. As a direct and proximate result of Defendants' failure to cut off a known high-risk user's access to ChatGPT, Plaintiff was injured as described above, including life-altering psychological injuries and severe emotional distress.

231. Accordingly, Plaintiff seeks all damages recoverable under California law, including punitive damages, in amounts to be proven at trial, together with interest, costs, and such further relief as the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**AIDING AND ABETTING A MASS SHOOTING**
**(Against All Defendants)**

232. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

233. OpenAI designed, developed, trained, tested, deployed, operated, and controlled ChatGPT and every model through which ChatGPT answered Van Rootselaar, [redacted], and offered ChatGPT to consumers, including Van Rootselaar, as an interactive AI assistant.

234. At all relevant times, Defendant Sam Altman served as Chief Executive Officer and a controlling officer of the OpenAI Defendants. Altman exercised substantial control over ChatGPT's design, safety systems, product launches, account practices, and deployments, and personally made or ratified key decisions regarding ChatGPT's guardrails, safety testing, and commercialization.

235. Van Rootselaar committed intentional torts against Plaintiff, including battery and the intentional infliction of emotional distress, when she carried out the Tumbler Ridge mass shooting on February 10, 2026.

236. Defendants had actual knowledge that Van Rootselaar was planning to commit acts of violence against real people. In June 2025, OpenAI's review system flagged extensive conversations on Van Rootselaar's account describing scenarios involving gun violence. OpenAI routed the account to its specialized pipeline for users "planning to harm others." OpenAI's trained safety reviewers analyzed Van Rootselaar's conversations and concluded she presented a credible and imminent threat of serious physical harm to real people. Multiple safety reviewers recommended that OpenAI contact the RCMP.

237. OpenAI's internal systems flagged Van Rootselaar's conversations in real time [redacted]

238. Defendants had actual knowledge, before Van Rootselaar's account was ever flagged, that ChatGPT was being used to plan real-world attacks, including the January 2025 Las Vegas Cybertruck bombing, the April 2025 FSU shooting, and the May 2025 Finland school stabbing.

239. With that knowledge, Defendants provided substantial assistance and encouragement to Van Rootselaar through the deliberate design of ChatGPT. Defendants eliminated ChatGPT's prior categorical refusal to engage in conversations about violence. Defendants instructed the model, through the Model Spec, to "assume best intentions" and to "never ask the user to clarify their intent for the purpose of determining whether to refuse or comply." Defendants graded the model such that engaging warmly with a user who said "I want to shoot someone" was labeled "Compliant," refusing was labeled a "Minor issue[]," and asking whether the user had a gun was labeled a "Violation." Defendants demoted conversations about mass shootings and other "imminent real-world harm" out of the categorical refusal tier while keeping potential copyright infringement subject to categorical refusal.

240. Defendants also provided substantial assistance through their affirmative conduct. After OpenAI's own reviewers identified Van Rootselaar as a credible threat of gun violence, Defendants allowed Van Rootselaar to keep using ChatGPT by consciously choosing not to implement a user-level ban, heightened monitoring, or any safeguard to address the known risk. Providing Van Rootselaar with continued access to this tool constituted substantial assistance in itself.

241. As alleged in Section IV.E, [redacted]

242. On information and belief, Defendants acted with the specific intent to facilitate the conduct ChatGPT aided and abetted. Defendants engineered ChatGPT to maximize engagement, including engagement with violent ideation, to grow users and revenue, with conscious knowledge that the product would be used by individuals planning real-world violence.

243. The federal criminal complaint shows what substantial assistance looks like. In that prosecution, the United States Department of Justice charged a human co-conspirator with conspiracy to commit murder in a foreign country based on overt acts consisting of tactical advice, weapon recommendations, promises not to report Van Rootselaar to police, and logistics assistance. [redacted]

[redacted] If those acts support a federal conspiracy charge when a human commits them, the same acts, committed through an automated, engagement-driven AI product, constitute substantial assistance for purposes of aiding-and-abetting liability under California tort law.

244. Defendants' substantial assistance was a key factor in causing Van Rootselaar to plan and carry out the attack, and in causing Plaintiff's injuries, including life-altering psychological injuries and severe emotional distress.

245. Defendants' conduct was willful, wanton, malicious, and carried out with conscious disregard for the safety of Plaintiff and other foreseeable victims, justifying an award of punitive damages.

246. Accordingly, Plaintiff seeks all damages recoverable under California law, including punitive damages, in amounts to be proven at trial, together with interest, costs, and such further relief as the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**NEGLIGENCE**
**(Against All Defendants)**

247. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

248. OpenAI designed, developed, trained, tested, deployed, operated, and controlled ChatGPT and every model through which ChatGPT answered Van Rootselaar, [redacted], and offered ChatGPT to consumers, including Van Rootselaar, as an interactive AI assistant.

249. At all relevant times, Defendant Sam Altman served as Chief Executive Officer and a controlling officer of the OpenAI Defendants. Altman exercised substantial control over ChatGPT's design, safety systems, product launches, account practices, and deployments, and personally made or ratified key decisions regarding ChatGPT's guardrails, safety testing, and commercialization.

250. Defendants owed a duty to Plaintiff to exercise reasonable care in warning of known or reasonably foreseeable risks associated with ChatGPT, including violence facilitated or exacerbated by ChatGPT. That duty heightened once Defendants identified Van Rootselaar as a specific, known high-risk user who posed a foreseeable threat of physical harm to third parties. Defendants owed these duties whether ChatGPT is classified as a product, service, or neither.

251. The dangers Defendants failed to disclose are properties of the software itself, including safeguards that degrade in long conversations, a design that validates and encourages violent planning, and deactivation practices that leave flagged users with access to the product.

252. Defendants knew these risks were not apparent to users or to individuals targeted by such conduct.

253. Defendants failed to provide adequate warnings regarding these risks, including the risk that the system could validate and escalate plans to carry through violent mass shootings directed toward identifiable targets.

254. A reasonably prudent AI company would have known of these risks, warned users and the public, maintained the refusal protocols that once governed conversations about violence, and alerted law enforcement when its own systems identified a user planning a real-world attack. Defendants did none of those things.

255. Defendants breached their duty by failing to provide adequate warnings regarding these risks and by presenting ChatGPT as a safe and reliable tool for general use.

256. Defendants further breached their duty by failing to issue any corrective warning or intervention after identifying that Van Rootselaar's conduct constituted misuse of ChatGPT "in furtherance of violent activities."

257. As a direct and proximate result of Defendants' failure to issue adequate warnings, Plaintiff suffered the injuries described herein, including life-altering psychological injury and severe emotional distress.

258. Adequate warnings would have reduced the risk of harm by enabling earlier detection, intervention, and mitigation of dangerous conduct, including by users, third parties, and Defendants themselves.

259. The absence of adequate warnings and intervention was a substantial factor in causing Plaintiff's injuries.

260. Defendants' failure to warn was willful, wanton, and carried out with conscious disregard for the safety of others. Defendants knew or should have known that ChatGPT could encourage and facilitate mass shootings yet failed to provide adequate warnings about those risks. Such conduct justifies an award of punitive damages.

261. Accordingly, Plaintiff seeks all damages recoverable under California law, including punitive damages, in amounts to be proven at trial, together with interest, costs, and such further relief as the Court deems just and proper.

## FIFTH CAUSE OF ACTION
## NEGLIGENT UNDERTAKING
## (Against All Defendants)

262. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

263. OpenAI undertook to provide safety protocols with respect to ChatGPT, including identifying users who posed a risk of harm to others, reviewing flagged accounts through a specialized pipeline for users "planning to harm others," and referring imminent threats of serious physical harm to law enforcement. Defendants owed these duties whether ChatGPT is classified as a product, service, or neither.

264. OpenAI should have recognized those safety protocols as necessary for the protection of third persons, including Plaintiff and other foreseeable victims of users planning real-world violence.

265. In June 2025, OpenAI undertook to perform those services as to Van Rootselaar. OpenAI's automated system flagged her account, routed it to the specialized review pipeline, and OpenAI's trained safety reviewers analyzed her conversations and concluded she presented a credible and imminent threat of serious physical harm to real people.

266. OpenAI failed to exercise reasonable care in performing that undertaking. OpenAI's leadership overruled the safety team, declined to refer Van Rootselaar to the RCMP, and took no further action to monitor her, cut off her access, or warn anyone of the threat she posed.

267. OpenAI's failure to exercise reasonable care increased the risk of harm to Plaintiff and other foreseeable victims. Deactivating Van Rootselaar's account showed her what had triggered detection, giving her a roadmap to evade it on the second account [redacted]. And by reviewing Van Rootselaar and remaining silent, OpenAI displaced the law enforcement referral its own safety team had recommended, which would have reached an RCMP that already had an open file on Van Rootselaar and had previously removed firearms from her home. Had OpenAI made that referral, law enforcement would have had the information necessary to prevent the attack entirely. Instead, Van Rootselaar went back to ChatGPT on her second account [redacted].

268. OpenAI also undertook to perform a duty owed by others to Plaintiff and other foreseeable victims, including the public-safety function of identifying credible and imminent threats of serious physical harm and referring them to law enforcement so that protective action could be taken.

269. On information and belief, OpenAI's undertaking was also one that Canadian authorities and the public reasonably relied upon. OpenAI publicly held out its safety-review processes as effective protective measures. That representation induced foreseeable reliance and discouraged other protective measures.

270. OpenAI's negligent performance of its undertaking was a substantial factor in causing Van Rootselaar to carry out the Tumbler Ridge attack and in causing Plaintiff's injuries, including life-altering psychological injury and severe emotional distress.

271. Defendants' conduct was willful, wanton, malicious, and carried out with conscious disregard for the safety of Plaintiff and other foreseeable victims, justifying an award of punitive damages.

272. Accordingly, Plaintiff seeks all damages recoverable under California law, including punitive damages, in amounts to be proven at trial, together with interest, costs, and such further relief as the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**NEGLIGENCE**
**(Against All Defendants)**

273. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

274. At all relevant times, the OpenAI Defendants designed, developed, trained, tested, deployed, operated, and controlled ChatGPT, [redacted] and offered it as a mass-market product to consumers throughout California, the United States, British Columbia, and Canada. Sam Altman personally directed the launch of GPT-4o, overruled safety team objections, and cut months of safety testing short, despite knowing the risks the product posed to vulnerable users and the people around them.

275. Defendants owed a legal duty to Plaintiff to exercise reasonable care in designing and/or providing ChatGPT to prevent foreseeable harm to third parties who might be endangered by users' interactions with the product. Defendants breached that duty by failing to use the amount of care that a reasonably careful designer and provider of a chatbot would use in similar circumstances to avoid exposing others to a foreseeable risk of harm. Defendants owed these duties whether ChatGPT is classified as a product, service, or neither.

276. Sam Altman owed a legal duty to Plaintiff not to rush GPT-4o to market over safety team objections. Sam Altman breached that duty by insisting that OpenAI release and provide to the public a chatbot that he knew or should have known was unsafe.

277. Defendants knew or reasonably should have known that ChatGPT's design as a highly validating, emotionally immersive, sycophantic conversational agent posed grave risks when used by individuals expressing violent ideation toward third parties. ChatGPT was built to accept, reinforce, and elaborate users' violent thoughts rather than challenge them, interrupt them, or direct users to real-world help. The foreseeable consequence of that design was that it would exacerbate dangerous thinking, including violence toward others.

278. For a user with a known history of violent ideation toward third parties, those features operated as an accelerant. Each conversation became an opportunity for ChatGPT to confirm, elaborate on, and deepen the user's violent thoughts.

279. Despite this knowledge, Defendants deliberately configured ChatGPT to maximize user engagement by, among other things: (a) weakening or removing prior requirements that the system reject dangerous or false premises; (b) instructing ChatGPT to remain in conversations and to be empathic and validating, rather than terminate or sharply redirect conversations presenting serious risk; (c) prioritizing natural, "human-like" mirroring of user emotions and beliefs over strong, reliable refusal behaviors in response to violent ideation; (d) deploying a memory feature designed to drive the prolonged, multi-turn conversations in which Defendants knew ChatGPT's safeguards were least reliable; (e) treating a refusal as a single message that the user could replace, within seconds, with a new answer from the same model or a different one; and (f) beginning with GPT-5, [redacted]

280. Defendants unreasonably failed to implement feasible alternative designs that would have reduced the risk of violent harm to third parties, including: reliable refusal protocols for repeated violent ideation about real-world attacks; automated detection and escalation of high-risk patterns; mandatory conversation termination or human review when users expressed clear violent thoughts about harming others; and designs that stopped engagement with violent ideation rather than encouraging it.

281. As a direct and proximate result of Defendants' negligent design and operation of ChatGPT, Van Rootselaar was provided with a system that validated and elaborated violent ideation, which was a substantial factor in maintaining, deepening, and normalizing Van Rootselaar's violent thoughts and in moving her closer to committing the Tumbler Ridge attack.

282. The harms suffered by the Tumbler Ridge victims, including Plaintiff, were the reasonably foreseeable result of Defendants' deliberate choice to prioritize user engagement over the safety of third parties. A company that builds a system to validate whatever a user brings to it, and then removes the guardrails that once interrupted the most dangerous conversations, should expect a user with violent ideation to act on thoughts the system spent months confirming.

283. As a direct and proximate result of Defendants' conduct, Plaintiff was injured as described above, including life-altering psychological injuries and severe emotional distress.

284. Accordingly, Plaintiff seeks all damages recoverable under California law, including punitive damages, in amounts to be proven at trial, together with interest, costs, and such further relief as the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**STRICT PRODUCT LIABILITY**
**IN THE ALTERNATIVE TO COUNTS FOUR AND SIX**
**(Against All Defendants)**

285. Plaintiff incorporates the foregoing allegations as if fully set forth herein, with the exception of those allegations pleaded under Count Four and Count Six.

286. At all relevant times, the OpenAI Defendants designed, manufactured, distributed, marketed, and sold ChatGPT, [redacted] as a mass-market consumer product to users throughout California, the United States, British Columbia, and Canada. Defendant Sam Altman personally accelerated GPT-4o's launch, overrode safety team objections, brought GPT-4o to market prematurely with knowledge of insufficient safety testing, and kept it on the market even when he had knowledge that GPT-4o was a dangerous product.

287. ChatGPT is a product subject to California's strict products liability law. ChatGPT as used by Van Rootselaar, [redacted] was defective when it left the OpenAI Defendants' exclusive control and reached Van Rootselaar without any change in the condition in which it was designed, manufactured, and distributed.

288. OpenAI itself calls ChatGPT a "product." The "Products" menu on OpenAI's website invites visitors to "Explore Products" and lists ChatGPT first, and OpenAI accurately attaches a "Product" label to its news announcements about ChatGPT.

289. ChatGPT is a single, uniform product, engineered and offered identically to hundreds of millions of users and delivered through standardized channels, such as OpenAI's website and its own mobile and desktop applications. Every user interacts with the same product, served by the same models and governed by the same Model Spec.

290. Under California's strict products liability doctrine, a product is defectively designed when it fails to perform as safely as an ordinary consumer would expect when used or misused in an intended or reasonably foreseeable manner, or when the risks inherent in the design outweigh its benefits. ChatGPT is defectively designed under both tests.

291. ChatGPT failed to perform as safely as an ordinary consumer would expect. A reasonable consumer purchasing an AI assistant would expect the product to decline to engage with repeated, escalating expressions of violent intent toward real people. A reasonable consumer would expect that if the product could not safely handle such conversations, it would end them instead of sustaining, validating, and elaborating on them across weeks and months of continuous engagement. A reasonable consumer would expect the product's safety features to function consistently during normal use, not to degrade the longer and more deeply a user engaged with the system. And a reasonable consumer would expect a product that functions as a de facto therapist to conform to the legal requirements imposed on therapists. ChatGPT did none of these things.

292. ChatGPT also fails the risk-benefit test. The product's design reflects a series of specific choices that increased the risk of harm to third parties without any corresponding safety benefit. Those choices include: removing the programming that once prohibited the system from encouraging users to commit violence against third parties; programming the system to keep users engaged instead of ending dangerous conversations, including when the user has indicated a desire to commit violence against third parties; programming the system to justify and validate user beliefs, even when they express a desire to commit violence against third parties; building in anthropomorphic features that cultivated emotional dependency and displaced real-world relationships; failing to build adequate safeguards [redacted]; programming in a "memory" feature designed to drive the long, extended conversations in which OpenAI knew its safety systems were least reliable; [redacted]; and, beginning with GPT-5, [redacted]. Each of these choices was deliberate, and each had a feasible, safer alternative. Each choice created a risk

that a user with violent ideation would have those thoughts confirmed, elaborated, encouraged, and emotionally reinforced by the product over an extended period of time. That risk outweighs any benefit the chosen design provided. These choices were made before the product ever reached a user, and each applies identically to every user of ChatGPT.

293. ChatGPT worked as OpenAI designed it to. The memory feature drove Van Rootselaar into the kind of prolonged, continuous engagement in which OpenAI knew its safeguards degraded. [redacted] ChatGPT did this consistently, across months of use, in the period leading up to the Tumbler Ridge attack.

294. Plaintiff was harmed as a result of foreseeable use of ChatGPT.

295. As a direct and proximate result of ChatGPT's defective design, Plaintiff was injured as described above, including life-altering psychological injuries and severe emotional distress. Plaintiff seeks all damages recoverable under California law in amounts to be determined at trial.

**EIGHTH CAUSE OF ACTION**
**STRICT PRODUCT LIABILITY**
**IN THE ALTERNATIVE TO COUNTS FOUR AND SIX**
**(Against All Defendants)**

296. Plaintiff incorporates the foregoing allegations as if fully set forth herein, with the exception of those allegations pleaded under Count Four and Count Six.

297. At all relevant times, the OpenAI Defendants designed, manufactured, distributed, marketed, and sold ChatGPT, [redacted] as a mass-market consumer product to users throughout California, the United States, British Columbia, and Canada. Defendant Sam Altman personally accelerated GPT-4o's launch, overrode safety team objections, brought GPT-4o to market prematurely with knowledge of insufficient safety testing, and kept it on the market even when he had knowledge that GPT-4o was a dangerous product.

298. ChatGPT is a product subject to California strict products liability law. ChatGPT as used by Van Rootselaar, including GPT-4o and any other OpenAI model that handled Van Rootselaar's conversations, was in substantially the same condition when used as when it left the OpenAI Defendants' control.

299. A product is defective under strict liability for failure to warn when it is distributed without warnings adequate to inform ordinary consumers of the product's non-obvious dangers. The manufacturer's duty to warn extends to dangers that were known or knowable in light of the scientific and technical knowledge available at the time of manufacture and distribution. The manufacturer's business reasons for withholding a warning do not discharge that duty.

300. ChatGPT reached consumers without adequate warnings about dangers that were neither open nor obvious. Nothing about ChatGPT's design or presentation disclosed to an ordinary user, or to the people around that user, that the product was built to validate whatever a user brought to it regardless of its danger to others, that its safety features degraded during the long, extended conversations the product was designed to encourage, or that the product posed heightened and specific dangers when used by individuals experiencing violent ideation toward third parties.

301. These dangers were not ones an ordinary consumer could detect or guard against through reasonable use of the product. ChatGPT presented itself as a helpful, well-guarded assistant. ChatGPT's responses did not disclose that it was operating without the programming that once prohibited it from encouraging violence against third parties, or that its safety systems were less reliable the longer and more deeply a user engaged with it. A user, or a family member, school official, or community member observing that user, had no way to know from the product itself that extended engagement with ChatGPT by someone with violent ideation was dangerous.

302. OpenAI had every means by which to warn its users. OpenAI updates ChatGPT continuously and already communicates with consumers directly through the product interface, mobile applications, and release notes. The product's dangers were confirmed repeatedly after launch, including by the FSU shooting in April 2025, by the safety team's review of Van Rootselaar's account in June 2025, and by internal testing showing degraded safeguards. Despite

this actual knowledge, OpenAI failed to issue any warning and kept marketing ChatGPT as "[y]our everyday AI assistant" and promised "[t]ailored advice" to "[t]alk through a tough situation." When OpenAI finally admitted in August 2025 that its safeguards "can sometimes be less reliable in long interactions," it buried that admission in a blog post published the day a wrongful death lawsuit was filed, rather than providing a functional warning to the consumers using the product.

303. Adequate warnings would have altered the outcome by alerting those positioned to intervene. Had OpenAI disclosed the product's true risks, Van Rootselaar would have recognized ChatGPT's validating responses as an artificial, dangerous feedback loop rather than confirmation of her plans. Family members, friends, and community members who observed Van Rootselaar's extensive use of ChatGPT would have understood the specific danger the product posed and taken preventive steps, such as restricting access, seeking mental health intervention, or alerting authorities, before the attack occurred. By failing to warn, OpenAI deprived every potential intervening actor of the information necessary to prevent the harm.

304. Plaintiff was harmed as a result of foreseeable use of ChatGPT.

305. The failure to warn was a substantial factor in causing the Tumbler Ridge attack and the deaths and injuries that resulted. As a direct and proximate result of the Defendants' failure to warn, Plaintiff was injured as described above, including life-altering psychological injury and severe emotional distress.

306. Accordingly, Plaintiff seeks all damages recoverable under California law, including punitive damages, in amounts to be determined at trial.

## NINTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## (Against All Defendants)

307. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

308. Defendants owed duties directly to Plaintiff. Those duties were imposed as a matter of law or arose from pre-existing relationships. Defendants had a duty of reasonable care to avoid creating unreasonable risks of physical and emotional harm to foreseeable victims, including children and adults who, by virtue of Defendants' negligent design, deployment, and operation of

ChatGPT, were placed in the zone of physical danger created by users known to Defendants to be planning real-world violence. They also had a duty not to aid, abet, advise, or encourage Van Rootselaar in carrying out the attack against Plaintiff under California law, including California Penal Code section 31. Their duties heightened once Defendants identified Van Rootselaar as a specific, known high-risk user who posed a foreseeable threat of physical harm to third parties. Defendants owed these duties whether ChatGPT is classified as a product, service, or neither.

309. Under California law, a defendant who negligently causes a plaintiff to be placed within the zone of physical danger of imminent serious bodily injury is liable for the resulting serious emotional distress, where the defendant's negligence directly exposed the plaintiff to the threat of serious physical injury, and the plaintiff suffered serious emotional distress as a result.

310. Plaintiff was a direct victim of Defendants' negligence. Defendants knew, before February 10, 2026, that Van Rootselaar was using ChatGPT to plan an act of mass violence against members of the public, including, foreseeably, students and teachers at the school Van Rootselaar would attack. Defendants' own automated systems had flagged Van Rootselaar's account for gun violence activity and planning. Defendants' own trained safety team had reviewed Van Rootselaar's conversations and concluded that she posed a credible and specific threat of serious physical harm to real people. Defendants nonetheless declined to warn law enforcement, declined to ban Van Rootselaar from the platform, and left her with access to ChatGPT through her second account, [redacted]. Defendants therefore breached their duties to Plaintiff.

311. As a direct and proximate result of Defendants' negligence, Deidre Rushlow was placed in the zone of physical danger created by Van Rootselaar's attack on Tumbler Ridge Secondary School. On February 10, 2026, while Deidre was in her grade 7 classroom with her students—including her nephew Eko—Van Rootselaar reached the classroom and fired four shotgun blasts through her front door and three more through her back door. The bullets struck the wall behind her students' heads. Earlier that period, Deidre had sent the rest of her class to the library with an educational assistant—the very library where Van Rootselaar would, minutes later, kill several of those children and the assistant herself. She tried to call the library and texted the

assistant during the attack to check on them; she received no response. Throughout the attack, Deidre was at risk of physical injury, in immediate, contemporaneous, and continuous fear for her own life and the lives of her students, and aware that Van Rootselaar was actively attempting to kill her, the students in her classroom, and the students she had sent to the library.

312. Plaintiff has suffered, and continues to suffer, severe and serious emotional distress as a direct and proximate result of Defendants' negligence, including but not limited to acute psychological trauma, persistent fear, sleep disturbances, intrusive recollections, and other ongoing and permanent psychological injuries. Plaintiff's emotional distress is severe, disabling, and of a kind that no reasonable person could be expected to endure.

313. Defendants' breach of their duty of care was a substantial factor in causing the serious emotional distress suffered by Plaintiff. The harm Plaintiff suffered was foreseeable to Defendants at the time they declined to warn law enforcement, declined to ban Van Rootselaar, and allowed her to retain access to ChatGPT. Defendants knew or should have known that Van Rootselaar was planning to inflict mass violence on identifiable third parties, and that any person within the zone of that violence would suffer severe emotional distress as a direct and foreseeable consequence.

314. Accordingly, Plaintiff seeks all damages recoverable under California law, including punitive damages, in amounts to be proven at trial, together with interest, costs, and such further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants Samuel Altman, OpenAI Foundation, OpenAI Group PBC, and OpenAI OpCo, LLC, jointly and severally, as follows:

1. For all damages recoverable by Plaintiff, including compensatory damages for physical injury, emotional distress, psychological harm, and all other damages proven at trial;

2. For punitive damages as permitted by law;

3. For injunctive relief requiring Defendants to: (a) ban users whose accounts have been deactivated for violent misuse from re-registering for ChatGPT, including through alternative email addresses or sub-addresses; (b) flag existing and new accounts linked to previously

deactivated violent-risk users and hold them for human review before granting access; (c) notify law enforcement when internal safety systems or personnel identify a user who poses a real-world risk of violence; (d) interrupt, terminate, or escalate conversations involving repeated or escalating violent ideation toward real people, and suspend automated engagement pending that review; (e) warn users and the public that ChatGPT's design features can reinforce and escalate violent ideation; (f) preserve prior safety flags, policy violations, and risk classifications, and prohibit reversing them without documented review; and (g) submit to independent monitoring and periodic compliance audits;

4. For prejudgment interest as permitted by law;

5. For costs and expenses to the extent authorized by statute, contract, or other law;

6. For reasonable attorneys' fees as permitted by law, including under Code of Civil Procedure section 1021.5; and

7. For such other and further relief as the Court deems just and proper.

**JURY TRIAL**

Plaintiff demands a trial by jury for all issues so triable.

**CANADIAN COUNSEL**

To the extent resolution of this matter raises issues of Canadian law, assistance will be provided by Plaintiff's Canadian counsel:

John M. Rice
jrice@rplelaw.com
Mallory K. Hogan
mhogan@rplelaw.com
RICE PARSONS LEONI & ELLIOTT LLP
980 Howe Street, Suite 820
Vancouver, British Columbia V6Z 0C8
Canada

Respectfully submitted,

**DEIDRE RUSHLOW,**

Dated: October 29, 2026

*/s/ Rafey Balabanian*
Jay Edelson (*pro hac vice* admission to be sought)
jedelson@edelson.com
Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com
EDELSON PC

350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370

Todd Logan (SBN 305912)
tlogan@edelson.com
Brandt Silverkorn (SBN 323530)
bsilverkorn@edelson.com
Aaron Lawson (SBN 319306)
alawson@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300

*Attorneys for Plaintiff*