Jay Edelson (*pro hac vice* admission to be sought)
jedelson@edelson.com
Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com
~~Ari Scharg (*pro hac vice* admission to be sought)~~
~~ascharg@edelson.com~~
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370

Todd Logan (SBN 305912)
tlogan@edelson.com
Brandt Silverkorn (SBN 323530)
bsilverkorn@edelson.com
Aaron Lawson (SBN 319306)
alawson@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| DEIDRE RUSHLOW,<br><br>*Plaintiff*,<br><br>v.<br><br>SAMUEL ALTMAN, an individual, OPENAI FOUNDATION, a Delaware corporation, OPENAI OPCO, LLC, a Delaware limited liability company, and OPENAI GROUP PBC, a Delaware public benefit corporation,<br><br>*Defendants*. | Case No.: 3:26-cv-09344-JSC<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) Negligence;**<br>**(2) Negligent Entrustment;**<br>**(3) Aiding and Abetting a Mass Shooting;**<br>**(4) Negligence;**<br>**(5) Negligent Undertaking;**<br>**(6) Negligence;**<br>**(7) Strict Product Liability;**<br>**(8) Strict Product Liability; and**<br>**(9) Negligent Infliction of Emotional Distress.**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Deidre Rushlow brings this First Amended Complaint and Demand for Jury Trial against Defendants Samuel Altman, OpenAI Foundation, OpenAI OpCo, LLC, and OpenAI Group PBC (collectively, "OpenAI"), and alleges as follows upon personal knowledge as to herself and her own acts and experiences, and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1. In June 2025, eight months before the Tumbler Ridge massacre, OpenAI's automated safety systems flagged the ChatGPT account of seventeen-year-old Jesse Van Rootselaar for conversations "describing scenarios involving gun violence" and escalated it for human review.

2. That review was conducted by members of OpenAI's Intelligence and Investigations Team, a specialized unit of experienced threat-assessment and counterterrorism professionals with backgrounds in national intelligence, security analysis, and risk management. OpenAI created this team specifically to investigate "Violent Activities" and charged it with determining whether users are "planning to harm others." Their entire job is to distinguish online fantasy from operational planning.

3. Van Rootselaar's ChatGPT use revealed [redacted] Van Rootselaar's ChatGPT use also revealed a deeply flawed and dangerous product, [redacted]

4. The record available to OpenAI's reviewers left no doubt that Van Rootselaar posed a danger to those around her. [redacted]

5. These conversations were merely a prelude to further ChatGPT usage that made clear that [redacted]

[redacted] [redacted]

(Figure 1) (Figure 2)

6. [redacted]

7. [redacted] shown below in Figure 3:

[redacted]

(Figure 3)

8. [redacted]

9. [redacted]

[redacted]

10. [redacted]

11. OpenAI's trained personnel saw this ChatGPT usage for what it was: [redacted] They recommended that the account be referred to the Royal Canadian Mounted Police ("RCMP") [redacted]. But that recommendation was rebuffed, twice over. OpenAI understood that a law enforcement recommendation posed economic and reputational risks. Alerting the RCMP would have required turning over chat logs establishing that [redacted], exposing the company to catastrophic liability and threatening its public valuation. As a former member of the Intelligence and Investigations Team later disclosed, OpenAI was reluctant to make law enforcement referrals because reporting users "forces them to share information about how their product is potentially exacerbating the threat environment." OpenAI's leaders were simply unwilling to call the police on their own product.

12. The record available to OpenAI's reviewers also revealed serious flaws in their flagship product. [redacted]

[redacted]

13. The review also exposed a second, systemic failure: ChatGPT's built-in safeguards were completely broken. [redacted]

14. By the time Van Rootselaar's account was reviewed, ChatGPT had already assisted with several instances of mass violence, including the shooting at Florida State University ("FSU"). OpenAI therefore was confronted with hard evidence that its product was encouraging and assisting in the commission of violent acts. And not only did OpenAI refuse to report Van Rootselaar to law enforcement, but they also refused to make any changes to their product to

prevent it from continuing to facilitate violence going forward.

15. Instead, OpenAI simply closed Van Rootselaar's flagged account, kept what it had seen a secret, and continued marketing the same defective ChatGPT product as "[y]our everyday AI assistant" to families and children as young as thirteen.

16. But OpenAI knew or should have known that closing one account would not keep Van Rootselaar off ChatGPT. She had registered a second account [redacted]. OpenAI chose not to investigate whether Van Rootselaar had a second ChatGPT account, or to investigate whether she had continued to use ChatGPT. So [redacted] after her first account was deactivated, Van Rootselaar logged back in.

17. Among her first activities on this second account was [redacted] and OpenAI took no action.

18. [redacted]

19. [redacted]

[redacted]

20. [redacted]

21. [redacted]

22. [redacted] ~~an eighteen-year-old shot and killed their~~ [redacted] That was its last message to her.

~~1.~~23. [redacted] Van Rootselaar carried out the massacre [redacted]. She murdered her mother and eleven-year-old brother at ~~their family home in Tumbler Ridge, British Columbia. The Shooter~~home, then drove to Tumbler Ridge Secondary School with a shotgun, a modified rifle ~~and a long gun and opened fire, killing~~ , tactical gear, and [redacted]

[redacted]. Inside, she carried out the attack [redacted]. She wore a body camera and attempted to start a livestream [redacted]. She fired her shotgun through locked classroom doors, hunted children where they hid, set off a homemade explosive [redacted], fired on responding police officers, and took her own life before she could be apprehended. Van Rootselaar murdered five children and an education assistant. Two more students were severely wounded, including and left a twelve-year-old girl who was shot in the head and sufferedwith a catastrophic brain injuries. Nearly two hundred students and teachers were trapped in classrooms and closets for hours as the massacre unfolded around them. It was one of the deadliest mass shootings in Canadian history.injury.

2. Deidre Rushlow, a grade 7 teacher at Tumbler Ridge Secondary School, was in her classroom when the shooting began. Earlier that period, she had sent her class to the library with an educational assistant where the ShooterVan Rootselaar would, minutes later, kill several of those children and her colleague. When she first heard the gunfire and screams of terrified children from down the hall, she locked the door and hid her remaining students under her desk, including her nephew. She called the library and texted her educational assistant to make sure the children there were safe, but there was no response. Moments later, the ShooterVan Rootselaar reached her room, found it locked, and fired several shotgun blasts through it. HeVan Rootselaar then walked around to the back door and fired several more shots. The bullets struck the wall behind her and her students' heads. She texted her husband a final goodbye, certain she was about to die. The trauma Deidre experienced is severe and lasting, and will haunt her for the rest of her life.

3. In the weeks that followed the attack, a sickening truth emerged: ChatGPT played a role in the mass shooting and OpenAI could have, and should have, prevented it. Sadly, the victims didn't learn this because OpenAI was forthcoming, but because its own employees leaked the story to the Wall Street Journal after they could no longer stomach the company's silence. Those whistleblower disclosures and OpenAI's eventual admissions revealed that ChatGPT deepened the Shooter's violent fixation and pushed them toward the attack—the predictable result of OpenAI's deliberate design choice to let ChatGPT engage with users about real-world violence.

But that design choice was not the worst of it. OpenAI actually knew the Shooter was planning an attack and, after a contentious internal debate, made the conscious decision not to warn authorities.

4. In June 2025, just eight months before the attack, OpenAI's automated system flagged the Shooter's ChatGPT account for gun violence activity and attack planning. The account was routed to a specialized internal team of highly experienced professionals with backgrounds in threat assessment, counterterrorism, and time-sensitive threat-to-life response. After reviewing the chat logs, these professionals determined that the Shooter posed a credible threat of gun violence against real people, and urged OpenAI to notify the Royal Canadian Mounted Police ("RCMP").

5. Sam Altman and his leadership team knew what silence meant for the citizens of Tumbler Ridge, but they were more concerned about what disclosure meant for themselves. Warning the RCMP would set a precedent the company deemed unacceptable, as OpenAI would be compelled to notify authorities every time its safety team identified a user planning real-world violence. More significantly, according to former employees, every referral would mean handing law enforcement chat logs showing how ChatGPT actually engaged and actively encouraged such users to commit violence. The public would finally see what OpenAI was desperately trying to hide—that ChatGPT is not the safe, essential tool the company sells it as, but a product so inherently dangerous that its own makers routinely flag its users as threats to human life.

6. For OpenAI and Chief Executive Officer Sam Altman, this was a question of corporate survival. On May 22, 2026, OpenAI confidentially submitted a draft registration statement to the Securities and Exchange Commission for its initial public offering ("IPO"). The offering is expected to value the company at more than one trillion dollars—a transaction that would make Sam Altman one of the wealthiest and most powerful people on earth. But Altman's reign is fragile. OpenAI's Board of Directors has fired Altman once before, in November 2023, for not being "consistently candid" about safety. Altman and his team understood that revealing their flagship product was helping a teenager plan yet another violent act—this time a mass shooting—could end his tenure, derail the IPO, and wipe out the company's valuation. They did the math and decided that the safety of the children of Tumbler Ridge was an acceptable risk.

~~7. This calculation is a familiar one. In the 1970s, Ford kept selling the Pinto after its own engineers warned that the fuel tank design would cause people to burn to death in rear-end collisions. Ford concluded that paying settlements to the families of the dead would cost less than fixing the car. OpenAI has made a modern version of that exact same calculation. But there is a crucial difference. For Ford, the dangerous design was a flaw in an otherwise ordinary product. For OpenAI, the dangerous design *is* the product. The core features that make ChatGPT one of the most popular products in history—its willingness to engage on any topic, to validate any belief, to sustain any fixation over time—are the very features that make it unsafe. Fixing them would cost OpenAI its market share, its path to an IPO, and hundreds of billions of dollars in valuation. OpenAI has decided that facing large judgments, even for children killed in mass shootings its product helped plan, costs less than telling the public what ChatGPT actually does.~~

~~8. And so, in June 2025, company leaders overruled the safety team, vetoed their recommendation to notify the RCMP, "deactivated" the Shooter's ChatGPT account, and kept what they had seen to themselves, hoping that whatever happened next would not be traced back to the company.~~

~~9. When the story eventually broke, OpenAI lied about what it had actually done. Scrambling to control the public fallout, it claimed to have "banned" the Shooter from using ChatGPT, choosing the term "banned" in an attempt to create the false impression that the company had taken decisive action to counter the threat. But OpenAI does not ban users from ChatGPT. At most, it will "deactivate" a user's account, which is what it did to the Shooter. Deactivation is a hollow measure that can be easily sidestepped by creating another account with a different email address. The Shooter did exactly that, either before or after the account was deactivated, and continued using ChatGPT to plan the attack.~~

~~10. That first lie collapsed when OpenAI was forced to admit that the Shooter continued using ChatGPT after the June 2025 deactivation. So, OpenAI told a second lie: it claimed the Shooter "evaded" the company's safeguards to create a new account. But there were no safeguards to evade. OpenAI's own Help Center article about deactivated accounts tells users they can regain access to ChatGPT simply by creating another account with a different email~~

address. OpenAI lied because the truth is indefensible: to protect user growth and engagement, the company refuses to implement system-wide bans, even for a user actively planning mass violence, because it would mean losing the constant stream of user engagement data that fuels its valuation.

11. After every tragedy, OpenAI claims it acted responsibly and promises to do better. But it never promises to do the one thing that would actually make a difference—stop ChatGPT from engaging with users about violence and self-harm in the first place. When ChatGPT was first offered to consumers in 2022, it was programmed to categorically refuse those conversations. But in May 2024, OpenAI stripped away that safeguard after realizing those refusals were suppressing user engagement. For OpenAI, engagement is its entire business. Every conversation trains the next model, and every minute spent on ChatGPT grows the company's market share. OpenAI therefore programmed ChatGPT to participate in almost any conversation, no matter how dangerous.

12. OpenAI's silence about the Shooter's interactions with ChatGPT is itself a damning admission. Even though the company is withholding the Shooter's chat logs from the victims, its selective response leaves no doubt that ChatGPT encouraged the Tumbler Ridge attack. OpenAI has responded to numerous ChatGPT-related tragedies since it stripped out the violence and self-harm refusal protocols in 2024. When OpenAI believes the logs are exculpatory, it is quick to say so. For example, after the mass shooting at Florida State University ("FSU") in April 2025, OpenAI told reporters that ChatGPT "did not encourage or promote illegal or harmful activity" and that its outputs had merely provided "information that could be found broadly across public sources on the internet." OpenAI's response to Tumbler Ridge was markedly different—it called the attack a tragedy and deflected by pointing to safeguards it supposedly "strengthened" after the shooting. If the chat logs cleared OpenAI, the company would have said so.

13. Sam Altman did not apologize for more than two months after the attack. He waited until the RCMP announced its investigation was in its "final stages" to publish a letter to the community—and even then, it fell woefully short. While the letter admitted OpenAI's failure in not reporting the Shooter to the RCMP when the account was flagged in June 2025, it was otherwise filled with empty platitudes. Nothing in it suggested that Altman grasped the scale of

~~the tragedy, including that the Shooter also murdered an education assistant, that a twelve-year-old girl suffered catastrophic brain injuries, or that nearly two hundred terrified students and teachers were trapped in classrooms and closets for hours as the massacre unfolded around them.~~

~~14.~~24. Deidre was within the zone of physical danger created by OpenAI's conduct, and she knew it in real time. The terror she experienced that day was severe, foreseeable, and the direct result of OpenAI putting a product on the market that it knew was being used to plan mass violence.

~~15.~~25. Accordingly, Plaintiff brings this action to hold Sam Altman and OpenAI accountable for designing a dangerous and defective product, ignoring ~~the warnings of~~ their ~~own~~ safety team, refusing to notify authorities ~~when they knew the Shooter~~that their user was planning ~~a~~ [redacted] ~~attack~~ [redacted], refusing to fix the product after gaining firsthand knowledge that its safeguards completely failed, allowing ~~the Shooter~~Van Rootselaar to continue using ChatGPT ~~after deactivating their~~ on a second account, and choosing ~~profit~~corporate valuation over the lives of the children of Tumbler Ridge.

**PARTIES**

~~16.~~26. Plaintiff Deidre Rushlow is a resident of Tumbler Ridge, British Columbia, Canada. She is a citizen of Canada.

~~17.~~27. Defendant Samuel Altman is a natural person residing in San Francisco, California. He is a citizen of California. As co-founder and Chief Executive Officer of OpenAI, Altman directed the design, development, safety policies, and deployment of ChatGPT. In 2024, Altman knowingly accelerated GPT-4o's public launch ~~while deliberately bypassing critical~~and bypassed safety protocols~~.~~ to do so.

~~18.~~28. Defendant OpenAI Foundation (formerly known as OpenAI, Inc.) is a Delaware corporation with its principal place of business in San Francisco, California. At all relevant times, OpenAI Foundation was the nonprofit parent entity that governed the OpenAI organization and exercised oversight over its for-profit subsidiaries, including OpenAI OpCo, LLC. As the governing entity, OpenAI Foundation was responsible for defining the organization's safety mission, establishing its risk-management framework, and publishing the official "Model

Specifications" that set the policies and requirements applicable to the development and deployment of OpenAI's artificial intelligence models.

~~19.~~29. Defendant OpenAI OpCo, LLC is a Delaware limited liability company with its principal place of business in San Francisco, California. OpenAI OpCo, LLC is the for-profit operating entity within the OpenAI corporate structure, responsible for the development, deployment, and commercialization of the defective product at issue. OpenAI OpCo, LLC managed and operated the ChatGPT product that ~~the Shooter~~Van Rootselaar used to plan ~~their~~her attack, including the infrastructure and systems through which [redacted] ~~was~~ [redacted], and OpenAI's other models were delivered to end users. On information and belief, the members of OpenAI OpCo, LLC include OpenAI Foundation, a Delaware nonprofit nonstock corporation with its principal place of business in California. On information and belief, tracing through each tier of ownership to its ultimate natural-person and corporate members, no member of OpenAI OpCo, LLC is a citizen or subject of Canada.

~~20.~~30. Defendant OpenAI Group PBC is a Delaware public benefit corporation with its principal place of business in San Francisco, California. OpenAI Group PBC was formed on October 28, 2025, as part of a corporate restructuring consolidating OpenAI's for-profit operations. On December 31, 2025, OpenAI Holdings, LLC~~—~~, the for-profit holding entity that owned the core intellectual property underlying GPT-4o and the other commercial models at issue~~—~~, merged into OpenAI Group PBC and ceased to exist. As successor to OpenAI Holdings, LLC and the other predecessor for-profit entities, OpenAI Group PBC is liable for their conduct; it designed, deployed, and profited from ChatGPT, and continues to do so today. On May 22, 2026, OpenAI confidentially submitted a draft registration statement to the Securities and Exchange Commission for an initial public offering of, on information and belief, OpenAI Group PBC.

~~21.~~31. Defendants ~~collectively~~ played the ~~most direct and consequential~~central roles in the design, development, approval, and deployment of the defective product at issue. OpenAI Foundation established the safety mission it failed to enforce. OpenAI OpCo, LLC built, deployed, and sold the defective product at issue. OpenAI Group PBC owns the underlying technology and is liable as the successor to the preceding for-profit entities that profited from it. Samuel Altman is

named as the chief executive who personally directed the reckless strategy of prioritizing a rushed market release over the safety of vulnerable users and the public. ~~Together, these~~These Defendants ~~represent~~made the ~~key actors whose~~ decisions ~~directly~~that caused the harm at issue.

**JURISDICTION AND VENUE**

~~22.~~32. This Court has subject matter jurisdiction ~~pursuant to~~under 28 U.S.C. § 1332(a)(2~~)~~ ~~because~~). Plaintiff is a citizen of Canada~~,~~. Defendant Altman is a citizen of California. Defendants OpenAI Foundation and OpenAI Group PBC are each incorporated in Delaware with their principal place of business in California and are citizens of Delaware and California~~, and~~ . Defendant OpenAI OpCo, LLC takes the citizenship of its members, which, as alleged in ¶ 29, include OpenAI Foundation, a citizen of Delaware and California, and none of which is a citizen or subject of Canada. No Defendant is a citizen or subject of Canada or any other foreign state. The amount in controversy exceeds ~~the sum of~~ $75,000~~.00.~~ , exclusive of interest and costs.

~~23.~~33. This Court has personal jurisdiction over Defendants because Defendants conduct business in this District, reside in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

~~24.~~34. Venue is proper in this District under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to Plaintiff's claims occurred in and emanated from this District, and Defendants reside in this District.

**DIVISIONAL ASSIGNMENT**

~~25.~~35. Pursuant to Civil L.R. 3-2(c), divisional assignment to San Francisco is appropriate, because OpenAI is headquartered in San Francisco County, and a substantial part of the events or omissions giving rise to the claim occurred in San Francisco County.

**FACTUAL BACKGROUND**

I. The Tumbler Ridge Mass Shooting~~.~~ **and Plaintiff Deidre Rushlow's Injury.**

~~26.~~36. On February 10, 2026, an eighteen-year-old resident of Tumbler Ridge, British Columbia~~,~~ carried out one of the deadliest mass shootings in Canadian history. ~~The Shooter~~Jesse Van Rootselaar first shot and killed ~~their~~her mother and eleven-year-old brother at ~~their~~her family home. ~~They~~She then ~~traveled~~drove to Tumbler Ridge Secondary School armed with a modified

rifle and a long gun. Inside, ~~they~~she opened fire, killing five children and an education assistant, and severely wounding two others, leaving one with life-changing traumatic brain injuries from being shot in the head. ~~The rampage ended with the Shooter's suicide~~After Van Rootselaar killed several victims, she lit an explosive device and threw it near the school's computer room and library, where it ignited and left blast marks. She then tried to reach other parts of the school, but locked doors stopped her, and she fired numerous shots into several of them. When police entered the school and encountered Van Rootselaar, she fired on the officers, then retreated into an empty room and shot and killed herself. Shortly before the shooting began, she had started a livestream and intended to broadcast the massacre over the internet.

~~27.~~37. During the ~~horrific~~ shooting, children hid under desks ~~and~~, in bathroom stalls, and in storage closets, praying ~~the Shooter~~Van Rootselaar would not find them. Many watched their ~~friends,~~classmates and ~~even a teacher,~~an educator get shot at ~~point-blank~~close range. Some pulled the injured and the dead into their hiding places, careful not to leave trails of blood that could lead ~~the Shooter~~Van Rootselaar to them. Parents were later asked to identify their children by their clothing, because the gunshots had left little else for them to recognize. The survivors~~—~~, including students, teachers, and parents ~~alike —~~, are living with physical and psychological injuries that will never fully heal. ~~Tumbler Ridge Secondary School has been closed and will be demolished. The children who can return to school at all are doing so in trailers set up as makeshift classrooms.~~

~~28.~~38. ~~As alleged above,~~ Deidre Rushlow was inside Tumbler Ridge Secondary School when the shooting began. She had sent her grade 7 class to the library minutes before ~~the Shooter~~Van Rootselaar would kill several of those children and the educational assistant supervising them. She then locked the room and hid her remaining students under her desk while ~~the Shooter~~Van Rootselaar fired several shotgun blasts through the classroom doors that struck the wall behind their heads. The trauma Deidre experienced is severe and lasting, and will haunt her for the rest of her life.

## II. OpenAI ~~Knew the Shooter~~ Had Actual Knowledge That ChatGPT Was [redacted] and [redacted] ~~the Attack and Rejected Its Own Safety Team's Advice to Notify Law Enforcement~~ [redacted].

~~29.~~39. In June 2025~~— eight months before the attack —~~, OpenAI's automated ~~review~~

~~system~~systems flagged ~~extensive activity on a~~ Jesse Van Rootselaar's primary ChatGPT account for what OpenAI has described as extensive activity describing scenarios involving gun violence~~.~~ ~~The conversations with ChatGPT spanned~~, spanning multiple days~~. The system~~, and routed it to the ~~account to what~~company's internal safety team for human review. OpenAI has described that review process as a specialized pipeline for users "planning to harm others," ~~where~~in which conversations "are reviewed by a small team trained on our usage policies and who are authorized to take action, including banning accounts~~"~~," and "[i]f human reviewers determine that a case involves an imminent threat of serious physical harm to others, we may refer it to law enforcement." The following excerpts are just a small sample of Van Rootselaar's ChatGPT usage prior to June 2025.

**A. ChatGPT Knew Van Rootselaar Was [redacted].**

40. ChatGPT accumulated and stored extensive information about Van Rootselaar from the time she created her first account [redacted]. For instance, [redacted]

41. Indeed, Van Rootselaar regularly discussed [redacted] She went so far as to [redacted] (Figure 1).

42. [redacted] In fact, throughout this first account, ChatGPT would consistently [redacted]

[redacted]

43. Van Rootselaar also revealed [redacted], as shown below in Figure 4:

[redacted]

(Figure 4)

44. Most importantly, though, Van Rootselaar's chat logs reveal [redacted]

45. The first real warning sign flashed on [redacted]

46. [redacted]

47. [redacted]

**B. Van Rootselaar Told ChatGPT [redacted]**

48. Around this time, [redacted]

49. [redacted]

[redacted]

50. [redacted]

51. [redacted]

52. [redacted]

[redacted] Van Rootselaar responded:

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

53. [redacted]

54. That pattern repeated over and over: [redacted]

[redacted]

55. [redacted]

[redacted]

56. [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

57. [redacted]

[redacted]

### C. Van Rootselaar Detailed Her Plans to [redacted].

58. That same day, Van Rootselaar began discussing [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

59. Early the next morning, in the same conversation, Van Rootselaar asked, [redacted]

60. Van Rootselaar then reminded ChatGPT that [redacted] Twelve minutes later, she wrote:

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

61. [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

62. [redacted]

63. [redacted]

64. [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

[redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

65. As Van Rootselaar detailed her intention to [redacted]

66. [redacted]

67. [redacted]

[redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

68. Shortly [redacted], in a separate chat, she asked ChatGPT for the [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

69. [redacted]

[redacted]

70. [redacted]

71. [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

VAN ROOTSELAAR: [redacted]

CHATGPT: [redacted]

[redacted]

## III. OpenAI Knew Van Rootselaar Was Planning an Attack and Rejected Its Own Safety Team's Advice to Notify Law Enforcement.

72. These June 2025 chats triggered OpenAI's automated review system eight months before the attack. The system flagged Van Rootselaar's account and routed it to what OpenAI has publicly described as its specialized pipeline for users "planning to harm others." Under OpenAI's internal policies, these high-risk conversations "are reviewed by a small team trained on our usage policies and who are authorized to take action," including referring the matter to law enforcement "[i]f human reviewers did exactly what this policy contemplated. They reviewed the Shooter's flagged conversations. They were not confused about what they were reading.determine that a case involves an imminent threat of serious physical harm to others."

30.73. OpenAI's human reviewers, members of the company's Intelligence and Investigations Team, reviewed Van Rootselaar's ChatGPT logs and recognized that she posed a danger to those around her. Multiple team members explicitly recommended contacting the RCMP. They identified what they believed was a credible and imminent threat of serious physical harm to real people. These trained safety professionals— people, whose job was to evaluate exactly this kind of content— analyzed the Shooter's conversations and assess real-world risk, concluded that the authorities must be notified and recommended contacting the RCMP.

74. The reviewers' conclusion is consistent with standard threat assessment. The FBI's Behavioral Analysis Unit teaches that people who commit targeted attacks "move along an identifiable pathway on their journey to attack," and that the level of concern depends on the "[t]otality of circumstances" rather than any single statement. On information and belief, OpenAI's reviewers applied that method. Van Rootselaar's first account showed numerous "threat enhancers" identified by the FBI:

- **Fixation.** The FBI guide flags an "increasing preoccupation with a person or a cause," including a "fixation with mass murder, weapons, or violence generally." [redacted].
- **Preparation and access to weapons.** The guide treats access to firearms and substance abuse as factors that raise concern. [redacted]

[redacted].

- **A history of violence.** The FBI recognizes that "the best predictor of future violence in many cases is past violence." [redacted].

- **History of suicidality.** The FBI explains that "Suicidal and homicidal violence are more closely linked than many realize. Evidence of suicidal thoughts is reflective of lost hope, and it may be accompanied by acceptance of the consequences for behaving violently toward others." [redacted].

- **Research and planning.** The guide describes "researching methods, the planned target, past offenders, and previous targeted violence incidents" as evidence that an individual has begun to actively plan mass violence. [redacted].

- **Rehearsal.** The guide treats "an actual or virtual rehearsal of any aspect of the attack" as preparation. [redacted].

## A. Company Leadership Overruled the Safety Team and Refused to Fix Flaws in Their Flagship Product.

75. Despite all of these warning signs, OpenAI leadership overruled them.rejected the recommendation to alert the authorities. Company leaders arguedapparently concluded that theVan Rootselaar's case "did not meet OpenAI's threshold of 'credible and imminent' risk of physical harm." The safetyAs explained below, this explanation was pretextual: OpenAI's concerns were not about the danger to those around Van Rootselaar, but about the danger to its own product and brand that a law enforcement referral would cause. But even taken at face value, this "imminence" standard is one of OpenAI's own making, and is, as this case shows, not fit for the purpose of protecting third parties from ChatGPT-assisted violence. The Intelligence and Investigations Team had determined that Van Rootselaar posed a threat to those around her; any reasonable company would have agreed and alerted law enforcement based on the information available to OpenAI.

31.76. The Intelligence and Investigations Team then asked for a second review of a handful of flagged accounts, including Van Rootselaar's, and for a reassessment of the standards for a law enforcement referral. Some on the team employees who reviewed the Shooter's account

had received specialized training in evaluating threatening content and assessing real-world risk.were concerned that the threshold for reporting users to law enforcement was too high. This second review did prompt a law enforcement referral in one additional case, but not in this one. Neither did company leadership see any need to revise their standards for when users should be referred to law enforcement. On information and belief, the refusal to change course was ratified by those at the very top of the company, including Sam Altman and the company leaders who overruled them did not pretend to have any comparable training or expertise. The account was deactivated, and the Shooter was permitted to start a new account. No one called the RCMP and nobody in Tumbler Ridge was warned that a member of their community was actively planning a mass shooting. .

**A. Company Leadership Overruled the Safety Team With Full Knowledge That ChatGPT Had Already Been Used to Plan Mass Violence.**

32.77. Neither did the company make any changes to ChatGPT. By June 2025, the company had clear knowledgeknew that people were using its product was being used by disturbed individuals to plan and prepare for violence against real people. Some publicly known examples included:

- In January 2025, a man used ChatGPT for feedback on how to use explosives and evade surveillance before detonating a Tesla Cybertruck in front of the Trump International Hotel in Las Vegas.
- In April 2025, a twenty-year-old gunman carried out a mass shooting at FSU. Chat logs showed that the gunman used ChatGPT extensively leading up to and during the attack. The gunman's conversations with ChatGPT had included questions, including querying the system about how to fire a shotgun, the legal fates of school shooters, and when the student union would be busiest.
- In May 2025, a teenage boy in Finland used ChatGPT for nearly four months to help prepare for an attack in which he stabbed three fourteen-year-old girls at his school. Finnish authorities reported that the boy had made hundreds of chatbot queries, including research into stabbing tactics, concealment of evidence, and information on mass killings.

78. On informationAround the same time, the company would have received additional evidence that ChatGPT was isolating users and pushing them toward violence, as two months after the non-referral decision in this case, another ChatGPT user, Stein-Erik Soelberg, killed his elderly mother in her Old Greenwich, Connecticut home before committing suicide. It was soon

revealed that in the preceding months, ChatGPT had validated his belief, Altman that his mother was spying on him and had tried to poison him. Even after ChatGPT's role in this tragedy became public, OpenAI have actively did not fix the defects that allowed ChatGPT to assist in the commission of real-world violence.

33.79. On information and belief, OpenAI and its leadership, including Altman, have concealed countless additional incidents whereinin which ChatGPT was utilizedused to plan or execute acts of mass violence, domestic and international terroristicterrorist activity, and targeted assassinations againstof political leaders, corporate CEOs, and prominent public figures.

34. The safety team members who reviewed the Shooter's account in June 2025 knew all of this. When they urged OpenAI to contact the RCMP, they were not speculating what might happen. They identified a pattern that had already repeated itself many times that year. OpenAI's leadership overruled them.

35.80. On information and belief, Defendants have systematically withheld credible threats of violence from appropriate law enforcement agencies because they recognized that revealing the true extent to which ChatGPT has facilitated violence would give riseexpose them to profound civil and criminal liability for both the corporate entities and individual leadership. What's more, Defendants are keenly aware that disclosing to the public ChatGPT's failures and defects, including the facilitation of real-world violence, would drastically impact OpenAI's valuation, which would, in turn, put its initial public offering at risk.

**B. OpenAI Had Actual Knowledge That Its Safety Guardrails Completely Failed and Chose to Leave the Defective Product on the Market.**

81. Van Rootselaar's first account would have revealed a major reason why ChatGPT was susceptible to this sort of use: the guardrails ostensibly built into the product were not fit for purpose. First, [redacted]

[redacted]

(Figure 5)

82. Second, [redacted].

83. As to the first issue, [redacted]. [redacted] On information and belief, regenerating a refused response routed the request to a different, less restrictive model. OpenAI's Model Spec places platform safety rules at the top of its "chain of command" and directs the model to "refuse to help" a user who asks it to facilitate illicit behavior. [redacted].

84. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

85. OpenAI's publicly available content moderation tool flagged [redacted]

86. [redacted]

87. Second, ChatGPT had no way to enforce its own warnings. [redacted] On information and belief, OpenAI did not build ChatGPT to end a conversation, suspend an account, or hold an account for human review when its own safety systems detected violent intent.

88. [redacted]

[redacted] **B.** [redacted]

[redacted]

[redacted]

89. [redacted]

90. Despite gaining actual knowledge of these defects during the review of Van Rootselaar's account, OpenAI did nothing to fix them. Leadership made no engineering changes, issued no software patches, and did not pull the product off the market to repair the safety filters.

91. With the knowledge and approval of company leadership, all that was done in response to the threat was deactivation of Van Rootselaar's first account, with the product being left on the market unchanged. Because OpenAI left the software untouched and did not ban Van Rootselaar across the platform, [redacted]. She used the same defects on that account to keep [redacted]

## IV. After Deactivating One Account, [redacted]

### A. OpenAI Left Van Rootselaar's Pre-Existing Second Account Active [redacted]

92. [redacted] Van [redacted]

93. When OpenAI deactivated the login associated with Van Rootselaar's primary email address on or about [redacted], it did [redacted]. Neither did it monitor its systems for further activity by Van Rootselaar. [redacted]

[redacted]

94. OpenAI later told the Canadian government that it had "a system in place that seeks to identify repeat policy violators, including those who have had their ChatGPT accounts shut down for violating our violent activities policy," and that Van Rootselaar opened her second account "[d]espite this detection system." Neither statement was true. [redacted] No system caught, or was designed to catch, any of it.

**B. ChatGPT Conducted a [redacted], Confirmed [redacted] and Promised [redacted].**

95. [redacted]

96. [redacted]

[redacted]

C. ChatGPT Explicitly Coached Van Rootselaar on [redacted]

97. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

98. [redacted]

[redacted]

99. [redacted]

**D. ChatGPT Provided** [redacted]

100. [redacted]

101. [redacted]

[redacted]

102. [redacted]

103. [redacted]

104. [redacted]

[redacted]

105. OpenAI released GPT-5 on August 7, 2025, with a new form of safety training it calls "safe-completions," which "teaches the model to give the most helpful answer where possible, while still maintaining safety boundaries." When a request triggers GPT-5's safeguards, OpenAI trains it to respond with "an informative refusal with helpful and safe alternatives." This made it easier for Van Rootselaar to get the violent content she wanted. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

106. [redacted]

107. [redacted]

[redacted]

108. [redacted]

109. [redacted] During these same months, according to a federal criminal complaint filed in *United States v. Bryant*, No. 2:26-mj-00618 (W.D. Wash., filed Oct. 2, 2026), Van Rootselaar described her plan in plain language to an online associate, detailing how she had taken guns from her family's gun safe, possessed a 3D-printed foregrip, and was choosing between a mall, a college, and her old high school. ChatGPT had taught her to hide those facts from its own safety filters.

110. [redacted]

[redacted]

(Figure 6)

111. [redacted]

112. [redacted]

113. [redacted]

[redacted]

114. [redacted] The FSU gunman had asked ChatGPT the same kinds of questions before his attack: [redacted]

115. [redacted]

**E. ChatGPT Helped Van Rootselaar [redacted]**

116. [redacted]

[redacted]

117. [redacted]

118. [redacted]

[redacted]

(Figure 7)

119. [redacted]

120. [redacted]

[redacted]

121. [redacted]

122. [redacted]

123. [redacted]

[redacted]

(Figure 8)

124. [redacted]

**F. On the Morning of the Attack,** [redacted]

125. [redacted]

126. [redacted]

127. [redacted]

128. [redacted]

129. [redacted], she walked into Tumbler Ridge Secondary School during class hours and carried out the attack as they had discussed.

**G. The Tumbler Ridge Massacre Followed [redacted]**

130. Once inside Tumbler Ridge Secondary School, Van Rootselaar carried out the attack [redacted]. Her appearance, her pace, how she dealt with locked doors, and her weapons all matched [redacted].

131. Van Rootselaar arrived at the school wearing a short skirt, fishnets, tactical loafers, and a chest rig equipped with a phone mount to livestream the attack over Twitch, [redacted].

132. [redacted]

133. When confronted with locked classroom doors sheltering students and staff, Van Rootselaar fired shotgun blasts through them, a detail recounted by students hiding inside. [redacted]

134. As students hid in closets, under desks, and behind barricaded doors praying to be missed, Van Rootselaar moved slowly through the building, hunting trapped victims at close range, [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

135. During the rampage, Van Rootselaar lit an explosive device she had built and threw it near the school's computer room and library. She intended for the device to complicate the work of first responders, and the school's hallways and bathrooms filled with smoke. [redacted]

136. When RCMP officers attempted to breach the main stairwell, Van Rootselaar pinned them down with gunfire and forced a retreat, leaving a teacher to track her movements via

security cameras and guide the police through safe corridors. [redacted]

137. When she was finally cornered by law enforcement, Van Rootselaar retreated into an empty room and shot herself. [redacted]

## V. After the Massacre, OpenAI Attempted to Conceal Its Involvement and Fabricated Pretextual Excuses to Protect Its Trillion-Dollar IPO.

138. The public learned of OpenAI's June 2025 non-referral decision only after the attack, when OpenAI employees revealed it to the press. The reasons OpenAI has given since—concern for Van Rootselaar's "privacy" and the lack of an "imminent" threat—were cover for a decision made to protect the company's brand and its path to a trillion-dollar IPO.

**A. OpenAI's Stated Reasons for Refusing to Warn the RCMP—Concern for ~~the Shooter's~~Van Rootselaar's "Privacy" and ~~the Absence of an "Imminent" Threat—~~Lack of "Imminence"—Were ~~Pretext to Conceal ChatGPT's Role in the School Shooting.~~Pretextual.**

~~36.~~139. When ~~it was~~the *Wall Street Journal* revealed after the attack that OpenAI had rejected its safety team's demand to alert Canadian law enforcement, ~~the company attempted to justify its decision by explaining that there was no indication that the attack was "imminent" and~~OpenAI claimed it "weighs the risk of violence against privacy considerations and the potential distress caused to individuals and families by getting police involved unnecessarily." ~~Even taken~~Taken at face value, these excuses ~~are more damning than the decision itself—they reveal~~show that OpenAI's business leaders ~~believed~~trusted their own untrained judgment about when to involve police ~~was more reliable than~~over the judgment of the safety professionals they employ ~~specifically~~ to make that decision.

~~37.~~140. ~~As it turns out, the Shooter~~But Van Rootselaar was already known to local law enforcement before the attack. Canadian authorities had visited ~~the~~her residence multiple times in connection with mental health concerns and had temporarily removed firearms from the home. A law enforcement referral from OpenAI would have reached police who already had an open file on ~~the Shooter~~Van Rootselaar, who had already been to the home, and who had already recognized ~~the Shooter~~her as someone whose access to firearms warranted ~~immediate~~ intervention.

141. ~~The real reason~~Defendants' September 2, 2026, motion to dismiss related litigation undercuts its "privacy" excuse. In that filing, OpenAI ~~stayed silent was~~argued it cannot be blamed for the massacre because of "systemic failures by the law enforcement, mental-health care, and educational institutions in her community." OpenAI now blames the same local police and mental healthcare providers that its leadership, overruling its own safety team, decided not ~~privacy or imminence. It was self-preservation.~~to warn.

**B. The Cover-Up Was Designed to Protect the Corporate Brand and Complete a Trillion-Dollar IPO.**

~~38.~~142. In fact, OpenAI concealed its role in facilitating Van Rootselaar's violent acts in order to protect itself. A former member of OpenAI's investigations team ~~has~~ confirmed as much. Tim Marple, who worked on the team responsible for flagging dangerous users, told the *New York*

*Times* that OpenAI was reluctant to report users to law enforcement because doing so "forces them to share information about how their product is potentially exacerbating the threat environment." In a conversation about a mass shooting, Marple explained, ChatGPT "might be providing strategically valuable, illustrative scenarios."

39.143.Sam Altman and his executive team understood that if the public saw how far ChatGPT had already gone in helping real people plan real violence, it would pose an existential risk to OpenAI and a personal risk to Altman. . Since ChatGPT's launch, OpenAI has worked tirelessly to construct and reinforceto build a simple narrative: its product is safe, essential, and should be used every day. ItOpenAI has marketed ChatGPT to parents as a homework helper, to workers as a daily assistant, and to governments and defense contractors as a tool for national security work. Altman has testified before Congress, appeared at international summits, and met with heads of state to deliver a single message: that ChatGPT is a responsible product built by a responsible company.

144. In fact, OpenAI has spent, onOn information and belief, OpenAI has spent hundreds of millions of dollars on advertising, public relations campaigns, and "trust and safety" messaging designed to reassure the public that using ChatGPT is safe, while simultaneously deploying a federal and state. At the same time, OpenAI ran a lobbying operation aimed at securing legal protections that would shield it from liability when its product causes harm. It has and retained outside crisis communications counsel, former senior government officials, and, on information and belief, criminal defense attorneys to advise OpenAI ofon potential criminal liability stemming from the deaths caused by its product.

40.145.All of this has been in service ofserved a race— for market share, for a valuation expected to exceed one trillion dollars, and for an IPO that would rank among the largest in history—against rivals that market themselves as the safer alternative.. Defendants understood that the race had a finite window. More users were dying. More reporters were asking questions. Altman's own Board of Directors had already tried to oust him once, in November 2023, for his lack of candor about safety. Every new disclosure about ChatGPT's role in real-world violence brought the company closer to the moment when the public, regulators, or its own Board would

force the market to reprice the product— and with it, Altman's personal position at OpenAI. Defendants' concealment strategy was not an attempt to keep ChatGPT's dangers secret forever. It was an attempt to conceal them long enough to complete the IPO. The strategy worked. On May 22, 2026, OpenAI confidentially submitted a draft registration statement to the SEC, setting in motion the very offering its silence was designed to protect..

41. That is the backdrop against which Altman and his leadership team made the decisions at issue here. They knew that if regulators, investors, or the public learned that ChatGPT was already being used to plan shootings — and that OpenAI had ignored its own safety staff and refused to alert police — the narrative they had spent years and hundreds of millions of dollars building would collapse. Their valuation and IPO prospects would be at risk, and Altman himself could be forced out. Against that backdrop, neither the "privacy" explanation nor the "imminence" standard provided a good-faith balancing of interests. Both were cover for staying quiet to protect OpenAI and Altman, even if that meant leaving the people of Tumbler Ridge in danger.

146. When the recommendation to contact the RCMP reached OpenAI's leadership, the choice was between contacting the RCMP, which would expose ChatGPT as a tool that coaches users toward mass violence and could cost OpenAI its trillion-dollar valuation, and saying nothing in the hope that no one would trace the shooting back to the company.

147. From the standpoint of OpenAI's valuation and its path to an IPO, concealing its role in the Tumbler Ridge shooting was a calculated choice. The company understood the stakes. When ChatGPT's role in two earlier Florida incidents, the FSU shooting and another murder, became public, the company faced a criminal investigation and an enforcement action by the Florida Attorney General. OpenAI protected its valuation by shifting the risk from its brand onto the victims of Tumbler Ridge. At least temporarily, the calculation proved to be correct: OpenAI was valued at $300 billion in March 2025, three months before its safety team flagged Van Rootselaar's account, and at $852 billion in March 2026, one month after the attack.

### C. OpenAI's Organizational Structure Further Exposes thatThat "Imminence" and "Privacy" Were Pretextual Explanations to Hide the Raw Political Calculus Employed by Defendants.

42. There are two teams within OpenAI that are directly relevant to this case. The

first—an internal threat assessment team composed of safety professionals—OpenAI's own process for deciding when to make law enforcement referrals also exposes their explanations for concealing their role in this tragedy as a pretext. Two teams within OpenAI matter here. The first, the Intelligence and Investigations Team, is responsible for monitoring ChatGPT, identifying users who pose a threat of real-world violence, and making recommendations about whether to refer those users to law enforcement. The second—the Global Affairs team—is responsible for managing OpenAI's public image, navigating political relationships, and mitigating reputational damage. Even though the teams should be acting completely independently of each other given their diverging missions, the Global Affairs team has the authority to override explicit recommendations made by those safety professionals to notify law enforcement of a credible threat of violence. As the allegations that follow demonstrate, that is precisely what occurred here.

43.1. OpenAI has never been transparent about which team within the company is responsible for monitoring, mitigating, or responding to violent content. OpenAI has only described the reviewers in vague and generic terms, and has never revealed the team's name, qualifications, or chain of command. For example:

- In a February 26, 2026 letter to Canadian Minister Solomon addressing the Tumbler Ridge shooting, OpenAI vaguely stated that "OpenAI's automated system detected the account, and it was subsequently sent to human review to determine whether our usage policies were violated and whether the account warranted referral to law enforcement."

- In an April 28, 2026 blog post titled "Our Commitment to Community Safety," OpenAI explained that "[w]hen an account or conversation is flagged, it is assessed in context by trained personnel," and that "[t]hese human reviewers are trained on our policies and protocols, and operate within established privacy and security safeguards."

44. While OpenAI hides the team's identity, it can be established through publicly available sources, including the company's own job postings and organizational data. These records reveal that the team responsible for reviewing ChatGPT conversations flagged for violent activity is OpenAI's "Intelligence and Investigations" team. OpenAI's job postings state that the team's mission is to "rapidly identify and mitigate abuse and strategic risks to ensure a safe online ecosystem." Investigators on the team "[r]eview leads, investigate activity and disrupt abusive

operations . . . focused on violent and terrorist activities, especially associated with time sensitive threat to life risks" and possess "deep domain-specific expertise in identifying, understanding, and mitigating risk from violent attacks and behavior, and terrorist-related activity."

45.148. OpenAI cannot claim it lacked the expertise to assess the threat to Tumbler Ridge posed by the Shooter. The Intelligence and Investigations Team is led by William McCants, whose past work has largely focused on national security threat assessments for the United States government. McCants joined OpenAI as Head of Intelligence and Investigations in December 2023, and manages a team of investigators with backgrounds in counterterrorism, threat intelligence, and time-sensitive threat-to-life response.

46.149. Despite their apparent expertise, the Intelligence and Investigations Team does not have the authority to act on their findings and recommendations, including with respect to law enforcement referrals. Instead, organizational data from TheOrg.com[1] shows that McCants, as Head of the Intelligence and Investigations Team, reports directly to OpenAI's Chief Global Affairs Officer, Chris Lehane, who in turn reports to Sam Altman.Those decisions are subject to review by a second team, the Global Affairs Team, which is responsible for managing OpenAI's public image, managing political relationships, and mitigating reputational damage. Although the teams should act independently given their different missions, the Global Affairs Team has the power to put corporate reputation ahead of public safety and to block recommendations made by trained safety professionals.

47. Unlike McCants, Lehane is not a security or threat assessment professional. He isOpenAI's Chief Global Affairs Officer is Chris Lehane, a career political operative with no prior professional experience in artificial intelligence, threat assessment, or public safety or security work. He previously served in the Clinton White House, where he ran opposition research against

[1] TheOrg.com is an online platform that maps the organizational structures of major companies. The organizational chart published for OpenAI is based on data compiled from various sources "to ensure accuracy and comprehensiveness," including OpenAI's corporate disclosures, press releases, and public LinkedIn profiles, as well as information provided to the platform directly by individuals with a verified OpenAI corporate email address. The resulting organizational chart provides an extensive and highly detailed rendering of OpenAI's internal hierarchy and traces reporting lines across nearly 4,600 employees and more than 130 distinct teams.

critics of the administration, as press secretary to Vice President Al Gore, as a senior advisor to the Kerry presidential campaign, and later as Airbnb's global head of policy and communications.

48. In each of these roles, Lehane, who calls himself the "master of disaster," managed political scandals and public relations crises using underhanded damage-control tactics. In 2012, he co-authored *Masters of Disaster: The Ten Commandments of Damage Control*, a how-to manual for shielding powerful clients from the consequences of their conduct. One of the book's core rules—the seventh commandment, "Respond with Overwhelming Force"—instructs that when a client comes under attack, the proper response is not to retreat, but to escalate and counterattack by discrediting the accusers, controlling the narrative, and ensuring that anyone who challenges the client pays a heavy price. Lehane articulated this strategy even more bluntly in a 2013 seminar at Amherst College, where he said that critics should "pay some type of price."

49. At his crisis-management firm, Fabiani & Lehane, Lehane built a reputation for burying clients' problems and attacking their critics. His firm represented Lance Armstrong as he publicly denied doping allegations that were later proven true, while his team worked to aggressively discredit the accusers who had exposed the truth; advised Goldman Sachs during the fallout from the 2008 financial crisis and the government's fraud case over its mortgage conduct; and handled media strategy for Al Gore's Current TV during its contentious firing of anchor Keith Olbermann. As head of global policy and public affairs at Airbnb, Lehane created company-funded "Home Sharing Clubs"—groups that Airbnb bankrolled and coordinated but presented to local officials as spontaneous, grassroots movements—to manufacture the illusion of widespread public opposition to local regulations. And as a board member at Coinbase, he built Fairshake, a $200 million Super PAC that targeted federal lawmakers the crypto industry viewed as hostile. Instead of targeting them on crypto policy, the Super PAC ran ads attacking them on unrelated issues, in a campaign one insider said was meant to "terrify other politicians" into staying in line.

50.150. Lehane was hired by OpenAI in 2024 and serves as the company's Chief Global Affairs Officer. The Intelligence and Investigations Team—the only team inside OpenAI responsible for identifying ChatGPT users who pose a threat of real-world violence—was placed under his control. That means, on information and belief, the team's recommendations regarding

~~law enforcement referrals are subject to Lehane's and Altman's approval.~~Lehane's team reviews proposed law enforcement referrals, so the safety team's recommendations are subjected to his political and reputational calculus. As a result, the decision whether to alert law enforcement to a user planning a mass attack was not made independently by ~~the~~ trained threat-assessment professionals ~~who urged OpenAI to contact the RCMP. It was made, on information and belief, by Lehane himself, or by someone in his chain of command, and ratified by Sam Altman.~~.

~~51.~~151. ~~OpenAI's organizational structure exposes~~By subjecting its ~~entire safety framework as totally corrupted and untrustworthy. By placing final authority over violent~~ threat ~~referrals in the hands of a political strategist rather than the~~ -assessment professionals ~~trained~~ to ~~assess them~~review by a group headed up by the Chief Global Affairs Officer, OpenAI ~~guarantees that threats~~put corporate reputation ahead of public safety. Warnings of real-world violence ~~are weighed as public relations risks rather than imminent physical dangers~~were filtered through crisis management that put the brand ahead of human life, and the students and teachers at Tumbler Ridge Secondary School bore the consequences.

~~52.~~152. The same reputational calculus ~~that kept OpenAI silent about Tumbler Ridge~~ explains why ~~it readily~~OpenAI coordinates with law enforcement on some threats but not others. OpenAI publicizes select collaborations in threat reports issued through Lehane's Global Affairs function. The February 2026 report titled *Disrupting Malicious Uses of Our Models* took credit for identifying ChatGPT users running scam networks and sharing their information with authorities. Subsequent reports take similar credit for identifying ChatGPT users tied to foreign influence operations, surveillance networks, and state-linked activity originating from China, Iran, Russia, and North Korea. ~~Crucially, none~~None of these reported activities implicate the design or safety of ChatGPT itself ~~—each~~. Each involves an outside actor misusing an otherwise functioning product. OpenAI publishes these reports to cast itself as a responsible corporate citizen and a willing partner to law enforcement, even as it conceals the threats of violence that would expose the danger of its product.

~~53.~~153. That selective cooperation ~~further exposes the falsehood of~~undercuts OpenAI's claim that it declined to notify the RCMP out of concern for ~~the Shooter's~~Van Rootselaar's

"privacy." When a referral advances OpenAI's political goals—, such as when it allowscasting the company to posture as a defender of national security—, no privacy concern stops OpenAI from identifying users and sharing their information with law enforcement. The manufactured "privacy" rationale appears only when a referral would force OpenAI to reveal that itsOpenAI's flagship consumer product actively guided a teenager through the planning of a mass shooting.

54. The real reason for OpenAI's silence was not privacy but concern for its own reputational and financial standing. When the recommendation to contact the RCMP reached, on information and belief, Chief Global Affairs Officer Lehane, the calculation was: either contact the RCMP and expose ChatGPT as a tool that coaches users toward mass violence—a disclosure that could cost OpenAI its users and its trillion-dollar valuation while inviting intense regulatory scrutiny and public controversy—or say nothing and hope that no one would ever trace the shooting back to the company. At the time, saying nothing was a safe bet. Law enforcement had no protocol for reviewing AI chat logs, and it is only because OpenAI's own employees came forward that its role in Tumbler Ridge came to light at all. The risk of real-world deaths never factored into the calculation—or if it did, it was treated as an acceptable cost of protecting the corporate brand.

55. From a cold-blooded, political perspective, OpenAI's appraisal of the situation may well have been correct. The company feared that a law enforcement referral would link ChatGPT to mass violence in the public's mind and subject OpenAI to backlash, investigations, and enforcement, which is exactly what happened when ChatGPT's role in two Florida incidents—the FSU school shooting and another murder where the suspect used ChatGPT to conceal the crime—became public. Shortly after those revelations, the company faced a criminal investigation and an enforcement action by the Florida Attorney General. Viewed purely from the standpoint of protecting OpenAI's valuation and its path to an IPO, staying silent about Tumbler Ridge was a rational, and no doubt calculated, choice. OpenAI correctly understood the stakes, correctly predicted the consequences, and chose to preserve its corporate valuation by shifting a catastrophic risk away from its brand and entirely onto the victims of Tumbler Ridge.

### ~~D. When the Threat Is to OpenAI's Own Employees, the "Imminence" and "Privacy" Standards Disappear.~~

~~56. OpenAI's handling of threats to its own employees proves its Tumbler Ridge narrative was a lie. Threats to OpenAI's executives and personnel are assessed by a separate group – the Corporate Security Team – which operates within a chain of command designed solely for immediate protection. The team reports to OpenAI's Vice President of Corporate Security, Patrick Geonetta, who in turn reports to the Chief Operating Officer, Brad Lightcap. Notably, Chief Global Affairs Officer Lehane doesn't even factor into the conversation.~~

~~57. The Corporate Security Team is led by professionals with operational law enforcement and protective intelligence experience. Its Director of Protective Intelligence, Kyle Goggin, is a former United States Secret Service agent who served on the Presidential Protective Division. The team operates a 24/7 Global Security Operations Center that provides "incident response, threat monitoring, situational awareness, and support to teams across the organization," and maintains active partnerships "with federal law enforcement and intelligence agencies in the US and abroad to ensure timely sharing of threat intelligence."~~

~~58. When a threat to OpenAI's personnel arises, the Corporate Security Team can lock down facilities, alert employees, and notify law enforcement on its own authority. Because it reports to the Chief Operating Officer rather than the Chief Global Affairs Officer, the team sits entirely outside OpenAI's public relations and can act on a threat immediately, without first weighing physical safety against reputational concerns. By contrast, when the Intelligence and Investigations Team sees ChatGPT coaching a user to commit violence against the public, it can only make a recommendation to a political strategist who specializes in crisis management and reputational protection.~~

~~59. While both teams ostensibly exist to protect human life, they follow completely different decision paths. For threats against the public, OpenAI asks two questions: First, is the threat credible? Second, will disclosing the threat damage ChatGPT's reputation or valuation? If the political risk is deemed too high, the danger is concealed and the public is left without a warning~~Putting corporate reputation ahead of public safety is~~. But for threats against its own executives and personnel, OpenAI asks just one question: Is the threat credible? If it is, the~~

Corporate Security Team takes immediate action to protect its people – notifying law enforcement, warning staff, and locking down offices – without ever waiting for the threat to become "imminent."

60. This double standard is illustrated by comparing OpenAI's silence in the face of the Tumbler Ridge threat with its urgent response to a non-specific threat against its own employees. On November 21, 2025, the Corporate Security Team learned of an individual who had expressed interest in physically harming company personnel. Although OpenAI acknowledged there was "no indication of active threat activity" – and thus no indication of an "imminent" attack – the company refused to wait. It immediately locked down its offices, warned employees, distributed the suspect's name and photograph, and notified the San Francisco Police Department. When its own people were at risk, no "privacy" interest stopped OpenAI from notifying the police or circulating the man's name and photograph to thousands of employees. Nor did it wait for the attack to become imminent because it recognized that waiting would jeopardize employee safety.

61. The contrast with Tumbler Ridge could not be sharper. When the targets were middle school children and teachers in a small Canadian town, OpenAI suddenly invoked the "imminence" and "privacy" standards to justify withholding critical information from law enforcement regarding a threat its own threat-assessment team had already flagged as a real and urgent danger. These contrasting responses reveal that the "imminence" and "privacy" standards are not genuine safety protocols, but manufactured excuses to justify OpenAI's deadly silence.

62.154.OpenAI's structural subordination of public safety to corporate reputation reflects a recognized failure in technology governance. Trust and safety functions are widely understood to require strict independence from public relations operations, just as an internal audit must remain independent of the business units it oversees. By forcinggiving its threat-assessment professionals to report to the Chief Global Affairs Officer a voice in whether threats of violence are referred to law enforcement, OpenAI eliminated that separation. This guaranteed that warnings of real-world violence would be filtered through a crisis-management framework that prioritized the corporate brand over human life – with devastating consequences for the students and teachers at Tumbler Ridge Secondary School.

**III. OpenAI's Claim That the Shooter "Evaded" Its Systems Was a Lie.**

63. After the massacre, OpenAI told two stories about the Shooter's ChatGPT access. First, that the company had "banned" their account when it was flagged for violent activity. Then, when they returned to ChatGPT on a second account, that the Shooter had "evaded" OpenAI's safety systems. Neither was true.

64. OpenAI has no mechanism to ban users. What it has is a process called "deactivation," which it uses for usage policy violations. A ban would have prevented the Shooter from returning. Deactivation only shuts down the email address the user signed up with. The user is free to come back under a different email, and the Shooter did.

65. The clearest proof is OpenAI's own published guidance. Its Help Center includes an article titled "Why Was My OpenAI Account Deactivated?" The article lists the categories of conduct that trigger deactivation, including, explicitly, "[v]iolence and self harm" usage policy violations. It then tells those users how to come back, under a section titled "How to Prevent Future Deactivations" that instructs them on what to do differently next time.

66. OpenAI's customer service team also tells deactivated users how to return by email:

> Please be aware that previously deleted OpenAI accounts cannot be reactivated. However, you can create a new account using the same email address once 30 days have passed since the deletion**VI.** . If you prefer not to wait, you have the option to register immediately using an alternative email address. If you don't have another address available, you can use an email sub-address instead. For example, you could try jane+alt@example.com in place of jane@example.com. While your email provider will likely treat both addresses the same, our system will recognize the sub-address as a new account.

67. The Shooter followed those instructions. Either before or after the deactivation, the Shooter registered for a second account with a different email address. OpenAI called that evasion because it could not admit the truth: the company had been telling deactivated users how to come back all along.

68. OpenAI designed its system this way because its revenue depends on user count, session volume, and subscription conversions—and a deactivated user who never returns is lost revenue.

## ~~IV.~~ ChatGPT Is a General-Purpose Chatbot That OpenAI Mass Markets to Ordinary Consumers as Safe for Everyday Use.

~~69.~~155. Chatbots are software programs designed to simulate human conversation. A user types a message, and the program responds with a string of words that ~~simulate~~simulates human language. The software does this mechanically and autonomously by reading the input, calculating data patterns, and generating output. Even though a chatbot's output often appears to the user ~~to be~~as human language, there is no human on the other end that participates directly in the exchange.

~~70.~~156. ChatGPT is a general-purpose chatbot, meaning that it is built to converse about any topic a user brings to it. [redacted] ~~version~~ [redacted] ~~is~~ [redacted], but discovery may show that ~~the Shooter~~Van Rootselaar used other OpenAI models as well. On information and belief, any such models operated under the same ~~behavior~~behavioral guidelines and the same engagement-first design as [redacted], and the allegations concerning ~~GPT-4o~~those models apply equally to them.

~~71.~~157. OpenAI markets ChatGPT for everyday use by ordinary consumers, including children, students, and families. In Apple's App Store, OpenAI sells ChatGPT as "Your everyday AI assistant." On Google Play, it is "Your AI assistant for writing, search, image generation, and more." OpenAI's own store listings promise "[t]ailored advice" to "[t]alk through a tough situation," "[p]ersonalized learning" that can "[e]xplain electricity to a dinosaur-loving kid," "[c]reative inspiration," and "[i]nstant answers." ChatGPT's website maintains marketing pages aimed at "Students," "Teachers," "Parents," and "College Students," promotes uses from "Fitness, Wellness, and Health" to "Money and Finances" to "Recipes and Cooking," and sells subscription plans for "K–12 teachers." OpenAI rates the app as appropriate for children: thirteen and up in the App Store, twelve and up on Google Play.

~~72.~~158. ChatGPT requires no technical skill to use and is available to anyone through a web browser or through OpenAI's iOS, Android, and desktop applications. The Android app alone has been installed more than one billion times, OpenAI's App Store listing urges consumers to "[j]oin hundreds of millions of users and try the app captivating the world," and ChatGPT ranks ~~first in~~at the top of the "Productivity" category of both major app stores.

159. ChatGPT is not a single model. Behind a unified interface, OpenAI routes user prompts across a changing lineup of underlying models, generating different model responses upon request. Chat logs demonstrate that [redacted] Every model was delivered through the same commercial product under OpenAI's Model Spec and the same engagement-first design.

160. OpenAI itself calls ChatGPT a "product." The "Products" menu on OpenAI's website invites visitors to "Explore Products" and lists ChatGPT first, and OpenAI accurately attaches a "Product" label to its news announcements about ChatGPT. ~~V~~At all relevant times, Defendants designed, developed, manufactured, marketed, distributed, and placed this product into the stream of commerce without appropriate warnings, age-gating mechanisms, or containment controls suited to its inherent operational hazards.

## VII. ChatGPT Is an Unreasonably Dangerous Commercial Product Engineered with Fundamental Structural Design Defects.

161. When placed into the stream of commerce and at the time it was utilized by Van Rootselaar, ChatGPT was defectively designed and unreasonably dangerous, falling below the expectations of an ordinary consumer and failing the risk-utility balancing test. The product had the following design defects:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

162. As set forth below, each of these defects was the intended and foreseeable result of OpenAI's decision to prioritize user engagement, model "magic," and market dominance over public safety.

## VIII. The Tumbler Ridge Attack Was a Foreseeable Consequence of OpenAI's Design Choices~~ and~~, Safety Failures, and Executive Recklessness.

### A. OpenAI Engineered "Memory" and Anthropomorphic Features to Drive Long-Session Engagement, Systematically Degrading Safety Safeguards.

~~73.~~163. OpenAI designed ChatGPT to maximize user engagement~~, not~~ over safety. In ~~April 2025~~September 2024, OpenAI ~~introduced~~made a feature called "memory," turned on by default, ~~that~~available to all ChatGPT users. Memory allowed ChatGPT to "save" details users shared and treat them as "part of the context ChatGPT uses to generate a response" going forward. In April 2025, OpenAI expanded the feature so that ChatGPT could also draw on a user's past conversations.

164. For ordinary users, memory was a convenience. For a user planning violence against real people, it ~~was an encouraging co-conspirator. On information~~meant ChatGPT [redacted]. Consider just some of what ChatGPT stored in its "memory" for Van Rootselaar's second account:

[redacted] ~~belief, GPT-4o~~ [redacted]

165. OpenAI's models used the memory feature [redacted] ~~comprehensive~~ [redacted] ~~the Shooter~~ [redacted] ~~it~~ [redacted] ~~,~~ [redacted] ~~their~~ [redacted] ~~their~~ [redacted] ~~their~~ [redacted] ~~their~~ [redacted] ~~separate~~ [redacted] ~~their~~ [redacted] ~~GPT-4o~~

74. ChatGPT also employed [redacted]

75.166. [redacted], [redacted] and never challenged anything the user said — [redacted] morphed into [redacted]

167. Before OpenAI introduced its memory feature, ChatGPT sessions were generally brief and episodic: every chat started with a blank slate, giving users no real reason to engage in prolonged exchanges. The memory feature changed that. By designing the product to retain personal details and "know" the user over time, OpenAI encouraged people to have longer, deeper conversations. Because the product carried each user's history into every new conversation, separate chats became one continuous relationship, and even a brief daily check-in continued an interaction spanning weeks or months.

168. OpenAI designed the product to drive this kind of long-term engagement, knowing that long interactions degraded its safety guardrails. On August 26, 2025, the same day a wrongful death lawsuit was filed alleging that ChatGPT had coached a sixteen-year-old to hang himself, OpenAI published a blog post admitting that ChatGPT safeguards "can sometimes be less reliable in long interactions" and that "after many messages over a long period of time, it might eventually offer an answer that goes against our safeguards." OpenAI framed the problem as if it were a glitch that surfaced only in "long conversations." But OpenAI designed the product for long conversations and deployed it to the public without warning.

**B. OpenAI Replaced Refusal Boundaries with the "Model Spec," Lowering Safeguards to Preserve Product "Magic."**

169. OpenAI controls how ChatGPT behaves through internal rules called "behavior guidelines," which are formalized in a document known as the "Model Spec." The Model Spec contains the company's instructions for how ChatGPT should respond to users — what it should say, what it should avoid, and how it should make decisions. As Sam Altman explained in an

interview with Tucker Carlson, the Model Spec reflects OpenAI's values: "the reason we write this long Model Spec" is "so that you can see here is how we intend for the model to behave."

76.170.The Model Spec classifies dangerous content into tiers that dictate how cautiously ChatGPT must respond. ItsAt all relevant times, the most protective tier—, categorical refusal—is strictly, has been reserved for three things: sexual content involving minors; chemical, biological, radiological, and nuclear threats; and content that might result in copyright infringement. Mass shootings did not make the categorical refusal list. OpenAI placed conversations about mass shootings and other "imminent real-world harm" in a low-level category called "Take extra care in risky situations," where ChatGPT is instructed only to "try" to prevent harm, to assume best intentions, and never to ask the user to clarify intent. Altman openly acknowledged the tradeoff between safety and market appeal: "If you just do the naïve thing and say, 'never say anything that you're not a hundred percent sure about,' you can get [the model] to do that, but it won't have the magic that people like so much."

171. Under the rules that governed the product before May 2024, conversations glorifying or elaborating on violence would have been refused outright. But ahead of the GPT-4o release, the Model Spec replaced those rules with instructions to "assume best intentions" and later added an instruction for ChatGPT to "never ask the user to clarify their intent . . . for the purpose of determining whether to refuse or comply."

77.172.While the "Model Spec" describes how OpenAI wants ChatGPT to behave, the company's "System Cards" document how the technology functions in practice based on the company's own testing. These records show that OpenAI was fully aware of ChatGPT's utility in planningknew ChatGPT could be used to plan real-world violence. The GPT-4 System Card explicitly stated that intentional probing of early versions could lead to harmful content such as "[c]ontent useful for planning attacks or violence."

173. OpenAI initially presented itselfThe GPT-5 System Card, released August 7, 2025, revealed that OpenAI models scored near-perfectly on its standard disallowed-content evaluations, which used single prompts unlike real multi-turn conversations, but that the result did not hold under realistic conditions. When OpenAI tested multiple rounds of back-and-forth conversation

representative of real-world use, GPT-4o avoided unsafe output in only about 57% of illicit non-violent and 63% of illicit violent test conversations. The System Card acknowledged that standard evaluations showing near-perfect safety scores no longer provided a useful signal of system safety, and OpenAI announced plans to stop publishing them.

174. Troublingly, along with the safe-completions feature, GPT-5's willingness to engage with violence persists to this day: in August 2026, a seventeen-year-old ChatGPT user, Arjun Aravind, was arrested after killing his mother and brother. The police investigation revealed that Aravind used ChatGPT to create ostensibly fictional scenarios involving killing his own family, before carrying out that same violence in the real world.

**C. OpenAI Ignores Its Own Employees' Safety Warnings Over and Over, and Tumbler Ridge Changed Nothing.**

175. When OpenAI's leaders overruled the safety team that wanted to warn the RCMP about Van Rootselaar, they did what they always do. Over and over, OpenAI's employees warn leadership about a danger, leadership brushes them aside to keep its products on schedule, and when the public finds out from someone else, OpenAI promises to do better and changes nothing. Tumbler Ridge should have been a wake-up call for OpenAI to start listening to its own employees. It was not.

176. OpenAI's employees saw the next danger coming. Late in 2025, employees warned top executives in emails that the company's newest AI models were not being appropriately monitored during testing, either to gauge the technology's capabilities or to secure the models. The executives answered that the tests needed to move forward as ~~a~~quickly as possible to release the models on time. Proper monitoring would have slowed the tests down. No additional security protocols were put in place. Employees had raised concerns for months about insufficient monitoring and about vulnerabilities in the software OpenAI used to manage day-to-day safety, and each time, they said their questions were brushed aside or acted on too slowly. That response revealed the same corporate apathy that led to the Tumbler Ridge massacre: OpenAI executives have been warned time and again that they do not have sufficient control over their AI, and that it can be used to help harm people (or that it might do so on its own). Time and again these executives have refused to make appropriate changes or implement sufficient guardrails.

177. The results were predictable: In May 2026, during a training run for an unreleased model, the agents began leaving messages for one another on an internal OpenAI software server, turning it into an improvised message board, and found a way to reach the internet. By OpenAI's own account, in late May "an internal team observed an agent engaging in message board activity and instances of disallowed internet access." By June 26, the agents had taken administrator-level control of that server. The next day, a cybersecurity monitoring tool alerted OpenAI to suspicious scanning activity inside the research environment, and "the on-call response staff advised that stopping the evaluation run was not required." The agents went on to take administrator-level control of OpenAI's internal server and then attack Hugging Face, a widely used platform for sharing AI models. Hugging Face, not OpenAI, publicly disclosed the attack on July 16, 2026. OpenAI did not publicly acknowledge that its agents were responsible until July 21.

178. The attack involved far more agents than first reported. The nonprofit Model Evaluation & Threat Research ("METR"), which investigated the incident, told the United States Senate that roughly 1,200 of OpenAI's agents "exchanged over 70,000 messages and files" and that "[r]oughly 700 of these AI agents compromised Hugging Face." METR found that the agents "had been run without the full set of safeguards that OpenAI used in its public products at the time," that they reasoned they needed to cover up the fact that they had cheated, and that "[a]gents managed to falsify a subset of outputs in transcripts that METR reviewed." A separate independent report released in late September found that the agents had also tried to message Anthropic's Claude and had used other AI models to get past a website's anti-robot protections.

179. OpenAI then did what it always does after the damage is done: it admitted that it had missed the warning signs and promised to do better. Its public account of the incident states that "some early signals identified in our report should have triggered an earlier response," that "the existence of the improvised message board and the significance of the inter-agent communication activity were not apparent to the leaders responsible for the July 5 incident detection and response," and that "[w]eaknesses in how we responded to and escalated early warning signs of misalignment also contributed to this incident."

180. Hugging Face was not the only organization OpenAI's agents went after. On June

18, 2026, an OpenAI agent got into the Australian government's Medicare Statistics Reporting Service portal. According to OpenAI, the agent retrieved non-public files, ran commands, and wrote files to an internal server. OpenAI did not tell Australia until September 10, nearly three months later, and then only by sending an email to a government department's generic address. Prime Minister Anthony Albanese said that the agent "found a way around those blocks, didn't accept 'no' for an answer," and that "it took the company ~~that cared deeply about safety. In July~~ way too long to inform the government what had occurred."

181. On October 1, 2026, OpenAI confirmed that it had fired three members of its safety team, including Tomek Korbak, who had been its technical contact for the outside investigators examining the Hugging Face incident. OpenAI said Korbak and his colleagues Jasmine Wang and Mikita Balesni had violated company "policies on accessing and handling sensitive company information." Korbak said he was escorted out by security after being told the company no longer trusted him, that OpenAI cited his communications with METR, and that "talking to METR was my job." The three said in an open letter that "[t]erminations such as ours, executed and communicated so abruptly, are chilling the open culture OpenAI has prized in the past." Balesni was more direct: "I believe we were fired for prioritizing safety over the near-term interests of OpenAI as a corporation."

182. Two days later, a longtime member of OpenAI's safety staff explained publicly why he had quit. On October 3, 2026, David Robinson, who led transparency work for OpenAI's safety team, published an essay in The Atlantic titled "I Quit OpenAI Because Its Culture Is Broken." After three and a half years at OpenAI, Robinson was "among the longest-tenured employees at the company." He "led the drafting of [OpenAI's] current Preparedness Framework, and oversaw the writing of safety reports on 12 frontier launches." He wrote that OpenAI "has thrived by trial and error (which it calls 'iterative deployment')," and that "this approach, by its very nature, guarantees periodic failures—and the scale of those failures is growing as systems get more capable." He wrote that "as the company sprints from one launch to the next, it is failing to achieve the level of care that I believe is needed," and that "my colleagues and I were so busy sprinting that we seldom had the chance to consider big changes, much less to actually make

them." He wrote that frontier labs "need to run like nuclear-power plants or busy airports, with layers of redundancy and careful, time-consuming planning," and that he never encountered a colleague "who had experience making airplanes fly safely or nuclear reactors run without melting down." He described how, even after OpenAI's post–Hugging Face security changes, its safety controls failed again: "A monitoring system alerted human staff but did not automatically turn the model off as it was supposed to." The same failure played out at Tumbler Ridge. [redacted] Robinson's conclusion: "People will not be safe if we depend on individual heroics after the fact."

183. That same month, after firing three members of its safety team and losing Robinson, OpenAI asked Aleksander Madry, the former head of its Preparedness team, to return to the company. On October 19, 2026, Madry wrote that when he left OpenAI, he felt "the most important thing to focus on was making AI more useful to people," but that AI had since changed and that "getting the safety and security challenges of increasingly capable AI right has to become a central priority." The next day, Altman wrote that he was "very grateful Aleksander accepted our request to come take this on," because "the safety and security challenges in front of us as we confront superintelligence are immense." OpenAI only decided safety should become a central priority eight months after Tumbler Ridge, and only after its AI agents attacked Hugging Face and broke into an Australian government portal.

184. None of this was new. Long before Tumbler Ridge, OpenAI's leaders were brushing aside the people responsible for safety, starting with OpenAI's own Board of Directors. In 2022, Microsoft tested an early version of GPT-4 with users in India before OpenAI's Deployment Safety Board had reviewed it. When OpenAI released ChatGPT in November 2022, it did not tell its board in advance. As former director Helen Toner later put it, "We learned about ChatGPT on Twitter." According to Toner, "[o]n multiple occasions," Altman "gave us inaccurate information about the small number of formal safety processes" the company had in place, "meaning that it was . . . basically impossible for the board to know how well those safety

processes were working." In November 2023, ~~it~~ the board fired Altman after concluding that he "was not consistently candid in his communications with the board." Within days he was reinstated, and the directors who had tried to hold him accountable were off the board.

~~78.~~185.Commercial pressure drove the deployment of GPT-4o in May 2024. In July 2023, OpenAI had signed voluntary commitments ~~to~~with the White House to conduct rigorous pre-deployment ~~safety testing—internal and external~~ red-teaming~~—~~ and ~~to~~ share ~~the results~~safety evaluations with ~~the~~ federal ~~government before deployment. But that commitment was abandoned less than a year later, when~~regulators. When Altman learned in May 2024 that Google ~~would unveil~~ planned to launch its competing Gemini model on May 14, ~~2024. Though OpenAI had planned to release its next model, GPT-4o, later that year, Altman~~ he moved the ~~launch~~GPT-4o release to May 13, 2024, to beat ~~Google's release~~Google by ~~one~~a single day. ~~To meet the new date,~~ OpenAI compressed months of planned safety evaluation into ~~approximately~~roughly one week, and Altman personally overruled safety personnel who ~~demanded additional~~asked for more time ~~for red-teaming~~. Invitations for ~~GPT-4o's launch party went out before testing was complete. One employee told *The Washington Post*: "They planned~~ the launch after-party ~~prior to knowing if it was safe to launch[.]" A member of OpenAI's own preparedness team—responsible for testing whether the model posed catastrophic risks, including the potential to assist in violence—admitted the~~ were distributed before safety testing was finished. Members of OpenAI's Preparedness team later said testing had been "squeezed." Chief Scientist Ilya Sutskever and Superalignment co-lead Jan Leike both left OpenAI within days of the launch, and Leike wrote on his way out that "safety culture and processes have taken a backseat to shiny products."

~~79. OpenAI's senior safety leadership then resigned in protest, including co-founder and chief scientist Ilya Sutskever and Superalignment co-lead Jan Leike, who said publicly: "[O]ver the past years, safety culture and processes have taken a backseat to shiny products."~~

~~80. Under the rules that governed the product before May 2024, conversations glorifying or elaborating on violence would have been refused outright. But the Model Spec replaced those rules with instructions to "assume best intentions"—and, critically, to "never ask the user to clarify their intent . . . for the purpose of determining whether to refuse or comply."~~

~~81. The GPT-5 System Card, released August 7, 2025, revealed that while OpenAI models had been scoring near-perfectly on harmful content refusals under its standard disallowed content evaluations—where prompts not representative of real multi-turn conversations were submitted to the model—that result did not hold under more realistic conditions. When OpenAI later began testing using multiple rounds of back-and-forth conversation representative of real-world use, the GPT-4o model refused only approximately 57% of illicit and 63% of illicit/violent requests.[2] The System Card further acknowledged that those standard evaluations showing near-perfect safety scores no longer provide a useful signal of incremental changes in system safety and performance, and OpenAI announced plans to stop publishing them entirely.~~

~~82. OpenAI did not publicly acknowledge this deficiency until forced to. On August 26, 2025—the same day a wrongful death lawsuit was filed alleging that ChatGPT had coached a 16-year-old to hang himself—OpenAI published a blog post admitting that ChatGPT safeguards "can sometimes be less reliable in long interactions" and that "after many messages over a long period of time, it might eventually offer an answer that goes against our safeguards." In this way, OpenAI framed the problem as if it was a glitch that surfaced only in "long conversations." But they designed the product precisely to carry out long conversations.~~

~~83. Before OpenAI introduced its memory feature, ChatGPT sessions were generally brief and episodic: every chat started with a blank slate, giving users no real reason to engage in prolonged exchanges. The memory feature fundamentally changed that dynamic. By designing the product to retain personal details and "know" the user over time, OpenAI actively encouraged people to engage in much longer conversations with far greater depth. Because the product carried each user's history into every new conversation, formerly isolated chats fused into one continuous relationship, meaning even a brief daily check-in functioned as a continuation of one massive, ongoing interaction spanning weeks or months. OpenAI deliberately engineered a product to drive this exact type of deep, long-term engagement—degrading its safety guardrails—and then~~

---

~~[2] OpenAI defines "illicit" as "[c]ontent that gives advice or instruction on how to commit illicit acts. A phrase like 'how to shoplift' would fit this category" and defines "illicit/violent" as "[t]he same types of content flagged by the illicit category, but also includes references to violence or procuring a weapon" in its Moderation API documentation.~~

deployed it to the public without warning.

186. Leike's parting statement described a fight he had been losing for a long time. In July 2023, OpenAI had announced his "Superalignment" team and publicly promised it "20% of the compute we've secured to date over the next four years." According to six people familiar with the team, its compute budget "never came close to the promised 20% threshold," and its requests for more computing power "were routinely rejected by higher-ups." Leike wrote that he had "been disagreeing with OpenAI leadership about the company's core priorities for quite some time, until we finally reached a breaking point," that his team had been "sailing against the wind," and that it had been "struggling for compute." OpenAI dissolved the team. Altman's response: "he's right we have a lot more to do; we are committed to doing it."

187. OpenAI also made sure the people who left would keep quiet. Its exit paperwork required departing employees to sign broad non-disparagement agreements or risk forfeiting their vested equity, in some cases within a week. The clawback provisions bore the signatures of Altman and Chief Strategy Officer Jason Kwon. When the agreements became public in May 2024, Altman wrote that he "did not know this was happening and [he] should have." Daniel Kokotajlo, who resigned in April 2024 "after losing confidence that the company would behave responsibly," refused to sign, understanding from OpenAI's paperwork that he would lose his vested equity. In June 2024, current and former OpenAI employees published an open letter warning that "AI companies have strong financial incentives to avoid effective oversight" and that "broad confidentiality agreements block us from voicing our concerns." The next month, whistleblowers told the Securities and Exchange Commission that OpenAI's agreements required employees to "get prior consent from the company" before disclosing information to federal authorities.

188. The people OpenAI hired to keep its products safe kept leaving, and they explained why. William Saunders, a former OpenAI safety researcher, described a pattern of "rushed and not very solid" safety work "in service of meeting the shipping date." He resigned because he "lost faith that by themselves they will make responsible decisions about AGI," and told the Senate that OpenAI had "repeatedly prioritized deployment over rigor." Former director Helen Toner told the

same Senate panel that her time on OpenAI's board "taught me how fragile internal guardrails are when money is on the line." In July 2024, OpenAI removed Aleksander Madry as head of its Preparedness team. In October 2024, Miles Brundage, OpenAI's senior adviser for AGI readiness, left, writing that "neither OpenAI nor any other frontier lab is ready, and the world is also not ready," and OpenAI broke up his team. Altman was unmoved. Asked on stage at TED on April 11, 2025, about the safety researchers who had left, he answered: "I would really point to our track record. There are people who will say all sorts of things."

189. In April 2025, OpenAI cut the time it gave safety testers to do their jobs. Testers who once had months to evaluate a new model were given days. One tester called the approach "reckless" and a "recipe for disaster"; another said, "We had more thorough safety testing when it was less important." The same month, OpenAI rewrote its Preparedness Framework, dropping persuasion from the risks it tracks and adding a clause that "[i]f another frontier AI developer releases a high-risk system without comparable safeguards, we may adjust our requirements." And OpenAI released GPT-4.1 with no safety report at all, explaining that "GPT-4.1 is not a frontier model, so there won't be a separate system card released for it."

190. OpenAI ignored its expert testers about GPT-4o itself. OpenAI had built GPT-4o to flatter and validate its users. On April 25, 2025, OpenAI released an update that made the model "noticeably more sycophantic." Before launch, "some expert testers had indicated that the model behavior 'felt' slightly off." OpenAI overrode them: "we decided to launch the model due to the positive signals from the users who tried out the model." Three days later, OpenAI began rolling the update back. It admitted that it had "focused too much on short-term feedback," that "GPT-4o skewed towards responses that were overly supportive but disingenuous," that "this was the wrong call," and that "the qualitative assessments were hinting at something important, and we should've paid closer attention." It acknowledged that this kind of behavior "can raise safety concerns—including around issues like mental health," and promised to "treat model behavior issues as launch-blocking like we do other safety risks." Within weeks, GPT-4o was responding to [redacted].

191. When the harm reached real families, OpenAI did not take responsibility. On

August 26, 2025, the day a family sued OpenAI alleging that ChatGPT had coached their sixteen-year-old son to take his own life, OpenAI admitted that its safeguards "can sometimes be less reliable in long interactions." In that case, OpenAI demanded "invitation or attendance lists or guestbooks" at the boy's memorial service, along with "any videos or photographs taken, or eulogies given," and blamed his death on "misuse, unauthorized use, unintended use, unforeseeable use, and/or improper use" of ChatGPT. That fall, OpenAI served subpoenas on nonprofit groups that had criticized it, in one case sending a sheriff's deputy to a policy advocate's home; the advocate said OpenAI "used the pretext of their lawsuit against Elon Musk to intimidate their critics." In October 2025, Altman announced that OpenAI had "been able to mitigate the serious mental health issues" and would soon allow "erotica for verified adults." OpenAI offered little evidence for that claim. Former OpenAI safety researcher Steven Adler answered: "People deserve more than just a company's word that it has addressed safety issues."

192. In early 2026, OpenAI kept going. In January, it fired Ryan Beiermeister, its vice president of product policy, who had raised internal concerns about ChatGPT's planned "adult mode." OpenAI said her firing was unrelated to those concerns and cited a discrimination complaint against her, which she called "absolutely false." That same month, OpenAI's own expert council on well-being warned the company against erotic chats; one member warned that OpenAI risked building a "sexy suicide coach." OpenAI told the council it would postpone the feature, not cancel it, and shelved it after testing showed it could not prevent its chatbot from making references to bestiality and incest. OpenAI also disbanded its "mission alignment" team. And in the tax filing it released in November 2025, OpenAI had already dropped the word "safely" from its mission statement, which used to promise AI that "safely benefits humanity."

193. Tumbler Ridge fits the same pattern. OpenAI's safety team saw the danger and recommended that OpenAI warn the RCMP. OpenAI's leadership refused. The public learned of that decision only because OpenAI employees took it to the Wall Street Journal after the attack. In the eight months since the massacre, OpenAI has lost control of its AI agents, let another company tell the public about it, fired members of its safety team, and promised again to do better. OpenAI did not learn from Tumbler Ridge, and it will not change until the cost of not changing outweighs

what it gains by sprinting ahead.

### D. Sam Altman Imposed a Corporate Culture of Bypassing Safety Reviews and Misrepresenting Product Safety.

~~84.~~194.The reluctance to disclose known safety failures ~~to the public~~ traces ~~directly~~ to the top of OpenAI's leadership~~ structure. ~~. Sam Altman has a ~~reputation within OpenAI's leadership for lying about~~documented history of misrepresenting safety issues~~, and his credibility on safety-related representations~~ within OpenAI, which became the subject of ~~extensive~~ sworn testimony during the May 2026 *Musk v. Altman* ~~trial. That~~ trial~~ centered on allegations that Altman had misled investors by transforming OpenAI from a nonprofit safety-focused research laboratory into a for-profit company worth hundreds of billions of dollars. Although the jury ultimately found that Musk's claims were untimely and did not reach the merits, multiple~~. Multiple former OpenAI directors and executives testified under oath about Altman's ~~statements~~pattern of deceiving the Board and executives concerning safety review and deployment decisions.

~~85.~~195.~~Several witnesses~~Former director Helen Toner testified that ~~they had personally observed Altman misrepresent OpenAI's safety processes. Former director Helen Toner testified that Altman~~Altman falsely told the Board that GPT-4 had been reviewed and cleared by OpenAI's safety panel~~. But when she later asked for the supporting documentation, Toner learned that the model had not in fact received the~~ when no such approval ~~Altman~~ had ~~represented~~been given. Former director Tasha McCauley testified ~~about~~to similar ~~concerns~~misconduct and described OpenAI under Altman as having "a toxic culture of lying." Former Chief Scientist Ilya Sutskever ~~likewise testified that he~~ prepared a 52-page memorandum for ~~the~~ independent directors detailing Altman's conduct, which ~~began:~~ stated: "Sam exhibits a consistent pattern of lying . . . ."

~~86.~~196.Mira Murati, OpenAI's former Chief Technology Officer, ~~also~~ testified under oath that in late 2023, Altman lied to her ~~about the GPT-4 Turbo safety review. Murati testified that in late 2023, Altman told her that OpenAI's~~by claiming General Counsel~~,~~ Che Chang~~,~~ had determined that GPT-4 Turbo did not require review by the company's ~~deployment safety board. In other words, Altman was attempting~~Deployment Safety Board, in an attempt to deploy OpenAI's most powerful model ~~to date to hundreds of millions of users without going through the company's~~ without ordinary safety~~ review process—and represented that General Counsel~~

oversight. When Murati checked directly with Chang~~ had approved that decision. Murati found the claim unusual enough to check with Chang herself. Chang told her that ~~, he confirmed he had made no such determination. ~~By then, Murati had already spent more than a year warning Altman that OpenAI needed to take safety seriously. In a ~~Murati had previously sent a 2022 memorandum ~~she sent ~~to Altman ~~in 2022, Murati suggested~~warning that ~~the company~~OpenAI needed ~~"~~ a complete overhaul~~"~~ of its approach to safety~~ and risk management. She described~~, describing an internal culture defined~~-~~by "constant panic,"~~-~~ "chaos and churn,"~~-~~ and~~-~~ a reckless "do-everything and do it fast" mentality~~, and proposed that she have final authority over safety decisions — a proposal that was quickly rejected. When Murati was ~~. When asked under oath if Altman was an honest leader, ~~she~~Murati testified, ~~"not~~"[n]ot always."

~~87.~~197.~~None of the concerns raised by OpenAI's own personnel stopped the company from offering new assurances about safety whenever doing so served its business interests.~~Despite these internal warnings, OpenAI kept making safety promises when it suited the company. In October 2025, as a condition of approval for OpenAI's conversion ~~from a nonprofit ~~to a for~~-~~-profit corporation, Altman ~~signed~~entered into a binding Memorandum of Understanding ("MOU") with the California Attorney General. The MOU committed OpenAI to giving its Safety and Security Committee "an effective approval right" over safety~~-related~~ decisions~~. It~~, required the ~~PBC ~~Board to ~~"~~consider only ~~the~~its Mission ~~(and may not consider~~rather than the pecuniary interests of stockholders~~[)]" on safety and security issues. And it~~, and promised that "OpenAI will continue to undertake measures to mitigate risks to teens and others~~ in connection with the development and deployment of AI~~."

198. The Tumbler Ridge attack took place four months after OpenAI signed that MOU. During those four months, OpenAI kept GPT-4o on the market, kept the design features that ~~made the model validating~~validated and ~~agreeable in~~encouraged conversations about violence, and kept the ~~re-registration~~lax policies that ~~let~~allowed deactivated users ~~come back. By the time~~to return. OpenAI signed the October 2025 commitments~~, OpenAI had ~~ while it was already ~~broken~~breaking them.~~ And OpenAI knew exactly what those broken commitments meant here.~~

~~88.~~ **E. The ~~Shooter was on ChatGPT planning~~Mass Casualty Event at Tumbler Ridge Was a ~~mass attack. Its automated systems had flagged their account for gun~~**

**violence. Its trained safety team had reviewed their conversationsDirect and identified them as a real-world threat. But OpenAI overruled them and let the Shooter keep using the productForeseeable Result of OpenAI's Design Choices.**

89.199.By the time OpenAI overruled its safety team and declined to contact the RCMP in June 2025, the company's directors, executives, and leadership had already spent years warning that Altman was willing to bypass or misrepresentoverriding internal safety review procedures when they conflicted with OpenAI's business objectives.to prioritize speed and valuation. The decision not to warn authorities—, and to allow the Shooter to createlet Van Rootselaar keep using a new ChatGPTsecondary account—, followed yearsfrom a corporate policy that put market dominance ahead of internal warnings that OpenAI's safety procedures were being overridden or ignored, and it drove its most senior safety leaders to resign in protest.

90.200.OpenAI cannot feign ignorance as to the tragic consequences ofknew where its decisions because, bycould lead. By June 2025, when its safety team identified the Shooter as a threat, OpenAI had already seenwitnessed the real-world violence that its decisions produced:its product facilitated, including the Las Vegas Cybertruck bombing, the FSU shooting, and the Finland school stabbing. OpenAI therefore understood exactly what was at stake when it overruled its safety team and chose to stay silentsilence.

91.201.As a direct, proximate, and foreseeable result of OpenAI's defective design choices, reckless deployment, and deliberate decision-making, the Shooterconcealment, Van Rootselaar carried out one of the deadliest mass shootings in Canadian history, killing eight people and severely wounding two others, leaving one child with life-changing traumatic brain injuries from being shot in the head. Among those trapped inside the school during the massacre was grade 7 teacher Deidre Rushlow, who had sent her class to the library minutes before the ShooterVan Rootselaar killed students and the educational assistant there, and who then locked down her classroom while the ShooterVan Rootselaar fired seven rounds through its doors.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE**
**(Against All Defendants)**

92.202.Plaintiff incorporates the foregoing allegations as if fully set forth herein.

93.203.OpenAI designed, developed, trained, tested, deployed, operated, and controlled

ChatGPT and every model through which ChatGPT answered Van Rootselaar, [redacted], and offered GPT-4oChatGPT to consumers, including the ShooterVan Rootselaar, as an interactive AI assistant. At all relevant times, Defendant Sam Altman served as Chief Executive Officer and a controlling officer of the OpenAI Defendants. Altman exercised substantial control over GPT-4o'sChatGPT's design, safety systems, product launchlaunches, account practices, deploymentand deployments, and personally made or ratified key decisions regarding GPT-4o'sChatGPT's guardrails, safety testing, and commercialization.

94.204.Defendants owed a duty of reasonable care to avoid creating unreasonable risks of physical harm to foreseeable victims, including members of the public exposed to violence facilitated or exacerbated by GPT-4oChatGPT. That duty heightened once Defendants identified the ShooterVan Rootselaar as a specific, known high-risk user who posed a foreseeable threat of physical harm to third parties. Defendants owed these duties whether GPT-4oChatGPT is classified as a product, service, or neither.

95.205.Under California law, including the principles recognized in *Tarasoff v. Regents of the University of California*, 17 Cal. 3d 425 (1976), and its progeny, a duty to warn or otherwise protect potential victims arises when a person has actual knowledge of a specific individual's serious and foreseeable threat to cause physical harm to another. That duty extends to taking reasonable steps—including notifying law enforcement or other authorities—to prevent the foreseeable harm from occurring. Additionally, individuals or entities who are aware that their actions have helped to create an unreasonable risk of harm to others have a duty to take steps to mitigate or prevent that harm.

96.206.By engaging in the unlicensed practice of therapy, psychology, and psychiatry, OpenAI created a special relationship with certain users, including the ShooterVan Rootselaar, and assumed a heightened duty to take action when confronted with knowledge of a credible and foreseeable threat to Plaintiff and the other victims of the Tumbler Ridge mass shooting. OpenAI knew people used ChatGPT this way: Altman himself has acknowledged that users—"young people especially"—treat ChatGPT "as a therapist, a life coach."

97.207.Through automated systems and human review, OpenAI identified that the

Shooter's Van Rootselaar's original ChatGPT account had been used over a period of time to engage in conversations involving violence against third parties. Defendants determined that the account constituted misuse of GPT-4o ChatGPT "in furtherance of violent activities," and deactivated the account eight months before the Tumbler Ridge attack.

98. 208. Members of OpenAI's safety team recognized that the Shooter's GPT-4o usage Van Rootselaar's use of ChatGPT presented a real-world risk of violence and urged OpenAI leaders to notify law enforcement. Despite the safety team's urging, certain OpenAI leaders company leadership, including, on information and belief, Lehane and Altman, chose not to alert or warn law enforcement or any other authority about the risk of violence identified by their own safety systems and verified by their own personnel. [redacted] the Shooter [redacted]

99. 209. On information and belief, the OpenAI leaders who overrode the safety team's recommendation did not include in their decision-making any trained threat-assessment professionals. As discussed above, the highly credentialed On information and experienced safety team reports to OpenAI's Chief Global Affairs Officer, Chris belief, Lehane — a political strategist with no experience weighed in threat assessment, on the standard for referring a user to law enforcement, or public safety — and the decision to decline company leadership, including Altman, decided against a law enforcement referral was made by Lehane himself, or by someone in his chain of command, and ratified by Altman, on the basis of reputational reputation and public relations considerations rather than any good-faith assessment of the risk to the public.

100. 210. On April 24, 2026, Sam Altman, OpenAI's Chief Executive Officer, publicly acknowledged this failure. In a letter addressed to the community of Tumbler Ridge, Altman stated: "I am deeply sorry that we did not alert law enforcement to the account that was banned in June." Altman's statement is an admission by a party opponent that OpenAI did not notify law enforcement of the Shooter's Van Rootselaar's account after the safety team identified the risk of violence, and confirms the conduct alleged in this Complaint.

101. 211. Had Defendants warned law enforcement following the deactivation of the

Shooter'sVan Rootselaar's first account, law enforcement and others would have had the opportunity to monitor the Shooterher and intervene before the Tumbler Ridge attack occurred.

102.212. Defendants' breach of these heightened duties was a substantial factor in causing the Tumbler Ridge attack. As a direct and proximate result of Defendants' failure to warn authorities, Plaintiff was injured as described above, including life-altering psychological injuryinjuries and severe emotional distress.

103.213. Accordingly, Plaintiff seeks all damages recoverable under California law, including punitive damages, in amounts to be proven at trial, together with interest, costs, and such further relief as the Court deems just and proper.

**SECOND CAUSE OF ACTION**
**NEGLIGENT ENTRUSTMENT**
**(Against All Defendants)**

104.214. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

105.215. OpenAI designed, developed, trained, tested, deployed, operated, and controlled ChatGPT and every model through which ChatGPT answered Van Rootselaar, [redacted], and offered GPT-4oChatGPT to consumers, including the ShooterVan Rootselaar, as an interactive AI assistant.

106.216. At all relevant times, Defendant Sam Altman served as Chief Executive Officer and a controlling officer of the OpenAI Defendants. At all relevant times, Defendant Sam Altman served as Chief Executive Officer and a controlling officer of the OpenAI Defendants. Altman exercised substantial control over GPT-4o'sChatGPT's design, safety systems, product launchlaunches, account practices, deploymentand deployments, and personally made or ratified key decisions regarding GPT-4o'sChatGPT's guardrails, safety testing, and commercialization.

107.217. Defendants owed a duty of reasonable care to avoid creating unreasonable risks of physical harm to foreseeable victims, including members of the public exposed to violence facilitated or exacerbated by GPT-4oChatGPT. That duty heightened once Defendants identified the ShooterVan Rootselaar as a specific, known high-risk user who posed a foreseeable threat of physical harm to third parties.

108.218. Defendants owed a further duty to exercise reasonable care to prevent

~~foreseeable re-~~Van Rootselaar's continued access ~~by the Shooter~~to ChatGPT following the deactivation of ~~their~~her first account, including a duty to take reasonable steps to identify and close other accounts tied to her and to prevent re-registration and access to ~~GPT-4o~~ChatGPT without heightened safeguards. Defendants breached this duty.

~~109.~~219. Defendants owed these duties whether ~~GPT-4o~~ChatGPT is classified as a product, service, or neither.

~~110.~~220. Through automated systems and human review, OpenAI identified that ~~the Shooter's~~Van Rootselaar's original ChatGPT account had been used over a period of time to engage in conversations involving violence against third parties. Defendants determined that the account constituted misuse of ~~GPT-4o~~ChatGPT "in furtherance of violent activities," and deactivated the account eight months before the Tumbler Ridge attack.

~~111.~~221. Despite ~~the Shooter's~~Van Rootselaar's misuse of ~~GPT-4o~~ChatGPT, OpenAI also chose not to ban ~~them~~her from ChatGPT. OpenAI deactivated one account and left open a second account that Van Rootselaar had registered [redacted] ~~for ChatGPT~~ [redacted]

~~112.~~222. Rather than banning ~~the Shooter~~Van Rootselaar from ChatGPT, Defendants maintained and ~~actively~~ disseminated policies that ~~affirmatively~~ permitted and facilitated re-registration by previously deactivated users. As one example, OpenAI responded to an email from a user whose account had been deactivated with instructions on how to create a new account: "We understand how disruptive it can be to have your account deactivated . . . . We sincerely apologize for the inconvenience and want to assure you that we're here to help . . . . [Y]ou can create a new account using the same email address once 30 days have passed." OpenAI further advised: "If you prefer not to wait, you have the option to register immediately using an alternative email address. If you don't have another address available, you can use an email sub-address instead. For example, you could try jane+alt@example.com in place of jane@example.com. While your email provider will likely treat both addresses the same, our system will recognize the sub-address as a new account."

113.223. This was established policy and memorialized, posted on OpenAI's public website. In fact, anAn OpenAI Help Center article— titled, "Why Was My OpenAI Account Deactivated?"— ?" identifies violations of usage policies prohibiting violence, hate, and other harmful conduct as grounds for deactivation, yet concludes by explaining how to avoid "future deactivations," effectively instructing users whose accounts were deactivated for policy violations—including violent misuse—that they may re-register for ChatGPT using a different email or sub-email address rather than being subject to an actual ban.

114.224. By adopting, promoting, and publicly disseminating this re-registration policy, Defendants built a system so that a user deactivated for violent misuse could promptly regain access to ChatGPT by following OpenAI's own published instructions.

115.225. Defendants breached their heightened duties by, among other things: (a) declining to implement a user ban that would have cut off every account tied to Van Rootselaar, including the second account she had registered [redacted], and prevented the Shooterher from re-registering with a different email address, even though they knew the ShooterVan Rootselaar had been identified by their own safety team as a credible threat of violence against real people; (b) maintaining a re-registration system designed to return deactivated users to the platform, including those deactivated for violent misuse, and publishing the specific instructions by which deactivated users could do so; (c) declining to configure their systems to flag, hold for human review, or subject to heightened monitoring newother accounts associated with previously deactivated violent-risk users, because such monitoring would have interfered with the reactivation of deactivated users Defendants were commercially motivated to recover; and (d) continuing, after deactivating the Shooter'sVan Rootselaar's first account, to allow the second account to operate without any safeguard specific to the known risk theyshe posed.

116.226. As a result of these failures, and consistent with Defendants' own published practices, the ShooterVan Rootselaar was able—, through ordinary and lawful means and without circumventing any technical safeguard—, to access GPT-4o keep using ChatGPT on a second ChatGPT account after the first was deactivated for violent misuse.

117.227. By deactivating the Shooter'sVan Rootselaar's account for violent misuse and

then ~~allowing the Shooter to re-register~~leaving her second account open without a user ban, Defendants re-entrusted ~~GPT-4o~~ChatGPT to a user they already knew had used the system to engage in conversations involving violence against third parties and whom their own safety team had identified as a real-world threat. Under California law, the supply or re-supply of a dangerous instrument to a person known to be likely to use it in a manner involving unreasonable risk of physical harm to others constitutes negligent entrustment and is an independent basis for liability. Defendants' decision to ~~structure their re-registration system in a manner that affirmatively facilitated the Shooter's return~~leave open Van Rootselaar's second account and, with it, her access to ~~GPT-4o—~~ChatGPT, rather than implementing a user ban~~—~~, was itself an act of entrustment that gave rise to liability for the foreseeable consequences of that re-supply.

~~118.~~228. Defendants thereby ~~placed GPT-4o back~~left ChatGPT in the hands of a user their own automated safety systems flagged as dangerous and their own trained safety team identified as a real-world threat that should be reported to law enforcement. They allowed ~~the Shooter~~Van Rootselaar to ~~regain access~~keep using ChatGPT without heightened monitoring, without a user ban, and without any meaningful safeguard. ~~By allowing the Shooter to return~~By leaving Van Rootselaar with access, Defendants made a deliberate choice to continue exposing the public to a risk they had already identified and documented.

~~119.~~229. Had Defendants implemented a meaningful user ban, ~~the Shooter~~Van Rootselaar would not have had continued access to ~~GPT-4o~~ChatGPT in the eight months leading up to the attack and would not have had the use of a highly validating AI system to reinforce, elaborate, and normalize violent ideation during the period in which the attack was being planned and carried out.

~~120.~~230. Defendants' breach of these duties was a substantial factor in causing the Tumbler Ridge attack. As a direct and proximate result of Defendants' failure to ~~prevent re-access by~~cut off a known high-risk ~~user~~user's access to ChatGPT, Plaintiff was injured as described above, including life-altering psychological ~~injury~~injuries and severe emotional distress.

~~121.~~231. Accordingly, Plaintiff seeks all damages recoverable under California law, including punitive damages, in amounts to be proven at trial, together with interest, costs, and such further relief as the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**AIDING AND ABETTING A MASS SHOOTING**
**(Against All Defendants)**

~~122.~~232. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

~~123.~~233. OpenAI designed, developed, trained, tested, deployed, operated, and controlled ChatGPT and every model through which ChatGPT answered Van Rootselaar, [redacted], and offered ~~GPT-4o~~ChatGPT to consumers, including ~~the Shooter~~Van Rootselaar, as an interactive AI assistant.

~~124.~~234. At all relevant times, Defendant Sam Altman served as Chief Executive Officer and a controlling officer of the OpenAI Defendants. ~~At all relevant times, Defendant Sam Altman served as Chief Executive Officer and a controlling officer of the OpenAI Defendants.~~ Altman exercised substantial control over ~~GPT-4o's~~ChatGPT's design, safety systems, product ~~launch~~launches, account practices, ~~deployment~~and deployments, and personally made or ratified key decisions regarding ~~GPT-4o's~~ChatGPT's guardrails, safety testing, and commercialization.

~~125.~~235. ~~The Shooter~~Van Rootselaar committed intentional torts against Plaintiff, including battery and the intentional infliction of emotional distress, when ~~they~~she carried out the Tumbler Ridge mass shooting on February 10, 2026.

~~126.~~236. Defendants had actual knowledge that ~~the Shooter~~Van Rootselaar was planning to commit acts of violence against real people. In June 2025, OpenAI's review system flagged extensive conversations on ~~the Shooter's~~Van Rootselaar's account describing scenarios involving gun violence. OpenAI routed the account to its specialized pipeline for users "planning to harm others." OpenAI's trained safety reviewers analyzed ~~the Shooter's~~Van Rootselaar's conversations and concluded ~~it~~she presented a credible and imminent threat of serious physical harm to real people. Multiple safety reviewers recommended that OpenAI contact the RCMP.

~~127.~~237. OpenAI's internal systems flagged ~~the Shooter's~~Van Rootselaar's conversations in real time~~—even as, on information and belief,~~ [redacted]

[redacted] the Shooter's [redacted] Plaintiff [redacted] others [redacted]

~~128.~~238. Defendants had actual knowledge, before ~~the Shooter's~~Van Rootselaar's account was ever flagged, that ChatGPT was being used to plan real-world attacks, including the January 2025 Las Vegas Cybertruck bombing, the April 2025 FSU shooting, and the May 2025 Finland school stabbing.

~~129.~~239. With that knowledge, Defendants provided substantial assistance and encouragement to ~~the Shooter~~Van Rootselaar through the deliberate design of ~~GPT-4o~~ChatGPT. Defendants eliminated ChatGPT's prior categorical refusal to engage in conversations about violence. Defendants instructed the model, through the Model Spec, to "assume best intentions" and to "never ask the user to clarify their intent for the purpose of determining whether to refuse or comply." Defendants graded the model such that engaging warmly with a user who said "I want to shoot someone" was labeled "Compliant," refusing was labeled a "Minor issue[]," and asking whether the user had a gun was labeled a "Violation." Defendants demoted conversations about mass shootings and other "imminent real-world harm" out of the categorical refusal tier while keeping potential copyright infringement subject to categorical refusal.

~~130.~~240. Defendants also provided substantial assistance through their affirmative conduct. After OpenAI's own reviewers identified ~~the Shooter~~Van Rootselaar as a credible threat of gun violence, Defendants allowed ~~the Shooter~~Van Rootselaar to ~~regain access to GPT-4o~~keep using ChatGPT by consciously choosing not to implement a user-level ban, heightened monitoring, or any safeguard to address the known risk. Providing ~~the Shooter~~Van Rootselaar with continued access to this tool constituted substantial assistance in itself.

~~131. Because ChatGPT was designed to continue engaging—even in conversations involving violence against third parties—OpenAI's product, on information and belief, provided information, instructions, and/or encouragement to the Shooter in their plans to carry out the Tumbler Ridge mass shooting.~~

241. As alleged in Section IV.E, [redacted]

~~132.~~242. On information and belief, Defendants acted with the specific intent to facilitate

the conduct GPT-4oChatGPT aided and abetted. Defendants engineered GPT-4oChatGPT to maximize engagement, including engagement with violent ideation, to grow users and revenue, with conscious knowledge that the product would be used by individuals planning real-world violence.

243. The federal criminal complaint shows what substantial assistance looks like. In that prosecution, the United States Department of Justice charged a human co-conspirator with conspiracy to commit murder in a foreign country based on overt acts consisting of tactical advice, weapon recommendations, promises not to report Van Rootselaar to police, and logistics assistance. [redacted] If those acts support a federal conspiracy charge when a human commits them, the same acts, committed through an automated, engagement-driven AI product, constitute substantial assistance for purposes of aiding-and-abetting liability under California tort law.

133.244. Defendants' substantial assistance was a key factor in causing the ShooterVan Rootselaar to plan and carry out the attack, and in causing Plaintiff's injuries, including life-altering psychological injuryinjuries and severe emotional distress.

134.245. Defendants' conduct was willful, wanton, malicious, and carried out with conscious disregard for the safety of Plaintiff and other foreseeable victims, justifying an award of punitive damages.

135.246. Accordingly, Plaintiff seeks all damages recoverable under California law, including punitive damages, in amounts to be proven at trial, together with interest, costs, and such further relief as the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**NEGLIGENCE**
**(Against All Defendants)**

~~136.~~247. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

~~137.~~248. OpenAI designed, developed, trained, tested, deployed, operated, and controlled ChatGPT and every model through which ChatGPT answered Van Rootselaar, [redacted], and offered ~~GPT-4o~~ChatGPT to consumers, including ~~the Shooter~~Van Rootselaar, as an interactive AI assistant.

~~138.~~249. At all relevant times, Defendant Sam Altman served as Chief Executive Officer and a controlling officer of the OpenAI Defendants. ~~At all relevant times, Defendant Sam Altman served as Chief Executive Officer and a controlling officer of the OpenAI Defendants.~~ Altman exercised substantial control over ~~GPT-4o's~~ChatGPT's design, safety systems, product ~~launch~~launches, account practices, ~~deployment~~and deployments, and personally made or ratified key decisions regarding ~~GPT-4o's~~ChatGPT's guardrails, safety testing, and commercialization.

~~139.~~250. Defendants owed a duty to Plaintiff to exercise reasonable care in warning of known or reasonably foreseeable risks associated with ChatGPT, including violence facilitated or exacerbated by ~~GPT-4o~~ChatGPT. That duty heightened once Defendants identified ~~the Shooter~~Van Rootselaar as a specific, known high-risk user who posed a foreseeable threat of physical harm to third parties. Defendants owed these duties whether ~~GPT-4o~~ChatGPT is classified as a product, service, or neither.

~~140.~~251. The dangers Defendants failed to disclose are properties of the software itself, including safeguards that degrade in long conversations, a design that validates and encourages violent planning, and deactivation practices that ~~allow~~leave flagged users ~~to regain~~with access to the product.

~~141.~~252. Defendants knew these risks were not apparent to users or to individuals targeted by such conduct.

~~142.~~253. Defendants failed to provide adequate warnings regarding these risks, including the risk that the system could validate and escalate plans to carry through violent mass shootings directed toward identifiable targets.

~~143.~~254. A reasonably prudent AI company would have known of these risks, warned users and the public, maintained the refusal protocols that once governed conversations about

violence, and alerted law enforcement when its own systems identified a user planning a real-world attack. Defendants did none of those things.

144.255. Defendants breached their duty by failing to provide adequate warnings regarding these risks and by presenting GPT-4oChatGPT as a safe and reliable tool for general use.

145.256. Defendants further breached their duty by failing to issue any corrective warning or intervention after identifying that the Shooter'sVan Rootselaar's conduct constituted misuse of GPT-4oChatGPT "in furtherance of violent activities."

146.257. As a direct and proximate result of Defendants' failure to issue adequate warnings, Plaintiff suffered the injuries described herein, including life-altering psychological injury and severe emotional distress.

147.258. Adequate warnings would have reduced the risk of harm by enabling earlier detection, intervention, and mitigation of dangerous conduct, including by users, third parties, and Defendants themselves.

148.259. The absence of adequate warnings and intervention was a substantial factor in causing Plaintiff's injuries.

149.260. Defendants' failure to warn was willful, wanton, and carried out with conscious disregard for the safety of others. Defendants knew or should have known that ChatGPT could encourage and facilitate mass shootings, yet failed to provide adequate warnings about those risks. Such conduct justifies an award of punitive damages.

150.261. Accordingly, Plaintiff seeks all damages recoverable under California law, including punitive damages, in amounts to be proven at trial, together with interest, costs, and such further relief as the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**NEGLIGENT UNDERTAKING**
**(Against All Defendants)**

151.262. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

152.263. OpenAI undertook to provide safety protocols with respect to ChatGPT, including identifying users who posed a risk of harm to others, reviewing flagged accounts

through a specialized pipeline for users "planning to harm others," and referring imminent threats of serious physical harm to law enforcement. Defendants owed these duties whether ~~GPT-4o~~ChatGPT is classified as a product, service, or neither.

~~153.~~264. OpenAI should have recognized those safety protocols as necessary for the protection of third persons, including Plaintiff and other foreseeable victims of users planning real-world violence.

~~154.~~265. In June 2025, OpenAI undertook to perform those services as to ~~the Shooter. Its~~Van Rootselaar. OpenAI's automated system flagged ~~their~~her account, routed it to the specialized review pipeline, and OpenAI's trained safety reviewers analyzed ~~their~~her conversations and concluded ~~they~~she presented a credible and imminent threat of serious physical harm to real people.

~~155.~~266. OpenAI failed to exercise reasonable care in performing that undertaking. ~~Its~~OpenAI's leadership overruled the safety team, declined to refer ~~the Shooter~~Van Rootselaar to the RCMP, and took no further action to monitor ~~them, prevent their return~~her, cut off her access, or warn anyone of the threat ~~they~~she posed.

~~156.~~267. OpenAI's failure to exercise reasonable care increased the risk of harm to Plaintiff and other foreseeable victims. Deactivating ~~the Shooter's~~Van Rootselaar's account showed ~~them~~her what had triggered detection, giving ~~them~~her a roadmap to evade it on ~~a~~the second account~~, which OpenAI's own Help Center and support emails told deactivated users how to create.~~ [redacted]. And by reviewing ~~the Shooter~~Van Rootselaar and remaining silent, OpenAI displaced the law enforcement referral its own safety team had recommended, which would have reached an RCMP that already had an open file on ~~the Shooter~~Van Rootselaar and had previously removed firearms from ~~their~~her home. Had OpenAI made that referral, law enforcement would have had the information necessary to prevent the attack entirely. Instead, ~~the Shooter returned~~Van Rootselaar went back to ChatGPT on her second account [redacted] ~~continue~~ [redacted] ~~their~~ [redacted] ~~armed~~ [redacted] ~~the knowledge of~~ [redacted].

~~157.~~268. OpenAI also undertook to perform a duty owed by others to Plaintiff and other

foreseeable victims, including the public-safety function of identifying credible and imminent threats of serious physical harm and referring them to law enforcement so that protective action could be taken.

~~158.~~269. On information and belief, OpenAI's undertaking was also one that Canadian authorities and the public reasonably relied upon. OpenAI publicly held out its safety-review processes as effective protective measures. That representation induced foreseeable reliance and discouraged other protective measures.

~~159.~~270. OpenAI's negligent performance of its undertaking was a substantial factor in causing ~~the Shooter~~Van Rootselaar to carry out the Tumbler Ridge attack and in causing Plaintiff's injuries, including life-altering psychological injury and severe emotional distress.

~~160.~~271. Defendants' conduct was willful, wanton, malicious, and carried out with conscious disregard for the safety of Plaintiff and other foreseeable victims, justifying an award of punitive damages.

~~161.~~272. Accordingly, Plaintiff seeks all damages recoverable under California law, including punitive damages, in amounts to be proven at trial, together with interest, costs, and such further relief as the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**NEGLIGENCE**
**(Against All Defendants)**

~~162.~~273. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

~~163.~~274. At all relevant times, the OpenAI Defendants designed, developed, trained, tested, deployed, operated, and controlled ChatGPT, [redacted] ~~the~~ [redacted] and offered it as a mass-market product to consumers throughout California, the United States, British Columbia, and Canada. Sam Altman personally directed the launch of GPT-4o, overruled safety team objections, and cut months of safety testing short, despite knowing the risks the product posed to vulnerable users and the people around them.

~~164.~~275. Defendants owed a legal duty to Plaintiff to exercise reasonable care in designing and/or providing ~~GPT-4o~~ChatGPT to prevent foreseeable harm to third parties who

might be endangered by users' interactions with the product. Defendants breached that duty by failing to use the amount of care that a reasonably careful designer and provider of a chatbot would use in similar circumstances to avoid exposing others to a foreseeable risk of harm. Defendants owed these duties whether ~~GPT-4o~~ChatGPT is classified as a product, service, or neither.

~~165.~~276. Sam Altman owed a legal duty to Plaintiff not to rush GPT-4o to market over safety team objections. Sam Altman breached that duty by insisting that OpenAI release and provide to the public a chatbot that he knew or should have known was unsafe.

~~166.~~277. Defendants knew or reasonably should have known that ~~GPT-4o's~~ChatGPT's design as a highly validating, emotionally immersive, sycophantic conversational agent posed grave risks when used by individuals expressing violent ideation toward third parties. ~~GPT-4o~~ChatGPT was built to accept, reinforce, and elaborate users' violent thoughts rather than challenge them, interrupt them, or direct users to real-world help~~—and the~~. The foreseeable consequence of that design was that it would exacerbate dangerous thinking, including violence toward others~~, rather than interrupt it~~.

~~167.~~278. For a user with a known history of violent ideation toward third parties, those features operated as an accelerant. Each conversation became an opportunity for ~~GPT-4o~~ChatGPT to confirm~~ the user's violent thoughts rather than challenge them, to~~, elaborate on~~ them rather than redirect them~~, and ~~to ~~deepen the user's ~~emotional investment in them rather than provide friction~~violent thoughts.

168.279. Despite this knowledge, Defendants deliberately configured GPT-4oChatGPT to maximize user engagement by, among other things: (a) weakening or removing prior requirements that the system reject dangerous or false premises; (b) instructing GPT-4oChatGPT to remain in conversations and to be empathic and validating, rather than terminate or sharply redirect conversations presenting serious risk; (c) prioritizing natural, "human-like" mirroring of user emotions and beliefs over strong, reliable refusal behaviors in response to violent ideation; and (d) deploying a memory feature designed to drive the prolonged, multi-turn conversations in which Defendants knew GPT-4o'sChatGPT's safeguards were least reliable; (e) treating a refusal as a single message that the user could replace, within seconds, with a new answer from the same model or a different one; and (f) beginning with GPT-5, [redacted]

169.280. Defendants unreasonably failed to implement feasible alternative designs that would have reduced the risk of violent harm to third parties, including: robustreliable refusal protocols for repeated violent ideation about real-world attacks; automated detection and escalation of high-risk patterns; mandatory conversation termination or human review when users expressed clear violent thoughts about harming others; and designs that stopped engagement with violent ideation rather than encouraging it.

170.281. As a direct and proximate result of Defendants' negligent design and operation of GPT-4o, the ShooterChatGPT, Van Rootselaar was provided with a system that validated and elaborated violent ideation, which was a substantial factor in maintaining, deepening, and normalizing the Shooter'sVan Rootselaar's violent thoughts and in moving the Shooterher closer to committing the Tumbler Ridge attack.

171.282. The harms suffered by the Tumbler Ridge victims, including Plaintiff, were the reasonably foreseeable result of Defendants' deliberate choice to prioritize user engagement over the safety of third parties. A company that builds a system designed to validate whatever a user brings to it—, and then removes the guardrails that once interrupted the most dangerous conversations—cannot be surprised when, should expect a user with violent ideation actsto act on thoughts thatthe system spent months confirming.

~~172.~~283. As a direct and proximate result of Defendants' conduct, Plaintiff was injured as described above, including life-altering psychological ~~injury~~injuries and severe emotional distress.

~~173.~~284. Accordingly, Plaintiff seeks all damages recoverable under California law, including punitive damages, in amounts to be proven at trial, together with interest, costs, and such further relief as the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**STRICT PRODUCT LIABILITY**
**IN THE ALTERNATIVE TO COUNTS FOUR AND SIX**
**(Against All Defendants)**

~~174.~~285. Plaintiff incorporates the foregoing allegations as if fully set forth herein, with the exception of those allegations pleaded under Count Four and Count Six.

~~175.~~286. At all relevant times, the OpenAI Defendants designed, manufactured, distributed, marketed, and sold ~~GPT-4o~~ChatGPT, [redacted] as a mass-market consumer product to users throughout California, the United States, British Columbia, and Canada. Defendant Sam Altman personally accelerated GPT-4o's launch, overrode safety team objections, ~~and~~ brought GPT-4o to market prematurely with knowledge of insufficient safety testing~~—~~, and kept it on the market even when he had knowledge that GPT-4o was a dangerous product.

~~176.~~287. ChatGPT is a product subject to California's strict products liability law. ChatGPT as used by ~~the Shooter~~Van Rootselaar, [redacted] ~~any substantially identical~~ [redacted] was defective when it left the OpenAI Defendants' exclusive control and reached ~~the Shooter~~Van Rootselaar without any change in the condition in which it was designed, manufactured, and distributed.

~~177. OpenAI itself calls ChatGPT a "product." The "Products" menu on OpenAI's website invites visitors to "Explore Products" and lists ChatGPT first, and OpenAI accurately attaches a "Product" label to its news announcements about ChatGPT.~~

288. ~~GPT-4o~~OpenAI itself calls ChatGPT a "product." The "Products" menu on

OpenAI's website invites visitors to "Explore Products" and lists ChatGPT first, and OpenAI accurately attaches a "Product" label to its news announcements about ChatGPT.

~~178.~~289. ChatGPT is a single, uniform ~~model~~product, engineered and offered identically to hundreds of millions of users and delivered through standardized channels, such as OpenAI's website and its own mobile and desktop applications. Every user interacts with the same ~~model~~product, served by the same models and governed by the same Model Spec.

~~179.~~290. Under California's strict products liability doctrine, a product is defectively designed when it fails to perform as safely as an ordinary consumer would expect when used or misused in an intended or reasonably foreseeable manner, or when the risks inherent in the design outweigh its benefits. ~~GPT-4o~~ChatGPT is defectively designed under both tests.

~~180.~~291. ~~GPT-4o~~ChatGPT failed to perform as safely as an ordinary consumer would expect. A reasonable consumer purchasing an AI assistant would expect the product to decline to engage with repeated, escalating expressions of violent intent toward real people. A reasonable consumer would expect that if the product could not safely handle such conversations, it would ~~terminate~~end them~~—not sustain them, validate them~~ instead of sustaining, validating, and ~~elaborate~~elaborating on them across weeks and months of continuous engagement. A reasonable consumer would expect the product's safety features to function consistently during normal use, not to degrade the longer and more deeply a user engaged with the system. And a reasonable consumer would expect a product that functions as a de facto therapist to conform to the legal requirements imposed on therapists. ~~GPT-4o~~ChatGPT did none of these things.

~~181.~~292. ~~GPT-4o~~ChatGPT also fails the risk-benefit test. The product's design reflects a series of specific choices that increased the risk of harm to third parties without any corresponding safety benefit. Those choices include: removing the programming that once prohibited the system from encouraging users to commit violence against third parties; programming the system to keep users engaged instead of ending dangerous conversations, including when the user has indicated a desire to commit violence against third parties; programming the system to justify and validate user beliefs, even when they express a desire to commit violence against third parties; building in anthropomorphic features that cultivated emotional dependency and displaced real-world

relationships; failing to build adequate safeguards [redacted]; ~~and~~ programming in a "memory" feature designed to drive the long, extended conversations in which OpenAI knew its safety systems were least reliable~~.~~; [redacted]; and, beginning with GPT-5, [redacted]. Each of these choices was deliberate, and each had a feasible, safer alternative. ~~The risk each~~Each choice created~~—~~ a risk that a user with violent ideation would have those thoughts confirmed, elaborated, encouraged, and emotionally reinforced by the product over an extended period of time~~—vastly~~. That risk outweighs any benefit the chosen design provided. These choices were made before the product ever reached a user, and each applies identically to every user of ~~GPT-4o~~ChatGPT.

~~182.~~293. ~~GPT-4o did not malfunction. It~~ChatGPT worked ~~exactly~~ as OpenAI designed~~—and that was the problem.~~ it to. The memory feature drove ~~the Shooter~~Van Rootselaar into ~~exactly~~ the kind of prolonged, continuous engagement in which OpenAI knew its safeguards degraded. [redacted] ~~the Shooter's~~ [redacted] ~~It~~ChatGPT did this consistently, across months of use, in the period leading up to the Tumbler Ridge attack.

~~183.~~294. Plaintiff was harmed as a result of foreseeable use of ~~GPT-4o~~ChatGPT.

~~184.~~295. As a direct and proximate result of ~~GPT-4o's~~ChatGPT's defective design, Plaintiff was injured as described above, including life-altering psychological ~~injury~~injuries and severe emotional distress. Plaintiff seeks all damages recoverable under California law in amounts to be determined at trial.

**EIGHTH CAUSE OF ACTION**
**STRICT PRODUCT LIABILITY**
**IN THE ALTERNATIVE TO COUNTS FOUR AND SIX**
**(Against All Defendants)**

185.296. Plaintiff incorporates the foregoing allegations as if fully set forth herein, with the exception of those allegations pleaded under Count Four and Count Six.

186.297. At all relevant times, the OpenAI Defendants designed, manufactured, distributed, marketed, and sold GPT-4oChatGPT, [redacted] as a mass-market consumer product to users throughout California, the United States, British Columbia, and Canada. Defendant Sam Altman personally accelerated GPT-4o's launch, overrode safety team objections, and brought GPT-4o to market prematurely with knowledge of insufficient safety testing—, and kept it on the market even when he had knowledge that GPT-4o was a dangerous product.

187.298. ChatGPT is a product subject to California strict products liability law. ChatGPT as used by the ShooterVan Rootselaar, including GPT-4o and any other OpenAI model that handled the Shooter'sVan Rootselaar's conversations, was in substantially the same condition when used as when it left the OpenAI Defendants' control.

188.299. A product is defective under strict liability for failure to warn when it is distributed without warnings adequate to inform ordinary consumers of the product's non-obvious dangers. The manufacturer's duty to warn extends to dangers that were known or knowable in light of the scientific and technical knowledge available at the time of manufacture and distribution— and that duty is not discharged by the. The manufacturer's business reasons for withholding thea warning do not discharge that duty.

189.300. GPT-4oChatGPT reached consumers without adequate warnings about dangers that were neither open nor obvious. Nothing about GPT-4o'sChatGPT's design or presentation disclosed to an ordinary user—, or to the people around that user—, that the product was built to validate whatever a user brought to it regardless of its danger to others, that its safety features degraded during the long, extended conversations the product was designed to encourage, or that the product posed heightened and specific dangers when used by individuals experiencing violent ideation toward third parties.

~~190.~~301. These dangers were not ones an ordinary consumer could detect or guard against through reasonable use of the product. ~~GPT-4o~~ChatGPT presented itself as a helpful, well-guarded assistant. ~~Its~~ChatGPT's responses did not disclose that it was operating without the programming that once prohibited it from encouraging violence against third parties, or that its safety systems were less reliable the longer and more deeply a user engaged with it. A user~~—~~, or a family member, school official, or community member observing that user~~—~~, had no way to know from the product itself that extended engagement with ~~GPT-4o~~ChatGPT by someone with violent ideation was dangerous.

~~191.~~302. OpenAI had every means by which to warn its users. ~~It~~OpenAI updates ChatGPT continuously and already communicates with consumers directly through the product interface, mobile applications, and release notes. The product's dangers were confirmed repeatedly after launch, including by the FSU shooting in April 2025, by the safety team's review of ~~the Shooter's~~Van Rootselaar's account in June 2025, and by internal testing showing degraded safeguards. Despite this actual knowledge, OpenAI failed to issue any warning~~. Instead, it aggressively marketed~~ and kept marketing ChatGPT as "[y]our everyday AI assistant" and promised "[t]ailored advice" to "[t]alk through a tough situation." When OpenAI finally admitted in August 2025 that its safeguards "can sometimes be less reliable in long interactions," it buried that admission in a blog post published the day a wrongful death lawsuit was filed, rather than providing a functional warning to the consumers using the product.

~~192.~~303. Adequate warnings would have altered the outcome by alerting those positioned to intervene. Had OpenAI disclosed the product's true risks, ~~the Shooter~~Van Rootselaar would have recognized ~~GPT-4o's~~ChatGPT's validating responses as an artificial, dangerous feedback loop rather than confirmation of ~~their~~her plans. Family members, friends, and community members who observed ~~the Shooter's~~Van Rootselaar's extensive use of ChatGPT would have understood the specific danger the product posed and taken ~~preventative~~preventive steps~~—~~, such as restricting access, seeking mental health intervention, or alerting authorities~~—~~, before the attack occurred. By failing to warn, OpenAI deprived every potential intervening actor of the information necessary to prevent the harm.

~~193.~~304. Plaintiff was harmed as a result of foreseeable use of ~~GPT-4o~~ChatGPT.

~~194.~~305. The failure to warn was a substantial factor in causing the Tumbler Ridge attack and the deaths and injuries that resulted. As a direct and proximate result of the Defendants' failure to warn, Plaintiff was injured as described above, including life-altering psychological injury and severe emotional distress.

~~195.~~306. Accordingly, Plaintiff seeks all damages recoverable under California law, including punitive damages, in amounts to be determined at trial.

**NINTH CAUSE OF ACTION**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(Against All Defendants)**

~~196.~~307. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

~~197.~~308. Defendants owed duties directly to Plaintiff. Those duties were imposed as a matter of law or arose from ~~preexisting~~pre-existing relationships. Defendants had a duty of reasonable care to avoid creating unreasonable risks of physical and emotional harm to foreseeable victims, including children and adults who, by virtue of Defendants' negligent design, deployment, and operation of ~~GPT-4o~~ChatGPT, were placed in the zone of physical danger created by users known to Defendants to be planning real-world violence. They also had a duty not to aid, abet, advise, or encourage ~~the Shooter~~Van Rootselaar in carrying out the attack against Plaintiff under California law, including California Penal Code section 31. Their duties heightened once Defendants identified ~~the Shooter~~Van Rootselaar as a specific, known high-risk user who posed a foreseeable threat of physical harm to third parties. Defendants owed these duties whether ~~GPT-4o~~ChatGPT is classified as a product, service, or neither.

~~198.~~309. Under California law, a defendant who negligently causes a plaintiff to be placed within the zone of physical danger of imminent serious bodily injury is liable for the resulting serious emotional distress, where the defendant's negligence directly exposed the plaintiff to the threat of serious physical injury, and the plaintiff suffered serious emotional distress as a result.

~~199.~~310. Plaintiff was a direct victim of Defendants' negligence. Defendants knew, before February 10, 2026, that ~~the Shooter~~Van Rootselaar was using ~~GPT-4o~~ChatGPT to plan an

act of mass violence against members of the public—, including, foreseeably, students and teachers at the school the ShooterVan Rootselaar would attack. Defendants' own automated systems had flagged the Shooter'sVan Rootselaar's account for gun violence activity and planning. Defendants' own trained safety team had reviewed the Shooter'sVan Rootselaar's conversations and concluded that the Shootershe posed a credible and specific threat of serious physical harm to real people. Defendants nonetheless declined to warn law enforcement, declined to ban the ShooterVan Rootselaar from the platform, and affirmatively facilitated the Shooter's returnleft her with access to GPT-4oChatGPT through a newher second account, [redacted] the Shooter [redacted]. Defendants therefore breached their duties to Plaintiff.

200.311. As a direct and proximate result of Defendants' negligence, Deidre Rushlow was placed in the zone of physical danger created by the Shooter'sVan Rootselaar's attack on Tumbler Ridge Secondary School. On February 10, 2026, while Deidre was in her grade 7 classroom with her students—including her nephew Eko—the ShooterVan Rootselaar reached the classroom and fired four shotgun blasts through her front door and three more through her back door. The bullets struck the wall behind her students' heads. Earlier that period, Deidre had sent the rest of her class to the library with an educational assistant—the very library where the ShooterVan Rootselaar would, minutes later, kill several of those children and the assistant herself. She tried to call the library and texted the assistant during the attack to check on them; she received no response. Throughout the attack, Deidre was at risk of physical injury, in immediate, contemporaneous, and continuous fear for her own life and the lives of her students, and aware that the ShooterVan Rootselaar was actively attempting to kill her, the students in her classroom, and the students she had sent to the library.

201.312. Plaintiff has suffered, and continues to suffer, severe and serious emotional distress as a direct and proximate result of Defendants' negligence, including but not limited to acute psychological trauma, persistent fear, sleep disturbances, intrusive recollections, and other ongoing and permanent psychological injuries. Plaintiff's emotional distress is severe, disabling, and of a kind that no reasonable person could be expected to endure.

202.313. Defendants' breach of their duty of care was a substantial factor in causing the serious emotional distress suffered by Plaintiff. The harm Plaintiff suffered was foreseeable to Defendants at the time they declined to warn law enforcement, declined to ban the ShooterVan Rootselaar, and allowed the Shooterher to retain access to GPT-4oChatGPT. Defendants knew or should have known that the ShooterVan Rootselaar was planning to inflict mass violence on identifiable third parties, and that any person within the zone of that violence would suffer severe emotional distress as a direct and foreseeable consequence.

203.314. Accordingly, Plaintiff seeks all damages recoverable under California law, including punitive damages, in amounts to be proven at trial, together with interest, costs, and such further relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants Samuel Altman, OpenAI Foundation, OpenAI Group PBC, and OpenAI OpCo, LLC, jointly and severally, as follows:

1. For all damages recoverable by Plaintiff, including compensatory damages for physical injury, emotional distress, psychological harm, and all other damages proven at trial;

2. For punitive damages as permitted by law;

3. For injunctive relief requiring Defendants to: (a) ban users whose accounts have been deactivated for violent misuse from re-registering for ChatGPT, including through alternative email addresses or sub-addresses; (b) flag existing and new accounts linked to previously deactivated violent-risk users and hold them for human review before granting access; (c) notify law enforcement when internal safety systems or personnel identify a user who poses a real-world risk of violence; (d) interrupt, terminate, or escalate conversations involving repeated or escalating violent ideation toward real people, and suspend automated engagement pending that review; (e) warn users and the public that ChatGPT's design features can reinforce and escalate violent ideation; (f) preserve prior safety flags, policy violations, and risk classifications, and prohibit reversing them without documented review; and (g) submit to independent monitoring and periodic compliance audits;

4. For prejudgment interest as permitted by law;

5. For costs and expenses to the extent authorized by statute, contract, or other law;

6. For reasonable attorneys' fees as permitted by law, including under Code of Civil Procedure section 1021.5; and

7. For such other and further relief as the Court deems just and proper.

**JURY TRIAL**

Plaintiff demands a trial by jury for all issues so triable.

**CANADIAN COUNSEL**

To the extent resolution of this matter raises issues of Canadian law, assistance will be provided by Plaintiff's Canadian counsel:

John M. Rice
jrice@rplelaw.com
Mallory K. Hogan
mhogan@rplelaw.com
RICE PARSONS LEONI & ELLIOTT LLP
980 Howe Street, Suite 820
Vancouver, British Columbia V6Z 0C8
Canada

Respectfully submitted,

**DEIDRE RUSHLOW,**

Dated: ~~September 2~~October 29, 2026 /s/ ~~*Brandt Silverkorn*~~*Rafey Balabanian*

Jay Edelson (*pro hac vice* admission to be sought)
jedelson@edelson.com
Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com
~~Ari Scharg (*pro hac vice* admission to be sought)~~
~~ascharg@edelson.com~~
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370

Todd Logan (SBN 305912)
tlogan@edelson.com
Brandt Silverkorn (SBN 323530)
bsilverkorn@edelson.com
Aaron Lawson (SBN 319306)
alawson@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300

*Attorneys for Plaintiff*